**In the United States District Court**
**Southern District of West Virginia**
**Division 3**

|  |  |  |
|---|---|---|
| **MARY DURSTEIN**, | ( | |
| | ( | Case no.  3:19-cv-00029 |
| 2960 3rd Ave. | ( | |
| Huntington, W.Va. 25702 | ( | Judge |
| Plaintiff, | ( | |
| | ( | |
| | ( | **Complaint for damages and** |
| v. | ( | **declaratory relief** |
| | ( | |
| **TODD ALEXANDER** (in his personal | ( | (jury trial demanded) |
| capacity only)**,** | ( | |
| | ( | |
| 104 Orchard Rd. | ( | |
| Barboursville, (Cabell County) W.Va. | ( | |
| 25504, (for damages), | ( | |
| | ( | |
| | ( | |
| **BOARD OF EDUCATION**, Cabell | ( | |
| County Schools, | ( | |
| | ( | |
| 2850 5th Ave. | ( | |
| Huntington, W.Va. 25702, | ( | |
| (for damages)**,** | ( | |
| | ( | |
| | ( | |
| **STATE SUPERINTENDENT OF** | ( | |
| **SCHOOLS**, West Virginia Dept. of | ( | |
| Education (in his official capacity only)**,** | ( | |
| | ( | |
| 1900 Kanawha Blvd., East, Bldg. 6 | ( | |
| Charleston, W.Va. 25305 | ( | |
| (for declaratory relief only), | ( | |
| Defendants. | ( | |

Plaintiff Mary Durstein for her Complaint hereby states and alleges as follows:

## Jurisdiction and Venue

1.     This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (redress deprivation under color of state law of federal constitutional right) and 28 U.S.C. §s 2201 and 2202 (declaratory judgment).

2.     Venue is proper in this district under 28 U.S.C. § 1391 as all defendants reside within this district and because a substantial part of the events giving rise to the plaintiff's claims occurred in this district.

## Parties

3.     Plaintiff Mary Durstein resides in Huntington, West Virginia.

4.     Plaintiff Durstein holds Permanent Professional Teaching Certificates issued by the West Virginia Department of Education in social studies, multi-subjects, and journalism. Defendant Board of Education, Cabell County Schools, employed Durstein as a full-time teacher from November, 2001 until defendant Board of Education terminated her employment by vote taken on March 6, 2017.

5.     During the 2016-2017 school year, Durstein taught world history, called World Studies, at Huntington High School.

6.     Defendant Todd Alexander resides in Barboursville in Cabell County, West Virginia, and is named in this complaint only in his personal capacity (not his official

capacity). During 2017, defendant Board of Education of Cabell County Schools employed him as Assistant Superintendent specifically for leadership and administrative services. His responsibilities included administering personnel issues with teachers.

7.      Defendant Board of Education, Cabell County Schools, supervises and controls the Cabell County school district, and is composed of five members elected to four-year terms by the voters of Cabell County. W.Va. Code, §s 18-5-1, 18-5-1b.

8.      Defendant State Superintendent of Schools is an office of the West Virginia Department of Education. Steven L. Paine, Ed.D. currently holds that position. Among the statutorily-prescribed duties of the State Superintendent of Schools is to revoke the teaching certificate of any teacher for any of the causes specified by state law, W.Va. Code § 18A-3-6. One such cause is for "immorality."

9.      Defendant State Superintendent of Schools is named in this complaint only in its official capacity, and this complaint seeks only declaratory relief as to this defendant.

## Background averments

### Twitter

10.     Twitter is a San Francisco-based online service that began in 2006 and is among many online services  popularly known as "social media." People—"users"— join Twitter by opening a free online account and selecting a Twitter user name. Registered users post short messages called "tweets," which Twitter restricted to 140

characters until November, 2017, when Twitter expanded the restriction to 280 characters.

11.     Registered Twitter users typically choose to subscribe to—"follow"—the tweets of other registered Twitter users. Twitter has customs of etiquette. When people follow you, you customarily follow them back. Registered users can forward each other's tweets to other registered users—called "retweets."

12.     Using Twitter is recreational and sometimes called "microblogging" as registered users send informal comments about politics, art, news, and other topics that interest them. Tweets can include photos and videos as well as words. Rhetorical hyperbole is conventional on Twitter.

