IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

MARY DURSTEIN,

                Plaintiff,

v.                                 CIVIL ACTION NO.  3:19-0029

TODD ALEXANDER;
BOARD OF EDUCATION, CABELL COUNTY SCHOOLS;
STATE SUPERINTENDENT OF SCHOOLS, WEST VIRGINIA
DEPARTMENT OF EDUCATION,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending are motions to dismiss by defendants Todd Alexander, the Board of Education of
Cabell County Schools, and the State Superintendent of Schools of the West Virginia Department
of Education. ECF Nos. 28, 26, 24. For the reasons below, the Court **DENIES** Defendant Todd
Alexander's Motion to Dismiss Amended Complaint, ECF No. 28. The Court **GRANTS IN
PART** as to Count Two and **DENIES IN PART** as to Count Four Defendant Board of Education
Cabell County Schools' Motion to Dismiss Amended Complaint, ECF No. 26. Lastly, the Court
**GRANTS** State Superintendent of Schools' Motion to Dismiss Amended Complaint, ECF No. 24.

**I. BACKGOUND**

In her Amended Complaint, Mary Durstein alleges the following facts. ECF No. 20.
Durstein worked as a full-time teacher for Cabell County Schools from November 2001 until her
termination on March 6, 2017. *Id.* ¶ 4. During the 2016–2017 school year, Durstein taught World
Studies at Huntington High School. *Id.* ¶ 5. She operated a Twitter account viewable by the public

and often posted about political issues. *Id.* ¶ 17–18. A journalism student at Marshall University gathered several of Durstein's tweets, and the student or a friend of the student shared the tweets with Cabell County Schools and local news organizations. *Id.* ¶ 23.

On January 9, 2017, Huntington High School Principal Jody Cunningham called Durstein into his office to meet with him and Todd Alexander, an assistant superintendent for Cabell County Schools. *Id.* ¶ 21–22, 6. At this meeting, Alexander and Cunningham discussed three of Durstein's tweets with her. *Id.* ¶ 24. The first, posted on July 16, 2015, is a retweet of conservative commentator Ann Coulter containing a photograph of two men and five women, some of whom are wearing hijabs. *Id.* ¶ 25; ECF No. 20-1. One of the men in the photo is Mohammad Youssuf Abdulazeez, who had opened fire on two military installations in Tennessee. ECF No. 20 ¶ 25. A caption above the photo reads "Deport them." ECF No. 20-1. The second tweet, also from July 16, 2015, states "Who cares if we offend Muslims at least they keep their heads on tact. They're the enemy!" ECF No. 20 ¶ 26; ECF No. 20-2. In the third tweet, posted on May 28, 2016, Durstein responds "Exactly !!!!!!!!!" to a meme calling President Barack Obama a "Muslim douchebag." ECF No. 20 ¶ 28; ECF No. 20-3.

After discussing these tweets, Alexander told Durstein three times to immediately shut down her Twitter account. ECF No. 20 ¶ 29. Cunningham told Durstein to sit at his desk and use his computer to shut down the account. *Id.* ¶ 31. Durstein did not know how to deactivate her account, so another school employee helped her shut it down while Alexander watched. *Id.* ¶ 31–32. Alexander then told Durstein "[y]ou're not to speak to the media" and placed her on administrative leave with pay. *Id.* ¶ 34–35.

On January 24, 2017, the Superintendent of Cabell County Schools suspended Durstein without pay. *Id.* ¶ 42. On March 6, 2017, the Board of Education of Cabell County Schools voted

to terminate Durstein. *Id.* ¶ 45; ECF No. 20-12. Durstein appealed, but the West Virginia Education and State Grievance Board upheld her termination on September 22, 2017. ECF No. 20 ¶ 46. On December 11, 2017, Durstein received notice that the State Superintendent of Schools was investigating whether to revoke her teaching certificates. *Id.* ¶ 50; ECF No. 20-13. As of the filing of her Amended Complaint, Durstein had not received a decision from this investigation. ECF No. 20 ¶ 51.

Durstein filed her Complaint on January 8, 2019, and her Amended Complaint on February 28, 2019. ECF Nos. 1, 20. The Amended Complaint includes five counts. Count One is a 42 U.S.C. § 1983 claim against Alexander for violating the First Amendment by coercing Durstein to terminate her Twitter account. ECF No. 20 ¶ 53–65. Count Two is a § 1983 claim against the Board of Education for its alleged custom of coercing employees to terminate their social media accounts. *Id.* ¶ 66–73. Count Three is a § 1983 claim against Alexander for violating the First Amendment by commanding Durstein not to speak to the press. *Id.* ¶ 74–82. Count Four is a § 1983 claim against the Board of Education for terminating Durstein's employment based on polices that violate the First Amendment. *Id.* ¶ 83–98. Count Five is a § 1983 claim seeking a declaratory judgment that the First Amendment bars the State Superintendent of Schools from revoking Durstein's teaching certificates based on her tweets. *Id.* ¶ 99–105.

## II. LEGAL STANDARD

To survive a motion to dismiss, a plaintiff's complaint must contain "a short and plain statement of the claim showing [the plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). The facts contained in the statement need not be probable, but the statement must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when "the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In considering the plausibility of a
plaintiff's claim, the Court must accept all factual allegations in the complaint as true. *Id.*

## III. DISCUSSION

### A. Claims Against Todd Alexander

#### 1. *Count One: Coercing Durstein to Terminate her Twitter Account*

Title 42 U.S.C. § 1983 subjects to civil liability anyone who, acting under color of state
law, deprives an individual of her constitutional or federal rights. Durstein alleges Alexander
violated the First Amendment by coercing her to terminate her personal Twitter account. ECF No.
20 ¶ 53–65. Alexander argues qualified immunity applies and that, even if qualified immunity does
not apply, the claim is not viable under the First Amendment. ECF Nos. 29, 50.

