**In the United States District Court
Southern District of West Virginia
Division 3 (Huntington)**

|  |  |  |
|---|---|---|
| | ( | |
| **MARY DURSTEIN**, | ( | |
| | ( | Case no. 3:19-cv-00029 |
| | ( | |
| | ( | Judge Robert C. Chambers |
| Plaintiff, | ( | |
| | ( | |
| | ( | **Supplemental complaint for damages** |
| | ( | **and declaratory relief** |
| v. | ( | |
| | ( | (jury trial demanded) |
| **TODD ALEXANDER, et al.,** | ( | |
| | ( | |
| | ( | |
| | ( | |
| Defendants. | ( | |

Plaintiff Mary Durstein hereby supplements her amended complaint (ECF #20) under Rule 15 of the Federal Rules of Civil Procedure setting out matters that have occurred since the filing of her amended complaint.

This Supplemental Complaint also supplements counts 4 and 5 of her amended complaint, avers facts to address plaintiff's standing to proceed with those supplemented counts, and adds a new count against defendant Board of Education of Cabell County based on facts that occurred during the summer of 2019, after the filing of Durstein's amended complaint. This pleading uses the terms "Cabell Schools" or the "Board" to refer to defendant Board of Education of Cabell County.

Durstein's Supplemental Complaint alleges as follows:

## Supplemental averments of fact

### A. Recap of defendant Superintendent's notice of investigating Durstein—December 11, 2017

1.      Exhibit 13 to the Amended Complaint (ECF 20-13) is a copy of a letter dated on Monday, December 11, 2017, that Durstein received from defendant State Superintendent of Schools, advising her that the Superintendent is investigating to decide whether a hearing is warranted under West Virginia Code § 18A-3-6 for "immorality" with "a rational nexus to your teaching responsibilities."

2.      The letter advised that the Superintendent had no timetable for completing the investigation, and that the Superintendent would advise Durstein in writing whether the Superintendent would "take further action." As of the filing of Durstein's amended complaint (Feb. 28, 2019), Durstein had received no such writing from the Superintendent.

### B. Closing the Superintendent's investigation—January 9, 2020

3.      On January 9, 2020—two years and one month after the date of the Superintendent's letter notifying Durstein of his ongoing investigation—the Superintendent sent Durstein a letter notifying Durstein that "We are closing our investigation without action against your Permanent Professional Teaching Certificates." A copy of that letter accompanies this Supplemental Complaint as **Exhibit 18**.

4.      That letter (Exhibit 18) also says: "We agreed to hold in abeyance any action against your certification pending outcome of these matters. This issue became ripe for

our review after a December 13, 2019, entry of an Order granting the State Superintendent of Schools' Motion to Dismiss in your federal civil case."

(a)     Read together, the two sentences quoted above falsely imply that the Superintendent agreed to hold its investigation of Durstein in abeyance pending the outcome of this lawsuit.

(b)     The Superintendent did not promise to hold its investigation of Durstein in abeyance during any part of this lawsuit.

(c)     The limit of what the Superintendent agreed to do was to hold in abeyance "action against your certification."

(d)     The agreement was between counsel for the Superintendent and counsel for Durstein, reached in June, 2019—one year and seven months after the date of the Superintendent's letter notifying Durstein of his investigation.

5.     The Superintendent's letter of January 9, 2020 (Exhibit 18), also says:  "We opened this investigation when Cabell County Schools provided us with statutory notice of your termination as a World Studies teacher at Huntington High School."

6.     **Exhibit 19** accompanying this Supplemental Complaint is an email transmitted on Thursday, March 23, 2017, by defendant Alexander to the Superintendent's investigator, James Agee, on Thursday, March 23, 2017. That email is what the Superintendent referred to when he wrote in his letter of January 9, 2020, that "Cabell County Schools provided us with statutory notice of your termination."

7.     The "statutory notice" to which the Superintendent referred derived from a

passage in the version of WVa. Code § 18A-3-6 that was in effect on March 23, 2017.

That passage:

> It shall be the duty of any county superintendent who knows of any acts
> on the part of any teacher for which a certificate may be revoked in
> accordance with this section to report the same, together with all the
> facts and evidence, to the state superintendent for such action as in the
> state superintendent's judgment may be proper.

A copy of WVa. Code § 18A-3-6 in effect on March 23, 2017, accompanies this

Supplemental Complaint as **Exhibit 20**.

### C. Impact of Superintendent's investigation on Durstein's job prospects in West Virginia

8.     On November 11, 2017, Durstein applied for an open teaching position with

Logan County Schools in Logan, West Virginia. Her teaching certificates and experience

qualified her for the position.

9.     When Logan Schools did not respond to Durstein's application, she spoke by

telephone to a woman who identified herself as Elizabeth Thompson, the Personnel

Director of Logan County Schools. Thompson said verbatim or in substance:  "You will

never get hired in this county. You are under investigation by the Department of

Education." That was how Durstein first learned that the Superintendent was

investigating her.

10.     Before applying to Logan Schools, Durstein applied for a variety of other teaching

positions in West Virginia, including to teach remedial reading to juveniles in a

detention center, and to teach remedial reading to inmates at a West Virginia jail. In

each instance, Durstein's applications were timely and received, but someone else was selected to fill the open positions, and Durstein did not receive any requests for an interview.

11.     A former West Virginia high school principal, whose service in that position ended in 2016 after more than two decades, attested in a declaration dated March 10, 2019, and filed in this action (ECF 36-1). In the declaration, he attested:

(a)     An applicant for a teaching position who was under investigation by the West Virginia Superintendent of Schools would be highly unlikely to land the position.

(b)     School districts would be especially reluctant to invest in a teacher who might be suspended from teaching or who might lose his or her certificate to teach.

(c)     An applicant under investigation would be competing with candidates whose teaching certificates are not in jeopardy, and a school district's preference markedly would be for such candidates.

12.     Durstein concluded that, as long as she is under investigation by the Superintendent, it would be futile to try to gain a teaching position with a school district in West Virginia.

13.     The pendency of the Superintendent's investigation was noted on the West Virginia Dept. of Education's online records about Durstein, which human resources officers of West Virginia school districts typically would consult when considering her application to teach.