13.     Only people registered with Twitter can send tweets and retweets. People who aren't registered can log onto Twitter's website, type in key words using Twitter's search tool, and read tweets that show up in the search results. But they cannot tweet or retweet through Twitter's online service.

14.     The tweets that will show up in results of word searches performed on Twitter's website will be those of registered Twitter users who did not exercise the option to "protect" their tweets. You "protect" your tweets through your account settings on the Twitter website. If you select that option, your followers can see your tweets, but your tweets will not be visible to someone else who performs a key word search on the Twitter website.

15.     Twitter cautions that, even if you "protect" your tweets, your followers may nonetheless capture images of your tweets and share them with people outside the scope of your protection.

16.     Twitter's default setting is that registered users' accounts are not "protected."

**Mary Durstein—registered Twitter user**

17.     In 2008 plaintiff Durstein became a registered Twitter user. She left intact Twitter's default setting—so her account was not "protected."

18.     She posted an estimated hundreds of tweets and retweets about politics and a variety of other topics. Over time, she accumulated 20 to 30 followers. None of her followers claimed to be a current educator within Cabell County Schools or a current student at Cabell County Schools or a family member of an educator or student at Cabell County Schools.

19.     Durstein and her followers tended to have in common that they liked the politically conservative rhetoric and other expression of Fox News commentators, and they liked to interact on Twitter about it or in response to it.

20.     Durstein tweeted and retweeted while at home and elsewhere—only when she was not on duty as a teacher. When tweeting and retweeting, Durstein used only electronic devices or computer equipment that she owned.

**The events of January 9, 2017**

21.     At about midday on Monday, January 9, 2017, Durstein was summoned to leave the homeroom class where she was in charge of the students there, and go to the office of the principal of Huntington High School, Jody Cunningham.

22.     When she arrived in the principal's office, defendant Alexander was there and Cunningham was sitting behind his desk.

23.     At that time, Durstein was not aware that a female journalism student at Marshall University—Karima Neghmouche—who was social media editor of the college newspaper, had collected several tweets that Durstein had posted intermittently over the past 18 months. Hours earlier, Neghmouche or a friend of hers had notified Cabell County Schools and local news organizations of those tweets.

24.     Alexander showed Durstein three tweets. Two were on the same Saturday during the summer 18 months before, a copy of which are **Exhibits 1 and 2** to this complaint. The other was dated on Saturday of Memorial Day weekend the year before (2016) a copy of which is **Exhibit 3** to this complaint.

25.     In **Exhibit 1**, on Saturday, July 16, 2015, Durstein retweeted a tweet from conservative television commentator Ann Coulter, saying "Deport Them." Below those words is a photograph of two men and several women posing to the camera, some of whom are wearing hajibs. One of the men was reported to be Mohammad

Youssuf Abdulazeez, who shot and killed two U.S. Marines at a recruitment center in Chattanooga, Tennessee the day before, and 30 minutes later shot and killed two more Marines and a U.S. Navy sailor at a nearby U.S. Navy Reserve center.

26.     In **Exhibit 2**, also on Saturday, July 16, 2015, Durstein tweeted a response to something expressed on Fox News commentator Eric Bolling's *Cashin' In* television program. The program allowed TV viewers to interact with Bolling and each other. Durstein's response to someone's remark:  "@ericbolling #cashinin #WakeUpAmerica #viewcrew  Who cares if we offend Muslims at least they keep their heads on tact. They're the enemy!" That tweet did not appear on the show (wasn't shown on the TV screen). Less than three weeks before, an Islamist terrorist in France decapitated his employer and drove his van into a gas factory near Lyon, causing an explosion with resulting injuries. It was one of several attacks on June 26, 2015, dubbed "Bloody Friday" and called the 2015 Ramadan attacks.

27.     In **Exhibit 3**, on the Saturday of Memorial Day weekend in 2016 (5-28-16), Durstein responded to a "meme." A meme is a word, phrase, but more often a visual image, that conveys a simple, catchy message or idea—often with a pop culture reference—and spreads virally over the internet over a brief span of time. Many are captioned visual images meant to be funny or as parody, and they tend to gather comments as they propagate.

28.     **Exhibit 3** shows two captioned photos, one on top of the other. The top photo shows President Obama when he visited Hiroshima, Japan, that Memorial Day

weekend and describes him as "apologizing." The photo underneath that shows the USS Arizona Memorial at Pearl Harbor, where Japanese bombers sunk the USS Arizona battleship when they attacked Pearl Harbor in 1941. Referring to President Obama, the meme's caption says "This is where you belong you Muslim douchebag." Durstein responded:  "Exactly !!!!!!!!!"