##### a. Qualified Immunity

Although qualified immunity is expansive, a government official "who performs an act
clearly established to be beyond the scope of his discretionary authority" is not entitled to a
qualified immunity defense. *In re Allen*, 106 F.3d 582, 593 (4th Cir. 1997). The issue is not whether
an official's actions were a proper or legal exercise of his discretionary authority. *Id.* at 594 ("If
these were the relevant inquiries, any illegal action would, by definition, fall outside the scope of
an official's authority.") (citation omitted). Rather, the Court must ask whether a reasonable official
in the defendant's position would have known that the conduct was clearly established to be
beyond the scope of his authority. *Id.* The Court determines the scope of an official's authority by
analyzing the statutes or regulations controlling the official's duties. *Id.* at 595 (citations omitted).
To gain qualified immunity, the defendant bears the burden of demonstrating his conduct falls
within the scope of his official duties. *Id.* at 594 (citations omitted).

Applying *Allen*, the relevant consideration here is not simply whether Alexander had authority to discipline employees for their out-of-work speech. This easily falls within Alexander's authority. *See, e.g.*, *Sims v. Metro. Dade Cty.*, 972 F.2d 1230, 1236 (11th Cir. 1992) (holding public employer acted within discretionary authority when disciplining employee for out-of-work statements). Instead, the issue is whether Alexander's authority included the ability to censure employees' social media accounts. Although Alexander bears the burden of showing this, he offered nothing helpful. *In re Allen*, 106 F.3d at 594. Alexander cites W. Va. Code § 21-5H-1(b)(4) as allowing an employer to require an employee to cooperate in an investigation, but Alexander omits the subsequent explanation narrowing this subsection to cases of employees improperly transferring employers' information. *See* ECF No. 50, at 3. Alexander also cites § 21-5H-1(c)(1) as precluding employer liability under the statute unless the employer accesses private information. *Id.* However, Alexander ignores that this subsection only applies to cases of employers inadvertently receiving employees' authentication information. Neither of these two cited subsections are relevant here.

Most glaringly, Alexander ignores that the cited statute expressly prohibits the conduct Alexander allegedly engaged in. Section 21-5H-1(a)(2) provides that an employer cannot "[r]equest, require or coerce an employee or a potential employee to access the employee or the potential employee's personal account in the presence of the employer . . . ." Section 21-5H-1(e) then defines "personal account" as "an account, service or profile on a social networking website that is used by an employee or potential employee for personal communications unrelated to any business purposes of the employer."

Although "public officials seldom use their offices to engage in conduct that is entirely beyond their discretionary authority," the Amended Complaint alleges conduct that West Virginia

law states is outside the authority of public employers. *In re Allen*, 106 F.3d at 594; *see Woods v. Town of Danville, W.V.*, 712 F. Supp. 2d 502, 509–10 (S.D.W. Va. 2010) (holding officer who drove outside of city limits in response to a call from a neighboring police department acted beyond the scope of his authority under West Virginia law). To be sure, § 21-5H-1(a)(2) alone does not preclude qualified immunity because a reasonable official in Alexander's position may not have known the alleged conduct was clearly established to be beyond the scope of his authority. *In re Allen*, 106 F.3d at 594. However, Alexander pointed to no statutes, manuals, directives, or other authorities that would suggest to Alexander that directly censoring employees' social media accounts was within his authority as an assistant superintendent. Therefore, the Court cannot dismiss Count One at this stage on qualified immunity grounds.

### b. The First Amendment

Alexander also argues the Court must dismiss Count One because Durstein's claim has no merit under the First Amendment. ECF No. 29, at 6–9. In cases involving the suppression of public employees' speech, courts apply the *Pickering* standard. *Pickering v. Board of Ed.*, 391 U.S. 563 (1968). The Court must first assess whether the employee spoke as a citizen (not pursuant to her official duties) on a matter of public concern. *Id.* at 568; *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Speech deals with matters of public concern when it relates "to any matter of political, social, or other concern to the community" or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations omitted). If the employee did speak as a citizen on a matter of public concern, the Court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

Here, Durstein did not speak pursuant to her official duties when she voiced her own opinions on her personal social media account while at home using her own electronic devices. ECF No. 20 ¶ 20. Furthermore, no serious argument can be made that Durstein's tweets were not related to matters of public concern. The three tweets discussed in the meeting with Alexander and Cunningham concerned the alleged culprit of two public shootings, immigration, relations between Muslims and non-Muslims, and the actions of President Obama. ECF Nos. 20-1, 20-2, 20-3. These are quintessentially "matter[s] of political, social, or other concern to the community." *Snyder*, 562 U.S. at 453. Durstein's tweets were also of obvious "legitimate news interest" because *WSAZ-TV*, *The Herald-Dispatch*, and *The Charleston Gazette-Mail* reported on them. *Id.*; ECF Nos. 4–8, 16. The controversial character of Durstein's speech is irrelevant to this determination. *See Rankin v. McPherson*, 483 U.S. 378, 387 (1987) ("The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.").