14.     The Superintendent's letter to Durstein of December 11, 2017 (Ex. 13 to amended complaint, ECF 20-13), told her:  "In the meantime, should you seek employment in the public school system, it is your responsibility to disclose the fact of our investigation to prospective employers regardless of whether their application or interview process calls for such disclosure."

15.     Independently of that command, Durstein would not have concealed from a prospective employer the existence of the Superintendent's pending investigation.

16.     Durstein has no information that the content and off-duty circumstances of her tweets doomed her employment prospects throughout 2018 and 2019 in West Virginia school districts.

17.     In 2018, an Ohio school district near Cabell County hired Durstein as a substitute teacher, a position that she continues to hold as of the filing of this Supplemental Complaint.

**D. Durstein's lesson from Cabell school officials—informing Durstein's decision to refrain from resuming speech about public controversies on social media**

18.     Throughout at least 8 years before defendant Alexander coerced Durstein to close her personal Twitter account on January 9, 2017, Durstein was a prolific commenter on Twitter. She enjoyed exchanging opinions with other Twitter users, including about politics, topics in the news, public controversies, and other matters of public concern.

19.     Throughout the time since defendant Alexander coerced Durstein to close her personal Twitter account, Durstein has wanted to resume exchanging views with others on social media about matters of public interest, and she has wanted to open a new

Twitter account. But she has neither opened a new Twitter account nor exchanged such views with others on social media, and anticipates that she will continue that restraint indefinitely so long as she wishes to maintain her certificates to teach.

20.     Durstein's decisions not to open a new Twitter account and not to resume exchanging views on social media about public controversies and other matters of public concern are coerced, as this Supplemental Complaint further explains.

21.     An overarching reason for Durstein's restraint derives from her experience with Cabell Schools beginning when defendant Alexander coerced her to close her personal Twitter account. The next paragraphs summarize what Durstein knew before January 9, 2017, and what she learned that day and later as she tried to keep her teaching job.

22.     A basic draw of Twitter is the enjoyment of reading others' responses to the message or image that you posted, which often develops into people "following" each other's posted remarks.

23.     Durstein has found that regular Twitter users learn from experience that bursts of hyperbole, exaggerated passion, and highly judgmental voicing of approval and disapproval arouses responses—especially when commenting about issues or people that other users are likely to know about, such as topics in the news.

24.     From Durstein's experience, people who are immersed in the flamboyant, rambunctious culture of social media generally recognize that each other's comments are colorfully overstated to entertain or to provoke reaction. So people immersed in

social media tend to discount the literalness and fullness of the purported sincerity of caustic speech uttered there.

25.     From at least her experience with Cabell Schools in 2017, Durstein found that people unaccustomed to the culture of social media do not apply that discount. When reading a message extracted from its social media environs and extracted from the full social media conversation, those people tend to judge the message by the civil, far more sober, and far less impetuous norms of face-to-face discourse. For example, the Superintendent of Cabell Schools commented to the press about Durstein's tweets: "We expect the same conduct on social media that we do in the classroom."

26.     In Durstein's experience, people who lack fluency in the hyperbolic norms of social media mistakenly react to the rash verbal roughhousing as unembellished.

27.     Further, Durstein recognizes that social media preserves impulsive speech uttered during particular moments in one's life. People outside the social media environment tend to assume when reading older messages that the speaker's opinion is literal and permanent as expressed. They assume that the speaker is immune from ever thinking differently; that the speaker never mellows upon reflection; the speaker's views never evolve. In sum: the speaker never sincerely sloughs off the expressed view.

28.     For example, the state administrative law judge who denied her grievance concluded that Durstein's tweets of 2015 and 2016 express literally, not hyperbolically, what Durstein "believes"—in the present tense. He said:

> Accordingly, it cannot be found that Grievant made these
> posts with a reckless disregard for the truth, because there

are groups such as the..."alt-right" which truly believe them
to be true.

It appears that Grievant believes them to be true as well.

29.    Durstein's lesson from Cabell Schools:  Five impetuous off-duty tweets preserved
by social media over the course of 18 months—which Cabell school officials knew
nothing about at the time—mattered more to those officials than 17 years of exemplary,
highly compassionate on-duty conduct that the officials witnessed and praised year after
year, and which was wholly inconsonant with the tenor of the comments.

### D. More specifics about Durstein's fears about resuming the exchange of comments about matters of public concern on social media

30.    In light of the experience summarized in the above paragraphs, Durstein
reasonably has perceived at least three risks to her if she resumed exchanging views with
others on social media about matters of public controversy or concern.

31.    One risk is that administrators of other school districts may share Cabell school
administrators' lack of fluency in social media expression and would misjudge the
qualities of future remarks on social media, jeopardizing Durstein's future employment
as either a candidate or an employed teacher.

32.    A second and related risk arose in late 2017, when the Superintendent concluded
that Durstein's tweets implicated his authority to revoke or suspend Durstein's teaching
certificates for "immorality" under WVa. Code § 18A-3-6, causing him to investigate her
for over two years. That investigation crushed teaching job prospects for her while it was
pending, and induced great anxiety about potentially losing her teaching license.

33.     The Superintendent's decision, for example, to investigate Durstein's silent retweet of an Anne Coulter comment cast a fearsome shadow over teachers' off-duty speech on their personal social media accounts. It would be impossible for Durstein, or any teacher, to predict which future speech on social media the Superintendent might deem worthy of investigating as "immoral" under West Virginia law.

34.     Durstein seeks to avoid expressive activity of a kind that the Superintendent already had deemed to implicate the "immorality" law, and that the Superintendent might conclude warrants further investigation, or even action against her. As summarized later in this Supplemental Complaint, the Superintendent's decision announced on January 9, 2020, to close his investigation without taking action against Durstein has not eliminated the risk that Durstein seeks to avoid.

35.     A third risk is that returning to Twitter and resuming the same sort of speech activity for which Cabell Schools fired her might have appeared to Cabell school officials as defying them, and Durstein would like to return to Cabell Schools as a teacher. When grieving her firing, she feared that the administrative law judge might view resuming such expressive activity as defiance, and hesitate to reinstate her.