29.     After Durstein acknowledged that those tweets were from her Twitter account, defendant Alexander told her to terminate her Twitter account "now."  Three times in the space of probably less than two minutes, Alexander commanded verbatim or in substance, "Shut it down now."

30.     When Durstein said that she didn't know how to shut down her account, Alexander replied verbatim or in substance, "This needs to be shut down now."

31.     They then enlisted the help of a school employee in an adjacent space outside the principal's office, who explained how to shut down the account. The principal told Durstein to sit at his desk and use his PC there to shut down her Twitter account.

32.     With defendant Alexander standing directly behind Durstein as she sat in the principal's chair, Durstein logged into her Twitter account with her username and password and followed the steps to terminate it. Alexander continued to stand behind her, watching what Durstein was doing until after she said that she had succeeded in deactivating her account.

33.     Durstein then returned to where she had been sitting before, the principal returned to his desk, and Alexander told her in substance that a lot of news media are energized about the tweets and instructed her verbatim or in substance:  "You're not to speak to the media."

34.     Then Alexander told her to gather her things because "you're on administrative leave with pay."

35.     Alexander did not mention to Durstein that the school district's Director of Communications was granting press interviews about the Durstein matter throughout the day, including an in-person on-camera interview with WSAZ-TV in the director's office. A transcript of WSAZ-TV's broadcast that day of part of that interview is **Exhibit 4** to this complaint, and a transcript of a follow-up WSAZ-TV broadcast on the same day is **Exhibit 5** to this complaint. A copy of an article in the online Charleston Gazette-Mail published that day is **Exhibit 6** to this complaint and can be found online at:

https://www.wvgazettemail.com/news/education/cabell-school-system-investigating-teacher-s-anti-muslim-tweets/article_916ef170-f2ac-5239-a14d-fc67029df63d.html

A copy of an article in the online Huntington Herald-Dispatch published that day is **Exhibit 7** to this complaint and can be found at:

https://www.herald-dispatch.com/_recent_news/huntington-high-teacher-suspended-over-racially-charged-tweets/article_521e364c-d6b2-11e6-902e-d34378e0e25e.html

A copy of an article in the online Huntington Herald-Dispatch published the next day (January 10, 2017) is **Exhibit 8** to this complaint and can be found at:

https://www.herald-dispatch.com/news/tweets-get-huntington-teacher-suspended/article_6b256161-7c9f-5816-8043-47ae9ef0228d.html

36.     Alexander also did not mention to Durstein that the Superintendent of Cabell County Schools also interviewed with the press about the Durstein matter, see Exhibits 7 and 8 to this complaint.

37.     Some of the remarks about Durstein attributed by news reports to the Superintendent and to the Director of Communications were harsh enough—overtly and by implication—that any reasonable person in Durstein's circumstances would feel compelled to publicly respond to protect reputation and esteem. But Durstein, a former journalist, complied with Alexander's demand and did not speak to any news organizations about the matter.

**Suspension without pay and termination of Durstein**

38.     On Tuesday, January 24, 2017, the Superintendent of Cabell County Schools issued a letter to Durstein suspending her without pay. The letter cited the same tweets that defendant Alexander had shown Durstein on January 9, but added two tweets that Alexander had not mentioned. Copies of the two added tweets are **Exhibits 9** and **10** to this complaint, and a copy of the suspension letter is **Exhibit 11** to this complaint.

39.     **Exhibit 9** is a tweet sent by Durstein on December 29, 2016, during the school district's winter break. It interacts with other Twitter users who were commenting in response to a Fox News.com report that the New York City police department would allow Sikh officers to wear turbans and beards while on duty. A Twitter user said: "It's funny how suburban white moms feel so persecuted by the obama administration." Durstein replied:  "That is true, no more political correctness after 1/20. Can't wait. Finally liberated." "1/20" referred to Donald Trump's inauguration as President of the United States.

40.     **Exhibit 10** is a meme that Durstein did not create. She retweeted it at night with the remark "Too funny not to tweet!" The meme shows a man and a woman, who is wearing a hajib that fully covers her head and face. The caption:  "Islamist advantage:  When you divorce your wife and remarry, you can still keep the same photo on your desk."