The Amended Complaint also implies deactivating Durstein's Twitter account did little to serve the orderly operation of the school. *See Pickering*, 391 U.S. at 568–69. Alexander argues Durstein's tweets disrupted the school's safe environment. ECF No. 29, at 8. But by the time Alexander allegedly coerced Durstein to shut down her Twitter, Durstein's tweets had already been saved and distributed to school administrators and news outlets. ECF No. 20 ¶ 23. Therefore, deactivating her account likely had little effect on the tweets' circulation and their damage to Cabell County Schools. Alexander claims generally that the tweets were disruptive, but he does not explain based on the alleged facts why deactivating the Twitter account—after the tweets became available off Twitter—was important for the school's orderly operation. ECF No. 29, at 8. Therefore, the Court finds Count One contains sufficient allegations to show a First Amendment violation.

2. *Count Three: Commanding Durstein Not to Speak to the Press*

Count Three is a § 1983 claim against Alexander for commanding Durstein not to speak to the press. ECF No. 20 ¶ 74–82. Alexander argues qualified immunity applies and that the claim is not viable under the First Amendment. ECF Nos. 29, 50.

*a. Qualified Immunity*

In contrast to Count One, Count Three involves a public employer's well-established authority to limit employees' speech, so qualified immunity applies. The first question under the qualified immunity analysis is whether "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the [official's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If no violation occurred, the analysis ends, and the plaintiff cannot prevail. *Id.* If the Court finds a violation may have occurred, the Court must consider whether the constitutional right was "clearly established," meaning "it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Id.* at 201–02 (citation omitted). The "clearly established" standard ensures officials are only liable "for transgressing bright lines" and not for "bad guesses in gray areas." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (citations omitted); *e.g. Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 909 (4th Cir. 2016) (holding police officers' use of stun gun violated the Fourth Amendment, but qualified immunity applied because the arrestee's right not to be tased was not clearly established).

Alexander's command that Durstein not speak to the press constituted a prior restraint. When a public employee challenges the constitutionality of a prior restraint, a modified *Pickering* standard that raises the government's burden applies.[1] *U.S. v. Nat'l Treasury Emps. Union*

_____

[1] Some courts restrict application of *NTEU* to broad statutory bans covering large groups

*(NTEU)*, 513 U.S. 454, 465–68 (1995). The Court first assesses whether the prior restraint restricted the employee from speaking as a citizen (not pursuant to her official duties) on matters of public concern. *Id.* at 466 (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)). If so, the government must demonstrate that "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Id.* at 468 (quoting *Pickering*, 391 U.S. at 571).

Alexander's prohibition undoubtedly covered Durstein's speech as a citizen on matters of public concern. *See Garcetti*, 547 U.S. at 418. Durstein's conduct ignited a controversy in the community. School officials, students, and journalists criticized Durstein in the media for her "lack of judgment," for setting a "very childish and elementary" example, and for making "racist" and "Islamophobic" statements. ECF Nos. 20-4, 20-6. Durstein desired, outside of her duties as a teacher, to defend her personal reputation against these criticisms and to explain her conduct. ECF No. 20 ¶ 41. Her response to the controversy was of "legitimate news interest" because journalists contacted her for a statement. *Snyder v. Phelps*, 562 U.S. 443, 453 (2011); ECF Nos. 20-6, 20-7, 20-8. However, the prior restraint kept Durstein from speaking to the press about her out-of-work conduct at the center of this controversy. ECF No. 20 ¶ 34.

---

of employees. *E.g. Baar v. Jefferson Cty. Bd. of Educ.*, 311 F. App'x 817, 821 (6th Cir. 2009) (holding *NTEU* was inapplicable because the restraint at issue was narrow, imposed on an individual employee, and imposed via a disciplinary action); *Belcher v. City of McAlester, Okla.*, 324 F.3d 1203, 1206 n.3 (10th Cir. 2003) (holding *NTEU* was inapplicable because the prior restraint was narrow and affected a small group of employees). The Court applies *NTEU* here based on *Mansoor v. Trank.* 319 F.3d 133 (4th Cir. 2003). The Fourth Circuit did not explicitly decide the applicability of *NTEU* to prior restraints on single employees because the defendant did not raise the issue. However, the Fourth Circuit did affirm the lower court's decision which applied *NTEU* to a restraint imposed on a single employee. *Mansoor v. County of Albemarle*, 189 F. Supp. 2d 426, 433–38 (W.D. Va. 2002).

As with deactivating Durstein's Twitter account, the Alleged Complaint implies that prohibiting Durstein from speaking to the press did little to serve the actual operation of the school. *See NTEU,* 513 U.S. at 468; *Pickering*, 391 U.S. at 568–69. Soon after learning of the tweets, Alexander placed Durstein on administrative leave, and school officials took to the media to condemn her conduct. ECF No. 20 ¶ 35–40. With these actions, Durstein no longer posed an obvious threat to students' health and safety. It is also not apparent how Durstein's comments to the press may have interfered with the school's ability to investigate and discipline her conduct. Prohibiting Durstein from speaking allowed the school to control the narrative in the media and usher Durstein quietly toward her termination, but these are scanty justifications for imposing a prior restraint on Durstein's speech. Therefore, the Court finds Durstein's Amended Complaint contains sufficient allegations of a constitutional violation to satisfy the first prong of the qualified immunity analysis.