### G. The Superintendent's letter of January 9, 2020, does not disclose why he closed his investigation of Durstein

36.     The Superintendent's letter of January 9, 2020, does not articulate any reason for the Superintendent's decision to close his investigation, and provides no assurance that Durstein does not risk another investigation by returning to engaging with others on social media about public controversies while at home.

37.    In authorizing the Superintendent to revoke a teacher's license for "immorality," WVa. Code § 18A-3-6(a) imposes a condition:  a teacher's "immorality" must bear a "rational nexus" to the teacher's performance of his or her job.

38.    The Superintendent's letter did not say that he had concluded—after more than two years of investigating—that Durstein's tweets do not implicate the statutory threshold of "immorality" as the Superintendent interprets "immorality." Nor did the letter say whether he concluded that the tweets did not satisfy the "rational nexus" criterion, or whether he closed the investigation for some other reason.

39.    From the Superintendent's January 9, 2020, letter, Durstein does not know whether it was the Superintendent's interpretation of the law, or the pendency of this lawsuit and its potential for appellate precedent, that caused the Superintendent to stop investigating her.

40.    The January 9, 2020, letter does not disavow that controversial off-duty speech by West Virginia teachers about matters of public concern can implicate the "immorality" law as the Superintendent interprets it.

41.    Even if the letter contained such a disavowal, there is no assurance that it would bind the Superintendent's successor in office. Steven Paine was the Superintendent who approved closing the investigation of Durstein. But on February 21, 2020, W. Clayton Burch replaced Mr. Paine as Superintendent.

42.    Although the Superintendent is the state administrator responsible for applying the "immorality" law, the Superintendent has not adopted a policy or similar measure

that authoritatively interprets the "immorality" law in the context of a teacher's off-duty speech.

43.     The statute itself contains no standards to confine the Superintendent's discretion in deciding whether a teacher's off-duty controversial speech implicates the statute's threshold requirement of "immorality," and West Virginia's highest court has not supplied any.

### H. Impact of defendants' actions on Durstein's speech—after the Superintendent closed his investigation on January 9, 2020

44.     Durstein is grateful that the Superintendent closed his investigation as of January 9, 2020, and decided not to proceed against her teaching certificates.

45.     Durstein wishes to maintain her West Virginia teaching certificates and wishes to return to teaching in West Virginia schools.

46.     The Superintendent's letter of January 9, 2020, advising that he has closed his investigation of Durstein without taking action against her teaching certificates, has not, however, relieved Durstein's reticence about voicing opinions on social media.

47.     Durstein was intimidated and daunted by the threat to her teaching certificates that the Superintendent's investigation of her tweets presented, and by the investigation's effect of causing West Virginia school districts to decline to consider her for open teaching positions for which she was qualified.

48.     Now that she has emerged from that two-year investigation with her teaching certificates intact, Durstein will not intentionally risk another paralyzing, anxiety-inducing investigation, even if it were to result in the same relieving outcome.

49.     Durstein has concluded that continuing to refrain from expressing herself on social media is the safest course to avoid the anguish of another investigation and threat to her teaching license.

50.     Adding to Durstein's reticence to return to social media is WVa. Code § 18A-2-8(a), a separate law that authorizes a county board of education to suspend or dismiss a teacher for "immorality." The Superintendent's willingness to spend two years investigating Durstein's five tweets for statutory "immorality" naturally signals to county boards of education that a teacher's off-duty speech about lawful activities and public controversy validly can implicate "immorality" under WVa. Code § 18A-2-8(a).

51.     Under WVa. Code § 18A-2-8(a), public expression of disapproval of a teacher's off-duty expression can control whether her perceived "immorality" bears a rational nexus to her fitness to teach, leading to and justifying her firing.

52.     Expressing herself using a "protected" Twitter account is not a palliating alternative. Twitter cautions that, even if you "protect" your tweets from readers who are not your "followers," any follower can capture images of your tweets and share them with anyone else. So any follower could share anyone's "protected" tweets via email, social media, or even print them on paper and circulate the hard copies.

53.     The circumstances as generally described in this Supplemental Complaint likely would deter any teacher of ordinary firmness from exercising the First Amendment right to exchange expression about public controversies with others on social media while off-duty.

### H. Final policymaking authority to hire new teachers at Cabell Schools

54.     Defendant Board of Education of Cabell County is a public corporation created by statute and founded in West Virginia's Constitution. It can sue and be sued; enter into contracts; and hold and dispose of property. The Board's authority is limited by statute. WVa. Code § 18-5-5; WVa. Const'n Art. 12, § 6; Cabell Bylaw 0122 (copy is **Exhibit 23**).

55.     The Board is a "political subdivision" for purposes of West Virginia's Government Tort Claims Act, WVa. Code § 29-12A-3. A "school district" is a geographic area. West Virginia does not recognize a school district as an independent political subdivision that can sue and be sued, enter into contracts; and hold and dispose of property.

56.     The Board's main duty is to establish policies that govern its schools. The Board appoints a Superintendent of Schools, whose main duty is to administer the Board's policies ("the Cabell Superintendent").

57.     The Cabell Superintendent is an officer of the Board, serving as Secretary.

58.     The powers of county boards of education to set policy are not absolute. Certain of the Board's actions "must be initiated and guided solely by the recommendation of" the Cabell Superintendent. Cabell Policy 1210 (copy is **Exhibit 24**.)

59.     The West Virginia Supreme Court of Appeals repeatedly has pronounced that, because the members of county boards of education are lay people, county boards of education are not qualified to evaluate the professional competency of teachers, which is the purview of professionally-trained county superintendents of schools and school principals. State ex rel. Rogers v. Bd. of Ed., 25 S.E.2d 537, 542 (1943); Mason County Bd. of Ed. v. State Supt. of Schools, 165 W.Va. 732, 738-740, 274 S.E.2d 435, 438-439 (1980); Trimboli v. Bd. of Ed., 167 W.Va. 792, 794-795, 280 S.E.2d 686, 688 (1981).