41.     On Monday, March 6, 2017, defendant Board of Education of Cabell County Schools held an evidentiary hearing on whether to terminate its employment of Durstein. The hearing ended with the Board voting to terminate Durstein's employment effective that night. All five board members attended. One abstained. One voted in Durstein's favor. The remaining three members voted to terminate her. A copy of the letter, dated March 7, 2017, notifying Durstein of her termination is **Exhibit 12** to the complaint.

42.     Durstein appealed her termination to the West Virginia Education and State Grievance Board, which upheld the termination on September 22, 2017.

**Crux of Durstein's record with Cabell County Schools**

43.     Until the morning of January 9, 2017, Durstein's tweets and retweets were a matter of practical obscurity despite their status as "unprotected" on Twitter. If any teacher or student at the school had come across any of those tweets or retweets before January 9, 2017, there was no resulting impact on the educational environment at the school.

44.     Cabell County school administration had never issued any discipline of Durstein, who was nominated to be Teacher of the Year at Huntington High School in 2015. Her record and evaluations as a teacher and school employee had been exemplary, and she repeatedly exhibited an unusual willingness to aid and respect students and others of all religious creeds, sexual orientations, races, and national origins.

45.     The Superintendent of Cabell County Schools, who suspended her and recommended her termination, testified in substance that he had not reviewed any evaluations of her teaching performance; had no evidence that Durstein had exhibited any prejudice or bigotry in performing her teaching in 17 years with the school district; and had no evidence that her off-duty Twitter comments had interfered with the educational process in any way.

**Defendant State Superintendent of Schools opens investigation of whether to revoke Durstein's West Virginia teaching certificates based on the tweets**

46.     By letter dated on Monday, December 11, 2017, Durstein received notice from defendant State Superintendent of Schools that it is investigating whether to revoke her West Virginia teaching certificates based on the tweets that led to her termination. A copy of that letter is **Exhibit 13** to this complaint.

47.     The letter advises that there is no timetable for completing the investigation, and that "at the conclusion of the investigation, we will advise you in writing whether" the Superintendent "will take further action." As of the date of filing this complaint, Durstein has received no such writing.

48.     The letter further advises that the Superintendent will be determining whether a hearing is warranted under West Virginia Code § 18A-3-6 for "immorality." The "immorality" would have to have a rational nexus to Durstein's teaching responsibility.

## Count 1

### (vs. defendant Alexander in his personal capacity under 42 U.S.C. § 1983)

49.     The First Amendment protects the freedom to speak one's mind as an aspect of individual liberty—and thus a good unto itself—but also as essential to the vitality of society as a whole.

50.     As do all citizens, Durstein enjoys a First Amendment right to access Twitter to express herself and to expose herself to the expression of other registered Twitter users.

51.     That First Amendment right includes the right to maintain and access tweets and retweets that she saved on her Twitter account, to retweet those messages at some future time at her discretion, and to allow others—registered and unregistered users of Twitter—to read those tweets and retweets by Durstein that happen to appear in search results conducted on Twitter.

52.     West Virginia law bars an employer from requesting, requiring, or coercing an employee to disclose an employee's authentication information to gain access to a personal social media account, such as a personal Twitter account. It also bars an employer from requesting, requiring, or coercing an employee to access the employee's personal social media account in the presence of the employer. W.Va. Code § 21-5H-1(a).

53.     Defendant Alexander had no authority under West Virginia law to request, require, or coerce Durstein to "shut down" her personal Twitter account as he did on January 9, 2017.

54.     In requesting, requiring, and coercing Durstein to shut down her personal Twitter account in his presence and in the principal's presence in the principal's office at Huntington High School on January 9, 2017, Alexander acted under color of

state law, exercising his purported authority as the Assistant Superintendent of Schools.

55.     Alexander's coerced termination of Durstein's Twitter account violated Durstein's right of free speech under the First Amendment as applied to the states under the Fourteenth Amendment.

56.     Alexander's coerced termination of Durstein's Twitter account directly and proximately caused Durstein to suffer emotional distress mental anguish, embarrassment, humiliation, loss of a pleasurable value of her life, and injury to her reputation which has persisted and is likely to persist indefinitely.