For the second prong, the Court considers whether Durstein's constitutional right was clearly established at the time Alexander allegedly violated it. *Saucier*, 533 U.S. at 201. A right is clearly established when the contours of the right are sufficiently clear to ensure that a reasonable official would have understood that the alleged conduct was unlawful. *Wilson v. Prince George's Cnty., Md.*, 893 F.3d 213, 221 (4th Cir. 2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). To determine whether a right is clearly established, the Court examines whether the Supreme Court, the Fourth Circuit, or the Supreme Court of Appeals of West Virginia have decided the law. *Id.* (citation omitted). The inquiry is not whether these courts have decided the law based on identical facts. *Id*. Instead, the Court considers whether officials within its jurisdiction have been provided fair warning, with sufficient specificity, that the alleged conduct is unlawful. *Id.*

The First Amendment's intolerance of prior restraints is well-established, for "a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975). Accordingly, the Supreme Court has held any prior restraint bears "a heavy presumption against its constitutional validity." *Id.* at 558 (citations omitted). Although the government has greater freedom to censor public employees, *NTEU* set a high bar for prior restraints nearly twenty-five years ago. *NTEU*, 513 U.S. at 465. At least two Fourth Circuit cases have entrenched these principles in this jurisdiction. In *Mansoor v. Trank*, the court affirmed that a police department's prohibition on a single officer from making negative comments about police officials violated the First Amendment. 319 F.3d 133, 138–39 (4th Cir. 2003). And in *Liverman v. City of Petersburg*, the court affirmed that a police department's social networking policy prohibiting employees from criticizing the department also violated the First Amendment. 844 F.3d 400, 407–09 (4th Cir. 2016). In light of this precedent, the Court finds the Amended Complaint contains sufficient allegations to show the alleged constitutional violation was clearly established. The Court therefore **DENIES** Alexander's Motion.

## B. Claims Against the Board of Education

### 1. Count Two: Having a Custom of Coercing Employees to Terminate Social Media Accounts

Count Two is a § 1983 claim against the Board of Education for having a custom of coercing employees to terminate their social media accounts. ECF No. 20 ¶ 66–73. The Board argues the Court should dismiss Count Two because Durstein failed to comply with West Virginia's notice-of-claim law, state sovereign immunity applies, and the Amended Complaint is insufficient to support a reasonable inference of liability.

*a. West Virginia's Notice-of-Claim Law*

The Board of Education first argues the Court must dismiss Counts Two and Four because Durstein failed to provide pre-suit notice as required by W. Va. Code § 55-17-3. ECF No. 27, at 4–5. However, West Virginia's notice-of-claim law does not apply to suits filed in federal court because § 55-17-2 limits the law's application to actions filed "in a circuit court or in the supreme court of appeals." *Smith v. Allred*, No. 2:15-cv-06026, 2016 WL 3094008, at *7 (S.D.W. Va. June 1, 2016); *Singh v. Nerhood*, No. 3:11-CV-00701, 2012 WL 4464025, at *4 (S.D.W. Va. Sept. 26, 2012). The state's notice-of-claim law also does not apply to § 1983 actions. *Felder v. Casey*, 487 U.S. 131, 153 (1988); *Smith*, 2016 WL 3094008, at *8.

*b. State Sovereign Immunity*

The Board of Education next argues state sovereign immunity applies. ECF No. 27, at 5–7; ECF No. 52, at 1–2. The Eleventh Amendment immunizes nonconsenting states against suits for damages in federal court. *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 67 (1989). Section 1983 does not abrogate states' Eleventh Amendment immunity. *Id.* at 65. Immunity extends to state officials and "arm[s] of the State," but not to municipal corporations or similar political subdivisions. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). Thus, the issue here is whether the Board of Education "is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend." *Id.* at 280. To make this determination, courts look at the "nature of the entity created by state law." *Id.*

In *Cash v. Granville County School Board of Education*, the Fourth Circuit laid out the factors courts should consider in determining whether state entities are entitled to Eleventh Amendment immunity. 242 F.3d 219, 221, 223–24 (4th Cir. 2001) (holding North Carolina county

school board was more like a municipality than an arm of the state). The primary factor is whether a judgment against the governmental entity would be paid from the state's treasury. *Id*. at 223. Courts also consider: (1) the extent of the state's control over the entity; (2) "the scope of the entity's concerns—whether local or statewide—with which the entity is involved;" and (3) "the manner in which State law treats the entity." *Id*. at 224.

The Board of Education did not analyze any of these factors, let alone show they weigh in its favor. ECF No. 27, at 5–7; ECF No. 52, at 1–2. Instead of examining the Board's nature under West Virginia law as required, the Board only pointed to three misleading precedents to make its case. *Cullens v. Bemis* is irrelevant here because the Michigan Department of Education was at issue, not a county board of education. 979 F.2d 850 (6th Cir. 1992). *Burkey v. Marshall County Board of Education* is also irrelevant because the court based its conclusion that West Virginia county boards of education are entitled to Eleventh Amendment protection on a state court decision that was later overruled. 513 F. Supp. 1084, 1095 (N.D.W. Va. 1981); *Ohio Valley Contractors v. Bd. of Educ. of Wetzel Cnty.*, 293 S.E.2d 437, 438 (W.Va. 1982); *see also Workman v. Mingo Cnty. Schools*, 667 F. Supp. 2d 679, 685 n.8 (S.D.W. Va. 2009). The third case, *Workman v. Mingo County Schools*, did conclude the Mingo County Board of Education was entitled to Eleventh Amendment immunity. 667 F. Supp. 2d at 685–87. However, the court came to this conclusion only because the West Virginia Board of Education had taken control of the Mingo County school system. *Id.* "Generally speaking," remarked Judge Goodwin, "county boards of education in West Virginia are probably not entitled to Eleventh Amendment protection." *Id.* at 685. These cases do not support the Board of Education's defense, and the Board did not apply *Cash* to itself. *See* 242 F.3d at 221, 223–24. Therefore, the Court cannot dismiss Durstein's claims based on Eleventh Amendment immunity.