60.     The Board has no authority to hire a candidate for a teaching position unless the Cabell Superintendent recommends that candidate. W.Va. Code § 18A-2-1(a); W.Va. Code § 18A-4-10(2).

61.     The Board is not expressly authorized to interview a candidate for a teaching position. But a superintendent, principal, and certain members of the faculty senate are expressly authorized to interview qualified candidates for teaching positions. W.Va. Code § 18A-2-1(a)(1); W.Va. Code St. R. § 126-126-7.2.e (excerpt is **Exhibit 25**); W.Va. Code St. R. § 126-126-5 (copy is **Exhibit 26**).

62.     If the superintendent, principal, and faculty senate unanimously recommend the same candidate for a classroom teaching position, the Board must hire that candidate. W.Va. Code § 18A-4-7a(d).

63.     The Board has required the Cabell Superintendent to prepare administrative guidelines for the recruitment and selection of teachers. So long as those guidelines do not conflict with state or federal law, the Board considers those guidelines to be

extensions of the Board's own policies. Cabell Policy 1230.01 (copy is **Exhibit 27**) ;

Cabell Policy 3120 (excerpt is **Exhibit 28**)

64.      From July, 2014, through April, 2020, the Cabell Superintendent recommended

over 1,200 candidates to the Board for full-time and substitute teaching positions. The

Board hired each one, and rejected none. Those hires included nearly 190 candidates

who were hired pending completion of the candidates' paper work needed to be eligible

for the position.

### H. Durstein applies in June and July, 2019, to fill openings posted by Cabell Schools for substitute teaching positions

65.      When the Superintendent's investigation of her was pending, its existence

deterred Durstein from applying for open teaching positions in West Virginia school

districts. But it did not deter her from applying to fill openings advertised by Cabell

Schools.

66.      Durstein lives in the Cabell Schools district, and greatly enjoyed teaching there

for 15 years as a full-time teacher plus two earlier years as a long-term substitute

teacher. She has wanted and still wants to return to teaching there.

67.      During the summer of 2019, Durstein thought that Cabell Schools—unlike other

school districts—might be willing to rehire her despite the Superintendent's then-

pending investigation. She came to that conclusion for these reasons:

(a)     As of the summer of 2019, defendant Alexander, who had recommended her firing, and the Superintendent of Cabell Schools, William Smith, who had recommended her firing, no longer worked for Cabell Schools.

(b)     By the time the 2019-2020 school year would begin, the students who were in 12th, 11th, and 10th grades at Huntington High School in January, 2017—when Durstein was suspended because of her tweets—would have graduated, and the students who were in 9th grade at that time would be in their final year of high school.

(c)     A member of the Board who had voted against firing Durstein was still a member of the Board, and an individual who was not on the Board when Cabell Schools fired Durstein had joined the Board.

(d)     Unlike administrators in any other school district, administrators who remained at Cabell Schools knew firsthand of Durstein's longstanding exceptional record there for 17 years as a caring and highly competent teacher.

(e)     Administrators and certain Board members who remained at Cabell Schools knew that the Superintendent was investigating her because of the tweets, which were aging.

68.     Durstein expected that the pendency of the Superintendent's investigation would matter least if she applied to be a substitute teacher at Cabell Schools.

69.     The Board has adopted and repeatedly reaffirmed a policy declaring a "critical need and shortage" of substitute teachers. The Board declared that "the number of available substitute teachers in the District who hold certification and training" to be

substitute teachers "and who are not retired is insufficient to meet the projected need for substitute teachers." Cabell Policy 3120.12 (a copy is **Exhibit 29**). The Policy listed particular classroom subjects where Cabell Schools most needed substitute teachers. Durstein was qualified to teach each listed subject, and had full-time experience teaching two of the subjects.

70.     In June, 2019, Durstein applied to fill a posted opening for a substitute teaching position that Cabell Schools advertised on its website, and in July, 2019, she applied to fill a separate posted opening for a substitute teacher that Cabell Schools advertised on its website. Durstein was and is qualified to be a substitute teacher for any subject.

71.     Cabell Schools hires substitute teachers to populate a pool of available substitute teachers. As for the posted openings for substitute teachers to which Durstein applied in June and July, 2019, Cabell Schools:

> (a)     received each of Durstein's online applications, and each was timely;

> (b)     did not request an interview with Durstein and did not hire her;

> (c)     hired at least 6 substitute teachers (cumulatively) to fill the postings.

### I. Durstein applies in June and July, 2019, to fill other openings posted by Cabell Schools for teaching positions

72.     In July, 2019, Durstein applied to fill an opening at Huntington High School for an Evening School Social Studies teacher, whose students would be adults seeking to earn a high school equivalency diploma or preparing for post-high-school education or training.

73.     In July, 2019, Durstein applied to fill an opening at Cabell Schools' central office for a Reading/Math Interventionist. An interventionist provides specialized individual and small group instruction beyond that provided through regular classroom instruction. The interventionist tries to aid students who are at risk for developing, or who are experiencing, difficulties with reading or math.

74.     In July, 2019, Durstein applied to fill an opening at Huntington High School for an Academic Coach. An academic coach primarily supports classroom teachers in implementing certain programs that Cabell Schools has adopted.

75.     Also in June and July, 2019, Durstein applied to fill openings at Cabell Schools for:

        (a)     3 kindergarten teachers, one each at Explorer Academy, Spring Hill Elementary School, and Ona Elementary School;

        (b)     a social studies teacher at Huntington High School—(Durstein was a social studies teacher at Huntington High School when Cabell Schools fired her over the off-duty tweets);

        (c)     a Title I Reading/Math teacher at Cabell Schools' central office;

        (d)     2 English Language Art Literacy positions to teach reading and writing readiness for the workplace, one at Huntington East Middle School and one at Huntington Middle School;

(e)     5 fifth grade teachers, one each at these elementary schools: Central City, Davis Creek, Spring Hill, Cox Landing, and Altizer;

(f)     2 fourth grade teachers, one at Central City Elementary School and one at Milton Elementary School;

(g)     1 grade three-four teacher at Explorer Academy;

(h)     2 second grade teachers, one at Southside Elementary School and one at Hite Saunders Elementary School;

(i)     2 first grade teachers, one at Culloden Elementary School and one at Southside Elementary School.