57.     When Alexander coerced Durstein to terminate her personal Twitter account in his and the principal's presence, Alexander knew that the First Amendment generally applied to expression via social media and proceeded with the oppressive conduct of coercing Durstein to shut down her personal Twitter account in the face of a perceived risk that he was violating her First Amendment rights or with reckless indifference to whether his coercion was violating her rights.

58.     Alexander therefore is personally liable to Durstein under 42 U.S.C. § 1983 because he acted under color of state law to deprive her of rights secured by the First Amendment as applied to the states by the Fourteenth Amendment, causing her injury for which Alexander must pay both compensatory and punitive damages.

59.     For count 1, Durstein therefore seeks from defendant Alexander compensatory damages in excess of $100,000, punitive damages in excess of $100,000, costs, an award of attorneys' fees under 42 U.S.C. § 1988 to the extent that she qualifies as a "prevailing party" through either a judgment or settlement, and all other relief to which Durstein is entitled.

### Count 2

### (vs. defendant Board of Education, Cabell County Schools under 42 U.S.C. § 1983)

60.     The high-ranking officials acting on behalf of defendant Board of Education of Cabell County Schools have developed a custom of coercing educators in the Board's employ to terminate their personal social media accounts when those officials have disapproved of the content of expression using those personal accounts as warranting that remedy.

61.     Before the Durstein matter arose, a guidance counselor at Huntington High School used her personal Twitter account to send tweets that the high school principal interpreted as "gay bashing." Working in conjunction with defendant Alexander, the principal (now an administrator) coerced the guidance counselor to shut down her personal Twitter account.

62.     Through testimony before it in the Durstein matter and otherwise, the defendant Board of Education has been aware of the custom described in the preceding paragraphs, has not objected to it, has acquiesced in it or condoned it, and

therefore adopted and ratified that custom as an appropriate remedy to combat uses of educators' personal social media accounts of which the defendant Board or its high-ranking administrators acting on the Board's behalf disapprove.

63.     As illustrated by W.Va. Code § 21-5H-1(a), defendant Board of Education has no authority under state law to request, require, or coerce an educator whom it employs to terminate the educator's personal social media account.

64.     Acting in accord with the unlawful custom that the Board of Education has ratified and adopted, Alexander's coerced termination of Durstein's Twitter account violated Durstein's right of free speech under the First Amendment. The Board's custom ,therefore, has violated Durstein's right of free speech under the First Amendment.

65.     Alexander's coerced termination of Durstein's Twitter account directly and proximately caused Durstein to suffer emotional distress mental anguish, embarrassment, humiliation, loss of a pleasurable value of her life, and injury to her reputation which has persisted and is likely to persist indefinitely.

66.     Defendant Board of Education, therefore, is liable to Durstein under 42 U.S.C. § 1983 as the unlawful custom that it has ratified and adopted—acting under color of state law through its purported authority under state law—deprived Durstein of rights secured by the First Amendment, causing her injury for which Alexander must pay compensatory damages.

67.     For count 2, Durstein therefore seeks from defendant Board of Education, Cabell County Schools compensatory damages in excess of $100,000, costs, and an award of attorneys' fees under 42 U.S.C. § 1988 to the extent that she qualifies as a "prevailing party" through either a judgment or settlement, and all other relief to which Durstein is entitled.

## Count 3

### (vs. defendant Alexander in his personal capacity under 42 U.S.C. § 1983)

68.     When defendant Alexander instructed Durstein not to talk to the press on January 9, 2017, he acted under color of state law, exercising his purported authority as the Assistant Superintendent of Schools.

69.     He issued that command knowing that school administrators were giving interviews to the press about Durstein, characterizing the content of her tweets, and otherwise conveying information shown in Exhibits 4, 5, 6, 7, and 8 to this complaint, which disparaged Durstein overtly and by implication and places her before the public in a light that would be objectionable or highly offensive to many people.

70.     Alexander therefore knew, or was purposefully indifferent to, the fact that—if Durstein obeyed his directive—Durstein would be unable to defend herself publicly by countering statements made to the press on behalf of the school district—at a time when the accusations against her were attracting intense and widespread public attention.

71.     Durstein obeyed Alexander's directive because she understood that failing to do so would result in Alexander using his authority as Assistant Superintendent to cause her to suffer injury to her employment as a teacher and potentially employability as a teacher.

72.     Alexander's coercion of Durstein's silence under the circumstances summarized in this complaint violated Durstein's right of free speech under the First Amendment.