*c. Liability under* Monell

The Board's final argument is that the Amended Complaint is insufficient under the governing standard in *Monell v. Department of Social Services.* ECF No. 27, at 10–12; 436 U.S. 658 (1978). Under *Monell*, courts may hold a local government entity liable for the actions of its officers under 42 U.S.C. § 1983 only if the entity itself caused the deprivation of the plaintiff's rights. *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell*, 436 U.S. at 692). A plaintiff can prevail if she suffered a deprivation of her federal rights and the execution of the government's "policy or custom" inflicted the injury. *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). A local government entity can develop a policy or custom in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Id.* (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)).

The first theory is inapplicable here because Durstein does not allege the existence of an express policy. ECF No. 20 ¶ 66–73. The second theory is also inapplicable because Alexander did not have final policymaking authority. To determine who exercises final policymaking authority, the Court looks to state law. *Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 196 (4th Cir. 1994) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124–26 (1988)). Under W. Va. Code § 18-5-1, the final policy making authority for a school district resides with the five members of its county board of education. *Carr-Lambert v. Grant Cnty. Bd. of Educ.*, No. 2:09-cv-61, 2009 WL 1935929, at *3 (N.D.W. Va. July 2, 2009). Durstein does not allege Alexander was a member of the Board when he coerced Durstein to terminate her Twitter account.

Durstein argues the Board of Education is liable under the third theory because the Board did not object and therefore condoned Alexander's decision to deactivate Durstein's Twitter account. ECF No. 47, at 11. To prevail on this theory, Durstein "must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right *will follow* the decision." *Carter*, 164 F.3d at 218 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 411 (1997)) (emphasis added). She "must show actual or constructive knowledge of a risk of constitutional injury, deliberate indifference to that risk, and an affirmative causal link between the [Board's] inaction and the particular constitutional injury" she suffered. *Id.* at 221 (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

The only relevant portion of the Amended Complaint for this theory is paragraph sixty-eight, which states, "[t]hrough testimony before it in the Durstein matter and otherwise, the defendant Board of Education has been aware of the custom described in the preceding two paragraphs, has not objected to it, has acquiesced in or condoned it, and therefore adopted and ratified that custom . . . ." ECF No. 20 ¶ 68. This assertion is insufficient because Durstein does not allege a prior act of deliberate indifference by the Board that gave rise to the risk of Alexander deactivating her Twitter account. Durstein only alleges that the Board became aware of Alexander's deactivation of the account *after* it occurred through Durstein's subsequent testimony. The allegation that the Board "otherwise" had knowledge of the risk of the alleged injury is an empty assertion the Court disregards.

Lastly, Durstein argues the Board of Education is liable under the fourth theory because Alexander and a prior principal coerced a different employee to shut down her Twitter account before Durstein. ECF No. 47, at 11. To establish liability under this theory, Durstein must point to a "persistent and widespread practice" of which the "duration and frequency" indicate

policymakers had actual or constructive knowledge of the conduct and failed to correct it due to "deliberate indifference." *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 402 (4th Cir. 2014) (citation omitted). However, the Amended Complaint only alleges the Board gained knowledge of the two incidents from Durstein's testimony after Alexander shut down Durstein's Twitter account. ECF No. 20 ¶ 68. Durstein does not allege the Board had actual or constructive knowledge of the first incident before the second incident occurred.

Therefore, the Court finds Durstein did not plead sufficient factual content for the Court to draw the reasonable inference that the Board is liable under *Monell*, and the Court **GRANTS** the Board's Motion as to Count Two.

### 2. *Count Four: Terminating Durstein's Employment Based on Unlawful Employment Policies*

Count Four is a § 1983 claim against the Board of Education for terminating Durstein's employment based on three employment policies that violate the First Amendment. ECF No. 20 ¶ 83–98. In addition to the notice-of-claim and state sovereign immunity arguments already disposed of, the Board argues the Court should dismiss Count Four because the Amended Complaint does not adequately allege a First Amendment violation.

### a. As-Applied Challenge

In his letters imposing suspension and termination, the Superintendent of Cabell County Schools listed Durstein's violation of three different employment policies as the reason for discipline. ECF Nos. 20-11, 20-12. Durstein alleges these policies, as applied to her, violate the First Amendment because they deprived her of employment based on her protected speech. ECF No. 20 ¶ 91. Because Durstein challenges an ex post disciplinary action rather than an ex ante restraint on speech, the Court applies the *Pickering* standard. *Liverman v. City of Petersburg*, 844 F.3d 400, 409 (4th Cir. 2016). The Court first determines whether Durstein spoke as a citizen on

a matter of public concern. *Id.* The Court then evaluates whether Durstein's interest in First Amendment expression outweighs the Board's interest in the efficient operation of the workplace. *Id.* And because Durstein claims retaliatory discharge, the Court lastly decides whether her protected speech was a substantial factor in the Board's decision to terminate her. *Id.* (citing *McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998)).