76.     The preceding paragraphs, including those addressing substitute teachers, describe a total of 24 posted openings that Cabell Schools advertised on its website and for which Durstein applied during the summer of 2019. Her state certificates and other credentials, and her teaching experience, qualified her for each of those positions; and Cabell Schools received her applications on time.

77.     None of the 14 principals of the schools whose open positions Mary sought to fill suggested an interview, nor did anyone at Cabell Schools' central office.

78.     Cabell Schools filled all but three of the positions for which Durstein applied during the summer of 2019. Of those hired:  (i) only one has as many years of full-time teaching experience as Durstein has; (ii) none had taught full-time in Cabell Schools for as many years as Durstein had; (iii) none was teaching for Cabell Schools at the time of

applying for the position; and (iv) none satisfied any category of applicant to which Cabell Schools was bound by law or its policies to give hiring priority over other candidates.

### J. Reasons for Cabell Schools' denial of all 24 of Durstein's applications in the summer of 2019

79.     Cabell Schools did not inform Durstein of any reason for deciding not to interview her or hire her.

80.     When Cabell Schools fired Durstein in March, 2017, one of the asserted reasons was the claim, which Durstein denies, that Durstein violated three identified policies. (See Ex. 12 to amended complaint, ECF 20-12.)

81.     Over two years later, when Durstein applied for the open teaching positions during the summer of 2019, Durstein was doing nothing that could colorably implicate any of those policies.

82.     A second reason cited for firing Durstein in March, 2017, was that the five off-duty tweets of 2015 and 2016 were suddenly publicized in January, 2017, in the "local, national and international" press. Those tweets have "become the subject of such notoriety as to significantly and reasonably impair your capability to discharge your teaching responsibilities." (See Exhibit 11 to amended complaint, ECF 20-11.)

83.     Durstein acknowledges that, in January, 2017, someone who did not follow Durstein on Twitter acted independently of Durstein and without her knowledge or consent to circulate tweets that she had posted in 2015 and 2016 to local news

organizations, which resulted in substantial publicity. Durstein denies impairment of her capability to discharge her teaching duties.

84.     Nevertheless, when Durstein applied for the 24 open teaching positions in the summer of 2019, the publicity that Cabell Schools cited in March, 2017, was about 2½ years old. That publicity was not ongoing during the summer of 2019, and did not impair her ability for the 2019-2020 school year to discharge the teaching duties of a substitute teacher, or an Evening School social studies teacher, a Reading/Math Interventionist, an academic coach, or any of the other teaching positions for which she applied.

85.     The remaining reason cited in March, 2017, by Cabell Schools for firing Durstein rested on the content of her five off-duty tweets of 2015 and 2016. Cabell Schools said at that time that those tweets revealed Durstein's "raw bigotry towards persons of the Islamic faith," making her "continued employment as a Social Studies teacher . . . in every way untenable." (See Exhibit 11 to amended complaint, ECF 20-11.) Durstein denies the validity of that asserted ground.

86.     Nonetheless, when Durstein applied for Cabell Schools' open teaching positions during the summer of 2019, Durstein had made no further public comments that might reinforce the conclusion expressed by Cabell Schools. By the summer of 2019, the five momentary tweets were three and four years old.

**Supplement to Count 4**

**(vs. defendant Cabell Board of Education under 42 U.S.C. § 1983—terminating Durstein's employment in March, 2017)**

87.    Durstein's tweets addressed matters of public controversy and concern.

88.    Cabell Schools applied WVa. Code § 18A-2-8 when it fired Durstein on Monday, March 6, 2017. A copy of the version of the statute in effect when Cabell Schools fired Durstein accompanies this Supplemental Complaint as **Exhibit 21**.

89.    On its face as of March 6, 2017, WVa. Code § 18A-2-8 authorized a county board of education to fire a teacher for any of several kinds of undesirable conduct listed in the statute, two of which were "immorality" and "insubordination."

90.    As of March 6, 2017, West Virginia's highest court had construed WVa. Code § 18A-2-8 to allow a teacher's qualifying off-duty conduct, *e.g.*, immorality, to justify firing the teacher only if that qualifying conduct had a "rational nexus" to the teacher's performance of teaching duties, described as "fitness to teach." Golden v. Bd. of Ed. of Harrison Co., 169 W.Va. 63, 68-69, 285 S.E.2d 665, 669 (1981).

91.    In 2019, West Virginia amended WVa. Code § 18A-2-8 to adopt the "rational nexus" component.

92.    As of March 6, 2017, West Virginia's highest court had construed the rational nexus limitation as applying where the qualifying off-duty conduct, *e.g.*, "immorality," had become "the subject of such notoriety as to significantly and reasonably impair the capability of the particular teacher to discharge the responsibilities of the teaching

position." <u>Golden v. Bd. of Ed. of Harrison Co</u>., 169 W.Va. 63, 69, 285 S.E.2d 665, 669 (1981).

93.     The publicity given to Durstein's tweets on January 9 and 10, 2017, resulted in the administration receiving messages through social media, email, telephone, and a letter strongly disapproving of Durstein because of the content of the tweets. Since the publicity was nationwide, Cabell Schools does not know what proportion of those messages were from Cabell County residents.

94.     Cabell Schools said that the public reaction to the publicized tweets impaired Durstein's ability to discharge her teaching duties.

95.     For the rational nexus test to apply, the off-duty tweets had to qualify under WVa. Code §18A-2-8 as one of the threshold statutory grounds for firing Durstein, such as "immorality" or "insubordination."

96.     Cabell Schools said that Durstein's off-duty tweets qualified as "insubordination."

97.     To support "insubordination," Cabell Schools said that Durstein violated the three policies cited in count 4 of Durstein's amended complaint (ECF 20). They are:

(a)     West Virginia Dept. of Education Policy no. 2460, "Acceptable Use of Electronic Resources, Technologies, and the Internet." The copy of Policy No. 2460 attached to the amended complaint as Ex. 17 (ECF 20-17) is a recent version that was not in effect when Cabell Schools fired Durstein. The version of the policy that was in effect when Cabell Schools fired Durstein accompanies this Supplemental Complaint as **Exhibit 22**.