73.     Alexander's coercion of Durstein's silence directly and proximately caused Durstein to lose the most potent opportunity to defend herself publicly, and to suffer emotional distress mental anguish, embarrassment, humiliation, loss of a pleasurable value of her life, and injury to her reputation which has persisted and is likely to persist indefinitely.

74.     When Alexander coerced Durstein not to defend herself in the press, Alexander knew that Durstein had a First Amendment right to defend herself by giving interviews to the press. But he proceeded with his oppressive command in the face of a perceived risk that he was violating her First Amendment rights or with reckless indifference to whether his coercion was violating her rights.

75.     Alexander therefore is personally liable to Durstein under 42 U.S.C. § 1983 because he acted under color of state law to deprive her of rights secured by the First Amendment, causing her injury for which Alexander must pay both compensatory and punitive damages.

For count 3, Durstein therefore seeks from defendant Alexander compensatory damages in excess of $100,000, punitive damages in excess of $100,000, costs, an award of attorneys' fees under 42 U.S.C. § 1988 to the extent that she qualifies as a "prevailing party" through either a judgment or settlement, and all other relief to which Durstein is entitled.

## Count 4

### (vs. defendant State Superintendent in his official capacity only under 42 U.S.C. § 1983 for declaratory relief only)

76.     The tweets by Durstein that are the subject of defendant State Superintendent's investigation as asserted in his letter of December 11, 2017 (Exhibit 13 to this complaint) are communications protected by the First Amendment and address matters that qualify as those of public interest and concern.

77.     Through that letter, defendant State Superintendent asserts that he may conclude that Durstein's tweets qualify as "immorality" under West Virginia Code § 18A-3-6, which could result in the defendant convening a hearing to decide whether to revoke or suspend Durstein's West Virginia teaching certificates.

78.     Revoking Durstein's certificates would impose a professional death penalty upon Durstein based on the content of speech on her personal Twitter account using devices she owned, while off-duty, and while school was not even in session. And it would likely lead to other states refusing to grant teaching certification to her. Indeed, the State of Kentucky has refused to grant teaching certification to Durstein,

and the State of Ohio is investigating her tweets, as that state has certified Durstein to teach there.

79.     For count 4, Durstein seeks a declaratory judgment that the First Amendment bars  defendant State Superintendent from revoking or suspending her teaching certificates based on the content of her tweets.

80.     For count 4, Durstein also seeks a declaratory judgment that the First Amendment bars defendant State Superintendent from applying the "immorality" provision of W.Va. Code § 18A-3-6 to her tweets as a ground for revoking or suspending her teaching certificates.

81.     For count 4, Durstein also seeks costs, an award of attorneys' fees under 42 U.S.C. § 1988 to the extent that she qualifies as a "prevailing party" through either a judgment or settlement, and all other nonmonetary relief from defendant State Superintendent to which Durstein is entitled. If the Court determines that sovereign immunity would bar a full award of attorneys' fees, Durstein seeks attorneys' fees in the largest amount covered by any applicable insurance policy covering Durstein's prayer for attorneys' fees.

Respectfully presented,


/s Michael S. Bailey
W.Va. Bar No. 8507
Michael S. Bailey
BAILEY LEGAL SERVICES PLLC
642 Main Street, Suite 201
P.O. Box 347
Barboursville, WV  25504
Tel:  304.736.0801
Fax: 304.736.0805
Email:  mbailey@baileylegalservices.com
Counsel for Mary Durstein

and

/s David Marburger
David Marburger
MARBURGER LAW LLC
14700 Detroit Avenue, Suite One
Cleveland, OH  44107
Tel:  216.930.0500
Email:  david@marburger-law.com
Of Counsel for Mary Durstein*

* Application for admission as Visiting Attorney being prepared.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.


/s Michael S. Bailey
W.Va. Bar No. 8507
Michael S. Bailey
BAILEY LEGAL SERVICES PLLC
642 Main Street, Suite 201
P.O. Box 347
Barboursville, WV  25504
Tel:  304.736.0801
Fax: 304.736.0805
Email:  mbailey@baileylegalservices.com
Counsel for Mary Durstein

and

/s David Marburger
David Marburger
MARBURGER LAW LLC
14700 Detroit Avenue, Suite One
Cleveland, OH  44107
Tel:  216.930.0500
Email:  david@marburger-law.com
Of Counsel for Mary Durstein*

* Application for admission as Visiting Attorney being prepared.