The Court already determined in its discussion of Count One that Durstein's tweets addressed matters of public concern, and the Board does not dispute Durstein's speech was the reason for her termination. Therefore, the Court only needs to consider Durstein's interest in First Amendment expression against the Board's interest in the efficient operation of its school system. *Id.* In describing its interests, the Board relies heavily on the factual assertions contained in the news reports and letters of suspension and termination attached to Durstein's Amended Complaint. ECF No. 27, at 9–10; ECF No. 52, at 2–7. However, Durstein did not attach these exhibits to adopt their factual assertions. She attached the news reports to show school officials spoke to the media while prohibiting her from doing so, and she attached the letters of suspension and termination to show these disciplinary actions occurred. ECF No. 20 ¶¶ 36–41, 42, 45. Therefore, the Court can only rely on these exhibits for those purposes. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016) (stating "in cases where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true"). Based on the Amended Complaint alone, the Court cannot ascertain the extent to which Durstein's speech had a detrimental effect on students and impeded the school's operation. Therefore, the Court **DENIES** the Board's Motion as to Court Four's as-applied challenge.

*b. Facial Challenge*

Durstein also asserts a facial challenge to the three employment policies the Board used as its basis for her termination. ECF No. 20 ¶ 92–93. The policies include Cabell County Schools' Employee Code of Conduct (ECF No. 20-14) and Anti-Harassment Policy (ECF No. 20-15) and the West Virginia Board of Education's Educational Purpose and Acceptable Use of Electronic Resources, Technologies, and the Internet Policy (ECF No. 20-17). Because these are generally applicable regulations limiting public employees' speech, the Court applies the modified *Pickering* standard established in *United States v. NTEU.* 513 U.S. 454 (1995); *Liverman*, 844 F.3d at 407–09. The threshold issue is whether the policies regulate employees' ability to speak on matters of public concern, which the Court presumes because the Board determined the policies prohibited Durstein's speech. *NTEU*, 513 U.S. at 466; ECF No. 20-11. Therefore, the government "must show the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Id*. at 468 (quoting *Pickering*, 391 U.S. at 571). The government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id*. at 475.

Durstein's facial challenge teeters on the brink of unviability because she fails to reference any specific provisions of these policies alleged to be unconstitutional. Instead, Durstein employs hyperbole and misrepresentation to make her claim. For example, the Amended Complaint alleges "each of the three policies . . . violates the First Amendment by affording the Board unfettered discretion to discipline or terminate" employees who hold beliefs that are not "politically correct," yet the Anti-Harassment Policy details the procedural safeguards afforded to those accused. ECF No. 20 ¶ 92; ECF No. 20-15. Durstein's second allegation is that the three policies violate the First

Amendment by authorizing the Board "to function as a de facto instrumentality of certain individuals who seek to punish a teacher whose off-duty speech directed to other adults offends such individuals as 'politically incorrect.'" ECF No. 20 ¶ 93. However, the Anti-Harassment Policy cabins administrators' power by defining prohibited conduct in close parallel to the Civil Rights Act and the West Virginia Human Rights Act. ECF No. 20-15. Despite these inadequacies, the Court finds plausible overbreadth and vagueness challenges. And, like Durstein's as-applied challenge, the Court is unable now to ascertain the interests at stake and the effect of Durstein's and similar speech on the actual operation of the Board's schools. The Court therefore **DENIES** the Board's Motion as to Court Four's facial challenge.

### C. Claim Against the State Superintendent of Schools

#### 1. Count Five: Revoking Durstein's Teaching Certificates Based on Her Tweets

Count Five is a § 1983 claim seeking a declaratory judgment on three issues. ECF No. 20 ¶¶ 99–105. First, Durstein seeks a declaratory judgment that the First Amendment bars the State Superintendent of Schools from revoking or suspending Durstein's teaching certificates based on her tweets. *Id.* ¶ 102. Second, Durstein seeks a declaratory judgment that the First Amendment bars the State Superintendent from applying the "immorality" provision of W. Va. Code § 18A-3-6 to her tweets as a ground for revoking or suspending her teaching certificates. *Id.* ¶ 103. Third, Durstein seeks a declaratory judgment that the "immorality" provision of W. Va. Code § 18A-3-6 violates the First Amendment on its face. *Id.* ¶ 104. The State Superintendent argues the Court should dismiss this claim because the *Younger* abstention doctrine applies and Durstein does not have standing. ECF Nos. 25, 13, 46.

*a.* Younger *Abstention*

In *Younger v. Harris*, the Supreme Court held that federal courts cannot enjoin pending state criminal proceedings absent exceptional circumstances. 401 U.S. 37, 43–54 (1971). The Court later extended *Younger* to civil enforcement actions "akin to a criminal prosecution" and to suits challenging "the core of the administration of a State's judicial system." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975); *Juidice v. Vail*, 430 U.S. 327, 335 (1977). In *Middlesex County Ethics Committee v. Garden State Bar Association*, the Court held abstention is warranted when: (1) there is an ongoing state judicial proceeding; (2) that implicates important state interests; and (3) provides for an adequate opportunity to raise constitutional challenges. 457 U.S. 423, 433–34 (1982). Lower courts treated these factors as the test for *Younger* abstention. However, the Court clarified in *Sprint Communications, Inc. v. Jacobs* that *Younger* abstention is limited to "three exceptional categories" of cases: (1) "parallel, pending state criminal proceeding[s]"; (2) "state civil proceedings that are akin to criminal prosecutions"; and (3) state civil proceedings that "implicate a State's interest in enforcing the orders and judgments of its courts." 571 U.S. 69, 79, 72–73 (2013) (citations omitted).