(b)     Cabell Schools Policy no. 3262, "Anti-harassment and Violence," (Ex. 15 to amended complaint, ECF 20-15); and

(c)     Cabell Schools Policy no. 3210, the Employee Code of Conduct for Professional Employees (Ex. 14 to amended complaint, ECF 20-14).

98.     A plain reading of West Virginia Dept. of Education Policy no. 2460 (Acceptable Use of Electronic Resources, Internet) shows that it applies only to use of the school district's own resources and use of the internet network and connection supplied by the school district. It does not apply to Durstein's off-duty tweets while at home, when school is not in session, using her own devices and her own internet connection.

99.     Cabell Schools Policy no. 3262 (Anti-harassment and Violence) says that it applies "during any school related activity or during any education sponsored event whether in a building or other property used or operated by the Board of Education or in any other facility being used by the Board." It does not apply to Durstein's off-duty tweets while at home, when school is not in session, using her own devices.

100.    Cabell Schools Policy no. 3210 (Employee Code of Conduct for Professional Employees) prescribes generalized standards of behavior for professional employees while engaging in duties at school or otherwise on behalf of Cabell Schools to educate and supervise students.

101.    Policy no. 3210 does not purport to regulate what teachers do during their leisure time at home, or what they can say to other adults unconnected with the school district during leisure time at home. It does not apply to Durstein's off-duty tweets while at

home, when school is not in session, and in exchanging views with other adults about public controversies.

102.     Before Cabell Schools suspended Durstein without pay, Durstein's counsel had discussed with at least one Cabell Schools administrator that Durstein intended to raise the First Amendment to contest being disciplined for the tweets.

103.     None of the critical reaction to Durstein's tweets was because she had (supposedly) breached school policies while off-duty or was insubordinate while off-duty.

104.     Rather, Cabell Schools concluded that the tweets exposed undesirable beliefs genuinely-held by Durstein literally as expressed, without exaggeration. Cabell Schools concluded that it was unacceptable for an individual who is a teacher to hold such beliefs. Reacting to the embarrassing publicity about the content of the tweets, Cabell Schools fired Durstein.

105.     The above circumstances reasonably imply that Cabell Schools asserted that Durstein violated the three cited policies as a pretext to justify firing Durstein under WVa. Code § 18A-2-8 without invoking the statute's "immorality" ground. The "immorality" ground reflects the crux of Cabell Schools' true rationale for firing Durstein, but would have been more vulnerable to Durstein's expected First Amendment challenge.

106.     Durstein did not publicize the tweets, and she is not responsible for the publicity that they received, either as a matter of law or as a matter of fact.

107.     The tweets were endowed with practical obscurity over the course of a year and longer—until some people whom Durstein does not know chose to transmit the tweets to the press. Those individuals claimed that the tweets offended them, yet they chose to offend others by encouraging the press to publicize the tweets and their connection to a teacher at Cabell Schools.

108.     Durstein did not interfere with Cabell Schools' mission of educating students in a fostering, compassionate, and inclusive environment. If the publicized tweets interfered with Cabell Schools' educational mission and environment, it was due to the people who chose to publicize the tweets, not Durstein.

109.     Also, in deciding to fire Durstein, Cabell Schools applied an interpretation of WVa. Code § 18A-2-8 by West Virginia's highest court that violates Durstein's First Amendment right to free speech both on its face and as applied to Durstein.

110.     West Virginia's highest court has decided that a county board of education may satisfy the rational nexus component of WVa. Code § 18A-2-8 by showing that the teacher's contested off-duty activity has become "the subject of such notoriety" as to significantly and reasonably impair the teacher's "fitness to teach." E.g., <u>Golden v. Bd. of Ed. of Harrison Co</u>., 169 W.Va. 63, 68-69, 285 S.E.2d 665, 669 (1981).

111.     West Virginia's highest court has decided that a county board of education can satisfy the link between "notoriety" and impairment of the teacher's "fitness to teach"  by showing vocal public disapproval of the teacher's contested off-duty activity. <u>Woo v. Putnam Co. Bd. of Ed</u>., 202 W.Va. 409, 412-413, 504 S.E.2d 644, 647, 648 (1998).

112.     Relying on perceived public disapproval of the content of Durstein's tweets, Cabell Schools applied the above standard to Durstein's off-duty speech when it fired Durstein and advocated that standard in opposing her grievance challenging the firing.

113.     Under that rule of law, popular opinion—approving or disapproving of a teacher's contested off-duty expression—controls whether the teacher is unfit to continue teaching, even if there is no evidence that the teacher taught in an unfit manner, justifying her firing.

114.     The First Amendment bars a rule of law, applied to Durstein, that allows popular disapproval of a teacher's off-duty expression to control the teacher's fitness to continue to teach where, as here, there is no evidence that the teacher performed her teaching duties in an unfit manner but instead performed her teaching duties in an exemplary manner.

115.     For the reasons expressed above, Cabell Schools violated Durstein's First Amendment rights by firing her, and WVa. Code § 18A-2-8 violates the First Amendment as applied to Durstein's speech and on its face as construed by West Virginia's highest court.

116.     If Cabell Schools continues to maintain that the three policies cited for Durstein's alleged insubordination applied to her off-duty tweets, then Durstein continues to assert Count 4 as stated in the amended complaint that those policies violate the First Amendment as applied to Durstein's speech.

117.    Durstein hereby withdraws Count 4's challenge to those policies as violating the First Amendment on their face, which she asserted in her amended complaint.

118.    Otherwise, Durstein continues to seek the compensatory and equitable relief pleaded in her amended complaint, as well as a declaratory judgment that the rule of law construing WVa. Code § 18A-2-8 violates the First Amendment on its face and as applied to Durstein.