The State Superintendent argues, and the Court agrees, that the proceeding against Durstein is quasi-criminal and fits in the second category. Quasi-criminal proceedings "are characteristically initiated to sanction the federal plaintiff, *i.e.*, the party challenging the state action, for some wrongful act." *Id.* at 79. "[A] state actor is routinely a party to the state proceedings and often initiates the action." *Id.* And, the proceedings commonly involve internal investigations, "often culminating in the filing of a formal complaint or charges." *Id.* A principal example of a quasi-criminal proceeding is *Middlesex*, in which the Supreme Court held that a state ethics committee proceeding against an attorney was quasi-criminal because "an investigation and

formal complaint preceded the hearing, an agency of the State's Supreme Court initiated the hearing, and the purpose of the hearing was to determine whether the lawyer should be disciplined for his failure to meet the State's standards of professional conduct." *Id.* at 81 (citing *Middlesex*, 457 U.S. at 433–35). In contrast, the Supreme Court held in *Sprint* that a proceeding before the Iowa Utility Board involving a fee dispute was not quasi-criminal because the Utility Board's adjudicative authority "was invoked to settle a civil dispute between two private parties, not to sanction Sprint for commission of a wrongful act." *Id*. at 593.

The proceeding against Durstein shares the key quasi-criminal features found in *Middlesex* and affirmed in *Sprint*. *Id* at 79. The West Virginia Department of Education, a state agency, initiated the proceeding. ECF No. 20-13. The Department began its investigation to potentially sanction Durstein for "immorality," a prohibited type of misconduct. *Id.* Consequently, Durstein faces the penalty of having her teaching certificates suspended or revoked. *Id.; see Baffert v. Cal. Horse Racing Bd*., 332 F.3d 613, 618 (9th Cir. 2003) (holding proceeding against trainer was quasi-criminal because his license was at issue and could be suspended or revoked). These features make the Department's proceeding "akin to a criminal prosecution" and appropriate for *Younger* abstention. *Sprint*, 571 U.S. at 79. Other courts have similarly concluded post-*Sprint* that *Younger* applies to school-related disciplinary proceedings. *E.g. Doe v. Univ. of Ky.*, 860 F.3d 365, 370 (6th Cir. 2017) (university student disciplinary proceeding); *Choudhry v. Regents of Univ. of Cal.*, No. 16-CV-05281-RS, 2016 WL 6611067, at *3 (N.D. Cal. Nov. 9, 2016) (university faculty disciplinary proceeding); *Sanchez v. Ariz. Bd. of Regents*, No. CV-15-01591-PHX-JAT, 2015 WL 6956288, at *3 (D. Ariz. Nov. 10, 2015) (university student disciplinary proceeding); *Ingber v. N.Y. City Dep't of Educ.*, No. 14 Civ. 3942(JMF), 2014 WL 2575780, at *4 (S.D.N.Y. June 9, 2014) (school teacher disciplinary proceeding).

Having concluded the Department of Education's proceeding is quasi-criminal, the Court now applies *Middlesex* to determine whether: (1) there is an ongoing state judicial proceeding; (2) that implicates important state interests; and (3) provides for an adequate opportunity to raise constitutional challenges. 457 U.S. at 433–34. As the State Superintendent notes, the Court addressed this exact issue in *Doe v. Sorsai*. No. 3:12-0065, 2012 WL 2952365 (S.D. W. Va. July 19, 2012) (adopting the Magistrate Judge's Proposed Findings and Recommendations in *Doe v. Sorsai*, No. 3:12-0065, 2012 WL 2954107 (S.D. W. Va. June 18, 2012)). In *Doe*, the Court held that the three *Middlesex* factors were met and *Younger* abstention applied to the plaintiff's request that the Court enjoin the West Virginia Department of Education from revoking his teaching certificates. 2012 WL 2954107, at *15–16. The Court affirms that conclusion here with additional analysis to address Durstein's disagreements.

Durstein argues *Doe* is incorrect and the first *Middlesex* factor is not met because the Department of Education's disciplinary proceeding is not "judicial in nature." ECF No. 36, at 14–17; *see New Orleans Pub. Serv., Inc. v. Council of City of New Orleans ("NOPSI")*, 491 U.S. 350, 369–70 (1989). The Fourth Circuit explained that administrative proceedings are not judicial in nature "if state law expressly indicates that the proceeding is not a judicial proceeding or part of one . . . or if the proceeding lacks trial-like trappings." *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1228 (4th Cir. 1989). Trial-like procedures alone, however, are insufficient for abstention. *See NOPSI*, 491 U.S. at 371 (citation omitted) (explaining that legislation too is frequently "preceded by hearings and investigations"). Instead, the Supreme Court has instructed courts to look at the "nature of the final act." *Id*. (citation omitted). A proceeding is "judicial in nature" if it "investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist." *Id*. at 370 (citation omitted). In contrast, a legislative

act "changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power." *Id*. at 371 (citation omitted).