119.    Durstein also seeks an award of costs and attorneys' fees under 42 U.S.C. § 1988.

## Supplement to Count 5

## (vs. defendant State Superintendent in his official capacity only under 42 U.S.C. § 1983 for declaratory relief)

120.    Because the Superintendent has closed his investigation of Durstein without taking action against her teaching certificates, Durstein no longer seeks a declaratory judgment on the grounds that she asserted in paragraphs 102 and 103 of her amended complaint:  (a) that the First Amendment bars defendant Superintendent from revoking or suspending her teaching certificates based on the content of her five tweets, or (b) that the "immorality" provision of WVa. Code § 18A-3-6 violates the First Amendment as applied to the content and context of Durstein's five tweets.

121.    Durstein holds valid certificates to teach in West Virginia, wishes to maintain them, and wishes to resume teaching in West Virginia schools.

122.    Durstein continues to seek a declaratory judgment that the provision of WVa. Code § 18A-3-6 that allows the Superintendent to revoke or suspend a teaching

certificate for "immorality" violates the First Amendment on its face. It does so in at least the ways summarized in the next paragraphs.

### Standardless discretion re threshold determination of "immorality" of speech

123.    WVa. Code § 18A-3-6 authorizes the Superintendent to revoke a teacher's certificates for "immorality" where there is a "rational nexus between the conduct of the teacher and the performance" of the teacher's job.

124.    The statute requires the Superintendent to make the threshold determination that the teacher has done something that qualifies as "immorality."

125.    In the near identically-worded WVa. Code § 18A-2-8(a), which authorizes county boards of education to fire teachers for "immorality," West Virginia's highest court has acknowledged that "immorality" is "an imprecise word which means different things to different people." Golden v. Bd. of Ed. of Harrison Co., 169 W.Va. 63, 67, 285 S.E.2d 665, 668 (1981).

126.    The Superintendent is the chief administrative officer of the state who regularly interprets, applies, and enforces the "immorality" provision in WVa. Code § 18A-3-6, authorizing him to suspend or revoke a teacher's certificate to teach.

127.    The Superintendent has interpreted Durstein's off-duty speech about issues of public concern as implicating "immorality" under the statute, warranting a prolonged multi-year investigation that placed her teaching certificates in jeopardy, induced prolonged anxiety, and crippled her prospects for a teaching position in West Virginia throughout the investigation's pendency.

Page **30 of 32**

128.     When announcing the close of his investigation of Durstein, the Superintendent did not disavow that the speech expressed in Durstein's Twitter posts, or that any teacher's off-duty speech about public issues, implicates the "immorality" statute.

129.     The statute contains no standards—on its face or as authoritatively interpreted by West Virginia's highest court—to confine the Superintendent's threshold determination of which speech can or cannot qualify as "immoral."

**Viewpoint discrimination re unorthodox views**

130.     Interpreting the near identically-worded WVa. Code § 18A-2-8(a), which authorizes county boards of education to fire teachers for "immorality," West Virginia's highest court interpreted "immorality" to mean failing to conform to the community's principles of what is acceptable. <u>Golden v. Bd. of Ed. of Harrison Co</u>., 169 W.Va. 63, 67, 285 S.E.2d 665 (1981).

131.     The near-identical provision allowing the Superintendent to suspend or revoke a teacher's teaching certificate for "immorality" allows the Superintendent to engage in viewpoint discrimination in violation of the First Amendment. That is:

(a)     The statute gives the Superintendent expansive discretion to make the threshold determination that views about public issues expressed by a teacher while off-duty violate the community's principles of what is acceptable, and thus are "immoral."

(b)     That threshold determination opens the way for the Superintendent to initiate the kind of investigation complained of here, as well as humiliating formal

proceedings in which a teacher must defend the orthodoxy of the views that she expressed, and the actual or potential loss of her teaching license.

### The "rational nexus" condition for revoking a teaching certificate based on "immorality" does not save the statute

132.     The statute does not save its constitutionality by mandating that the Superintendent must find a "rational nexus" between a teacher's "immorality" and the "performance of the teacher's job."

133.     The "rational nexus" limitation supplies no standard to narrow the breadth of the Superintendent's discretion to make the threshold judgment about whether speech can qualify as "immoral" in the first instance, which by itself can trigger an investigation that cripples a teacher's job prospects for over two years while keeping her on edge about whether the Superintendent will seek to suspend or revoke her teaching license.

134.     If the Superintendent concludes that the teacher's off-duty remarks evidence an attitude or belief unacceptable for someone who teaches, it necessarily follows that the teacher's contested expression has a rational nexus to her fitness to teach.

### Statute coerces restraint of speech protected by First Amendment

135.     For teachers who wish to maintain valid West Virginia teaching certificates, the inability to predict which off-duty speech about public issues might qualify as "immorality" in the view of whoever occupies the office of Superintendent inevitably raises the specter of an investigation like the one that Durstein endured, but with no assurance of a benign outcome.

136.     That threat, arising from the breadth of the Superintendent's subjective discretion and the way that West Virginia's highest court has defined "immorality," naturally motivates and coerces licensed teachers to refrain from engaging in certain speech that they have a right to express under the First Amendment, just as Durstein continues to restrain her own First-Amendment-protected speech via social media.

137.     In addition to the declaratory judgment sought by this Supplement to Count 5, Durstein seeks an award of costs and attorneys' fees under 42 U.S.C. § 1988 as pleaded in her amended complaint.

## New Count 6

### (vs. defendant Cabell Board of Education under 42 U.S.C. § 1983—declining to hire Durstein because of her constitutionally-protected speech)

138.     The allegations of all prior paragraphs describing Durstein's applications to Cabell Schools during the summer of 2019 for open teaching positions, and Cabell Schools declining to hire her without asking for an interview are adopted here by reference.

139.     The First Amendment to the United States Constitution protects Durstein's expression about matters of legitimate concern via social media as expressed before Cabell Schools fired her on March 6, 2017, and protects her right to seek legal redress through this lawsuit.

140.     If Durstein's exercise of First Amendment rights was a substantial factor in Cabell Schools' choice to withhold employment from Durstein in response to her applications

Page **33 of 32**

in mid-2019 to fill 24 open teaching positions, and that choice comprised the policy of Cabell Schools or implemented the policy of Cabell Schools, Cabell Schools is liable to Durstein under 42 U.S.C. § 1983.

141.    To be actionable under § 1983, a local government's policy need not be in writing or receive formal approval through official decisionmaking channels.

142.    To be actionable under § 1983, a local government's policy need not be a generally applicable rule that controls future situations; a policy may apply specifically to just one existing situation.

143.    A high-ranking administrator of local government may have *de facto* final authority to establish policy as to a contested matter where the administrator's decision is not subject to meaningful review by a higher authority or the higher authority acquiesces in the administrator's exercise of authority; is within the realm of the grant of authority to the administrator under state and local law; and is not constrained by policies that the administrator did not impose.

144.    Where a high-ranking administrator has *de facto* final authority to establish the local government's policy as to a contested matter, the administrator's decisionmaking is attributed to the local government under § 1983 even though a higher authority has retained the right to approve.

145.    A single decision by a local government administrator whose acts fairly may be said to represent official policy can be actionable under § 1983.

146.     The state and local law and the circumstances summarized in this Supplemental Complaint reasonably imply that the Cabell Superintendent has *de facto* final authority to establish Cabell Schools' policy as to which applicants for classroom teaching positions qualify to be interviewed to join Cabell Schools' faculty and which candidates will join Cabell Schools' faculty. In practice, such decisions by the Superintendent are *de facto* final decisions despite the Board's technical, but unexercised, authority to overturn the Superintendent's decisions.

147.     Durstein's qualifications for those open positions exceeded those of virtually every individual whom Cabell Schools hired to fill them.

148.     The grounds upon which Cabell Schools fired Durstein in March, 2017, were not present when she applied in the summer of 2019 to fill each of 24 open teaching positions.

149.     The existence of Durstein's off-duty tweets as publicized in early 2017 does not present a ground for concluding more than two years later—during late summer of 2019— that Durstein could not thereafter discharge the duties of teaching as required for a substitute teacher, an Evening Social Studies teacher, a Reading/Math Interventionist, an academic coach, or any of the other positions for which Durstein applied at that time.

150.     The circumstances summarized in this Supplemental Complaint reasonably imply that Cabell's Superintendent or the Board decided to "blackball" Durstein, declining to consider her for any of the 24 openings at 14 different schools—including

for critically-needed substitute teaching positions—and declining to invite her to interview with any of the 14 affected school principals.

151.    The circumstances summarized in this Supplemental Complaint reasonably imply that Durstein's off-duty expression about matters of public concern via social media before March 6, 2017—and/or Durstein's seeking legal redress in this lawsuit for Cabell Schools' firing her on that date—comprise substantial factors in Cabell Schools' 24 decisions to reject her applications without even requesting an interview and despite Cabell Schools' declared critical need for substitute teachers.

152.    Cabell Schools' decisions not to hire Durstein for any of those positions, solely or in part because of her past speech about matters of public concern or because of her First Amendment right to pursue this lawsuit, violates Durstein's right to free speech under the First Amendment and has caused injury to her by denying her employment.

153.    Durstein seeks an order compelling Cabell Schools to hire her for a teaching position for which she is qualified and she seeks an award of damages against Cabell Schools in excess of $100,000 for lost professional compensation and employment benefits, emotional distress, mental anguish, embarrassment, humiliation, loss of a pleasurable value of her life, all of which has persisted and is likely to persist indefinitely, and she seeks all other relief to which she is entitled.

154.    Durstein also seeks an award of costs and attorneys' fees under 42 U.S.C. § 1988 to the extent that she qualifies as a "prevailing party" through either a judgment or settlement or otherwise.

Respectfully presented,


/s Michael S. Bailey_____              /s David Marburger_____
WVa. Bar No. 8507                          David Marburger
Michael S. Bailey                          MARBURGER LAW LLC
BAILEY LEGAL SERVICES PLLC                 14700 Detroit Avenue, Suite One
642 Main Street, Suite 201                 Cleveland, OH  44107
P.O. Box 347                               Tel:  216.930.0500
Barboursville, WV  25504                   Email:  david@marburger-law.com
Tel:  304.736.0801
Fax: 304.736.0805                          Of Counsel for Mary Durstein
Email:  mbailey@baileylegalservices.com

Counsel for Mary Durstein

**JURY DEMAND**

Plaintiff hereby demands a trial by jury as to all issues so triable.


/s Michael S. Bailey
WVa. Bar No. 8507
Michael S. Bailey
BAILEY LEGAL SERVICES PLLC
642 Main Street, Suite 201
P.O. Box 347
Barboursville, WV  25504
Tel:  304.736.0801
Fax: 304.736.0805
Email:  mbailey@baileylegalservices.com
Counsel for Mary Durstein

and

/s David Marburger
David Marburger
MARBURGER LAW LLC
14700 Detroit Avenue, Suite One
Cleveland, OH  44107
Tel:  216.930.0500
Email:  david@marburger-law.com
Of Counsel for Mary Durstein

<u>CERTIFICATE OF SERVICE</u>

The undersigned counsel for Plaintiff, Mary Durstein, served the foregoing *Supplemental complaint of plaintiff Durstein for damages and declaratory relief* by electronically filing a copy of the same with the Clerk of the Court using the CM/ECF system on this 14th day of April, 2020 to:

Kelli D. Talbott
Senior Deputy Attorney General
Office of the W. Virginia Attorney General
812 Quarrier Street, Second Floor
Charleston, W. Virginia  25301
Tel:  304.557.8989
Fax:  304.558.4509
Email:  kelli.d.talbott@wvago.gov

*Counsel for State Superintendent of Schools, W. Virginia Dept. of Education*

Perry W. Oxley
David E. Rich
Eric D. Salyers
Oxley Rich Sammons
517 9th Street, P.O. Box 1704
Huntington, W. Virginia 25718-1704
Tel:  304.522.1138
Fax:  304.522.9528
Email: poxley@oxleylawwv.com
Email:  drich@oxleylawwv.com
Email:  esalyers@oxleylawwv.com

*Counsel for Todd Alexander & Cabell County Board of Education*

/s David Marburger
David Marburger