The applicable statutes and regulations reveal that the Department of Education's certificate revocation proceeding is "judicial in nature." As a threshold matter, no state law expressly indicates the proceeding is not judicial. *See Telco*, 885 F.2d at 1228. Secondly, the proceeding bears the hallmarks of a trial. Under the governing West Virginia Administrative Procedures Act, the State Superintendent must give Durstein timely and proper notice. *Scott v. Stewart*, 560 S.E.2d 260, 262 (W.Va. 2001) (explaining that the Act applies); W. Va. Code § 29A-5-1(a). The hearing is impartial, and the state rules of evidence apply. W. Va. Code §§ 29A-5-1(d), 29A-5-2(a). The parties can present argument and evidence, including witness testimony. *Id.* § 29A-5-1(a). The parties can issue subpoenas and subpoenas duces tecum. *Id.* § 29A-5-1(b). Durstein has the right to cross-examine witnesses and submit rebuttal evidence. *Id.* § 29A-5-2(c). The Department's final decision is accompanied by findings of fact and conclusions of law, and both parties have the right to appeal in state court. *Id.* §§ 29A-5-3, 29A-5-4. In addition to these trial-like features, the "nature of the final act" is judicial because the disciplinary hearing will declare and enforce Durstein's liability under West Virginia's pre-existing law governing certificate revocation. *Id.* § 18A-3-6; *see NOPSI*, 491 U.S. at 370–71. Thus, the proceeding is judicial in nature. *See also Harper v. Pub. Serv. Comm'n of W. Va.*, 291 F. Supp. 2d 443, 455 (S.D. W. Va. 2003), *rev'd on other grounds*, 396 F.3d 348 (4th Cir. 2005) (finding proceedings before the Public Service Commission were "judicial in nature" because they occurred in an adversarial, trial-like setting with discovery, witness testimony, and exhibits); *Sutton v. N.C. State Bar*, No. 5:14-CV-243-BR, 2014 WL 4546017, at *6 (E.D.N.C. Sept. 12, 2014) (finding state bar hearing panels were judicial in nature because they, among other powers, could enter discovery orders,

subpoena witnesses, compel document production, and make findings of fact and conclusions of law).

Even if the hearing is judicial in nature, Durstein argues abstention is inappropriate because the Department of Education has not called a hearing—the agency is only investigating whether to hold one. ECF No. 36, at 20–21. Durstein relies on two Fourth Circuit cases, but neither are instructive here. *Id.* In *Certa v. Harris*, the Fourth Circuit only concluded abstention was not appropriate because the underlying dispute before the administrative board had been settled. No. 01-1132, 2001 WL 1301404, at *4 (4th Cir. Oct. 26, 2001). But here, the Department of Education is actively investigating Durstein to determine whether her conduct warrants a hearing. ECF No. 20-13. Secondly, in *Telco*, the Fourth Circuit held there was no "ongoing state proceeding" because the state agency only held an informal conference and never initiated a formal hearing or prosecution, leaving the plaintiff in uncertainty. 885 F.2d at 1228. In contrast, the Department of Education made clear that its investigation will decide whether a hearing is warranted, and the Department has provided Durstein with the contact information of her investigator to stay informed. ECF No. 20-13. To split the Department's process into separate investigative and adjudicative proceedings as Durstein argues would effectively eliminate *Younger* by allowing plaintiffs to file in federal court as soon an investigation is announced. The Court therefore concludes the Department's investigation and hearing are two phases of the same proceeding. *See Ocean Grove Camp Meeting Ass'n of United Methodist Church v. Vespa-Papaleo*, Nos. 07-4253, 07-4543, 2009 WL 2048914 (3d Cir. July 15, 2009) (holding the judicial proceeding begins when a complaint is filed and an investigation is launched); *O'Neill v. Coughlan*, 511 F.3d 638, 643–44 (6th Cir. 2008) (holding that the filing and investigation of a grievance is part of the state's judicial proceeding).

Durstein does not, nor could she successfully, contest the second and third *Middlesex* factors. The second factor is met because free and efficient education is a state constitutional right in West Virginia, and the Department's certificate revocation proceeding implicates this important state interest by ensuring the fitness of teachers. W. VA. CONST. art. XII. The third factor is also met because Durstein has an adequate opportunity to raise her constitutional challenges by appealing an adverse decision to the proper circuit court. W. Va. Code § 29A-5-4(g)(1); *see Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 629 (1986) (citing *Middlesex*, 457 U.S. at 436) (holding that even if an administrative proceeding does not allow for adjudication of constitutional challenges, the ability to raise those challenges on appeal is sufficient).

The Court therefore finds abstention is warranted under *Younger* and need not address the State Superintendent's argument that Durstein lacks standing. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999) (affirming federal courts' ability to "to choose among threshold grounds" for dismissing a case without reaching the merits); *Disability Rights N.Y. v. N.Y.*, 916 F.3d 129, 131 n.1 (2d Cir. 2019) (citation omitted) (affirming lower court's decision on abstention grounds without reaching the issue of standing). Accordingly, the Court **GRANTS** the State Superintendent's Motion.

### IV. CONCLUSION

For these reasons, the Court **DENIES** Defendant Todd Alexander's Motion to Dismiss Amended Complaint, ECF No. 28. The Court **GRANTS IN PART** as to Count Two and **DENIES IN PART** as to Count Four Defendant Board of Education Cabell County Schools' Motion to Dismiss Amended Complaint, ECF No. 26. Lastly, the Court **GRANTS** State Superintendent of Schools' Motion to Dismiss Amended Complaint, ECF No. 24. Having ruled on these motions,

the Court lifts the stay on discovery and further scheduling imposed by the Court's June 14, 2019

Order, ECF No. 55.

ENTER:        December 13, 2019

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE