THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**MARY DURSTEIN,**

       **Plaintiff,**

**v.**                                                       **CASE NO.: 3:19-cv-00029**

**TODD ALEXANDER,**
**BOARD OF EDUCATION, CABELL COUNTY SCHOOLS, and**
**STATE SUPERINTENDENT OF SCHOOLS, WEST VIRGINIA DEPT. OF**
**EDUCATION,**

       **Defendants.**

**DEFENDANT TODD ALEXANDER'S MEMORANDUM OF**
**LAW IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

### I.      INTRODUCTION

This Defendant, Todd Alexander ("Defendant Alexander"), by and through counsel, Perry W. Oxley, David E. Rich, Eric D. Salyers, and the law firm of Oxley Rich Sammons, PLLC, hereby submits this Memorandum of Law in Support of his Motion for Summary Judgment. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Alexander is entitled to summary judgment on all claims asserted against him in Plaintiff's Amended Complaint. *See* ECF 20. In support of his Motion, Defendant Alexander states as follows:

### II.      STATEMENT OF FACTS

The Plaintiff, Mary Durstein, worked for Cabell County Schools ("CCBOE") from December of 1999 until the date of her termination, March 6, 2017. *See* ECF 195-1, pg. 10. Around 2011-2012, the Plaintiff started working at Huntington Hugh School. *See* ECF 195-1, pg. 16. During the 2016-2017 school year, the Plaintiff taught World Studies to freshman at Huntington High School. *See* ECF 195-1, pg. 17. The Plaintiff's World Studies class covered the middle east

and the religion of Islam. *See* ECF 195-1, pg. 18, 84. Specifically, the World Studies class is a "survey of various world cultures in which students examine the distinguishing and unique features – including religious, political, and historic features – and major contributions of significant cultures." *See* ECF 195-4, pg. 76. In World Studies, students are to:

> - Compare and contrast political ideologies in order to analyze the evolving role of government in world affairs prior to the year 1900 (e.g., democracies, republics, dictatorships, various types of monarchies, oligarchies, theocracies and parliamentary systems),
> - Explain how migration of people and movement of goods and ideas can enrich cultures, but also create tensions.
> - Explain how the uneven distribution of resources in the world can lead to conflict, competition or cooperation among nations, regions, and cultural groups.
> - Outline the origins of religion in the Middle East and the changing role of women in that region through to the modern (or contemporary) period.
> - Identify and evaluate the individual, political, religious and economic roles in medieval society.
> - Analyze the social, political and economic upheaval and recovery that occurred in Europe during the Middle Ages, including the plague and the subsequent population decline, the predominance of religion and the impact of the crusades.
> - Compare the political actions of European, Asian and African nations in the era of imperial expansion.

*See* ECF 195-4, pg. 76-77. The Plaintiff taught a very diverse group of kids in her World Studies classroom. *See* ECF 195-1, pg. 18. The Plaintiff was aware of at least one Muslim student and one Muslim staff member in 2017. *See* ECF 195-1, pg. 87.

Karima Negmouche, a female journalism student at Marshall University, and 2013 graduate of Huntington High School, retweeted some of the Plaintiff's older tweets on or about January 8, 2017. *See* ECF 193-1, pg. 48, 53-54; ECF 193-2, pg. 28. This action brought notoriety to the tweets of the Plaintiff. *See* ECF 193-1, pg. 48-49.

Jedd Flowers, Cabell Schools' director of communications, was notified of the twitter posts at approximately 3:24 a.m. on January 9, 2017. *See* ECF 187-1, pg. 19. That morning, Mr. Flowers

contacted Superintendent Bill Smith, who in turn asked Defendant Alexander to begin an investigation. *See* ECF 187-1, pg. 157.

Around midday on January 9, 2017, Huntington High School Principal Joedy Cunningham called the Plaintiff into his office for her to meet with him and Defendant Alexander. *See* ECF 195-1, pg. 19; ECF 196-1, pg. 24-25. Defendant Todd Alexander was the Assistant Superintendent of CCBOE. *See* ECF 194-1, pg. 12. Defendant Alexander was asked to report to the school to investigate the tweets and interview the Plaintiff. *See* ECF 194-1, pg. 15-16.  At this meeting, Defendant Alexander discussed at least two tweets with the Plaintiff, which she confirmed were indeed her tweets. *See* ECF 195-1, pg. 21-22.

One tweet that Defendant Alexander discussed with the Plaintiff was a July 16, 2015, retweet from conservative television commentator Ann Coulter that said, "Deport them." *See* ECF 195-1, pg. 21; ECF 195-4, pg. 33; ECF 194-2, pg. 3. Below those words is a photograph of two men and several women posing before the camera, some of whom are wearing hajibs. *See* ECF 195-4, pg. 33. The Plaintiff testified that she retweeted this tweet because she agreed with Ann Coulter. *See* ECF 195-1, pg. 53. The Plaintiff believed that people who commit murder in the name of a religion should be deported and thus retweeted the tweet, however, only one of the individuals was accused of murder, and the photograph included six other Muslim individuals. *See* ECF 195-1, pg. 54; ECF 195-4, pg. 77-78.

Additionally, a May 28, 2016, tweet was discussed with the Plaintiff on January 9, 2017, to which she tweeted "Exactly!!!!!!" in response to two captioned photos, one on top of the other. *See* ECF 195-1, pg. 21; ECF 195-4, pg. 39; ECF 194-2, pg. 4. The top photo shows President Obama when he visited Hiroshima, Japan, that Memorial Day weekend and describes him as "apologizing." *See* ECF 195-4, pg. 39. The photo underneath that one shows the USS Arizona

Memorial at Pearl Harbor, where Japanese bombers sunk the USS Arizona battleship when they attacked Pearl Harbor in 1941. *See* ECF 195-4, pg. 39. Referring to President Obama, the meme's caption says, "[t]his is where you belong you Muslim douchebag." *See* ECF 195-1, pg. 21; ECF 195-4, pg. 39.

Defendant Alexander testified, in response to the tweets of the Plaintiff, that the newspaper was contacting the central office, that citizens from outside the community were contacting the office, and that students were talking about them, so the tweets were becoming a disruption. *See* ECF 194-1, pg. 28.

After the tweets were discussed and the Plaintiff admitted that she was responsible for them, the Plaintiff then used Mr. Cunningham's computer to take down her tweets. *See* ECF 195-1, pg. 22-23. Prior to the Plaintiff removing her twitter account from the public eye, her account, with the username PigPen63, was not protected by any privacy measures, and the general public was free to locate and capture any of her tweets. *See* ECF 195-1, pg. 43-46. In fact, students at Huntington High saw her tweets. *See* ECF 193-1, pg. 91. The Plaintiff testified that Defendant Alexander asked her to take down her twitter account. *See* ECF 195-1, pg. 28. Defendant Alexander and Mr. Cunningham, the other two people in the room, testified that it was the Plaintiff's idea to shut down her twitter account and that Mr. Alexander simply advised her that it was a good idea. *See* ECF 194-1, pg. 51-52, 54; ECF 196-1, pg. 120-121. Defendant Alexander stated, "I did not give her a directive to shut it down." *See* ECF 194-1, pg. 57. Mr. Cunningham testified that it was the Plaintiff's suggestion to take down her twitter account. *See* ECF 196-1, pg. 121. Nonetheless, Defendant Alexander testified that he wanted to prevent and control the disruption that the Plaintiff's tweets caused by having the twitter account shut down in the interim

period and did not intend for it to be shut down indefinitely. *See* ECF 194-1, pg. 35-36. There was nothing preventing the Plaintiff from reopening her twitter account. *See* ECF 196-1, pg. 128-130.

Additionally, the Plaintiff testified that Defendant Alexander informed the Plaintiff that CCBOE would handle the media on her behalf. *See* ECF 195-1, pg. 31. Specifically, the Plaintiff testified that Defendant Alexander stated, "they would be handling it and for me not to speak to anyone from the media." *See* ECF 195-1, pg. 31. Defendant Alexander testified that he advised her not to speak to the media. *See* ECF 194-1, pg. 69. Mr. Cunningham also testified that Defendant Alexander used the term advised. *See* ECF 196-1, pg. 142. Following the January 9, 2017, meeting, the Plaintiff was placed on paid administrative leave. *See* ECF 195-1, pg. 33-34. Defendant Alexander testified that he believed that if the Plaintiff would have returned to Huntington High, "it would have been detrimental to the educational climate at the school. *See* ECF 194-1, pg. 132-133.

On January 23, 2017, the Plaintiff met with Bill Smith, then Superintendent of CCBOE. *See* ECF 195-1, pg. 36. This meeting and the decision of the Superintendent to suspend the Plaintiff without pay and to ask the Board to terminate the Plaintiff's employment was reduced to writing by letter dated January 24, 2017. *See* ECF 195-4, pg. 76-80. The January 24, 2017, letter discussed six tweets at issue: (1) a July 16, 2015, tweet stating "@ericbolling #cashinin #WakeUpAmerica #viewcrew Who cares if we offend Muslims at least they keep their heads on tact. They're the enemy!", (2) the July 16, 2015, retweet of Ann Coulter discussed above, (3) the May 28, 2016, tweet of President Obama in Japan discussed above, (4) a meme that shows a man and a woman who is wearing a hajib that fully covers her head and face with the caption: "Islamist advantage: When you divorce your wife and remarry, you can still keep the same photo on your desk" with the Plaintiff retweeting the meme, adding "Too funny not to tweet!", (5) a December 29, 2016

tweet in response to a Fox News tweet regarding Sikh officers being allowed to wear turbans stating "only until January 20th", referring to President Trump assuming office on January 20, 2017, and (6) a retweet of a statement by Seve Hirsch: "And…..It's muslims. [sic] We must name our enemy and stop being politically correct. #IslamIsTheProblem #BuildTheWall.". *See* ECF 195-4, pg. 76-80.

In the January 24, 2017, letter, the Superintendent stated that "your public statements are antithetical to the course content you are paid by the Board to impart to students. I find that your continued employment as a Social Studies teacher is simply and in every way untenable." *See* ECF 195-4, pg. 79. Moreover, the Superintendent noted the numerous complaints by former students, parents, and members of the public. *See* ECF 195-4, pg. 79. Additionally, the Superintendent noted the notoriety of the tweets in the news media. *See* ECF 195-4, pg. 79-80. Finally, the Superintendent found that the Plaintiff's public statements "are inconsistent with each of the policies described above," referring the Employee Code of Conduct, the policy regarding Anti-Harassment and Violence, and the policy regarding Educational Purpose and Acceptable Use of Electronic Resources, Technologies and the Internet. *See* ECF 195-4, pg. 80.

In the Employee Code of Conduct, policy 3210 provides "[t]his policy also requires Cabell County professional employees respond immediately and consistently to incidents of bullying, harassment, intimidation, substance abuse and/or violence, or any other code of conduct violation that impacts negatively on students in a manner that effectively addresses incidents, deters future incidents, and affirms respect for individuals." *See* ECF 195-1, pg. 89. Policy 3362 regarding Anti-Harassment and Violence provides: "The board vigorously enforces prohibition against discriminatory harassment based on race, color, national origin, sex … disability, age, blindness, creed, or religion, ancestry, socioeconomic status, physical appearance, sexual orientation, mental,

physical, developmental sensory disability or genetic information that are protected by federal civil rights laws." *See* ECF 195-1, pg. 90. Further, Section C regarding Religious/Ethnic harassment provides "It is the responsibility of all students and employees to promote and maintain an environment free of all types of religious/ethnic harassment. *See* ECF 195-1, pg. 91. Finally, the Acceptable Use policy, under West Virginia Board of Education Policy 2460, Section 5(8)(B)(1) "prohibits staff from engaging on social media inside or outside of the classroom and any behavior that constitutes a violation of district or county policy or that is detrimental to the health and/or welfare of students." *See* ECF 195-1, pg. 93. The same policy also prohibits "Cyberbullying, hate mail, defamation, harassment of any kind, discriminatory jokes and remarks and other unauthorized uses as referenced in WVBE policies and other policies and laws." *See* ECF 195-1, pg. 97.

Ghada Hamad, the Plaintiff's Muslim co-worker, was offended and upset by her tweets. *See* ECF 195-1, pg. 66. Ms. Hamad stated that she found the Plaintiff's tweets to be highly offensive, racists, bigoted, and that she felt threatened by them, so much that she cried. *See* ECF 196-2, pg. 16.

Moreover, on January 17, 2017, the Muslim Association of Huntington, through Dr. Majed Khader, who is Muslim, authored a letter to the Board regarding the tweets of the Plaintiff. *See* ECF 195-6; ECF 189-1, pg. 19, 78. The first paragraph of the letter provides that "[t]he Muslim community in Huntington was shocked and deeply offended by the tweets of Mrs. Durstein" and that they were worried about the effect the tweets will have on the children. *See* ECF 195-6. Moreover, Dr. Khader testified that several members of the community were talking about the Plaintiff's tweets, and as a result he took extra measures hiring police officers to guard their local

Mosque because he was afraid someone would attack them as a result of her tweets. *See* ECF 189-1, pg. 91. Additionally, the first paragraph provides the following regarding the Plaintiff's tweets:

> Tweets such as 'Who cares if we offend Muslims, they are the enemy, Islam is the problem,' or retweeting Ann Coulter's tweet 'Deport them' in reference to a picture of a Muslim family are unbecoming of an educator, let alone a social studies teacher who is supposed to set an example for the students' conduct and understanding of the complex society we live in and prepare them to exemplary citizens. Needless to say, these tweets along with equally inflammatory ones on African-Americans are indicative of bigotry, hatred, and I'm sorry to say ignorance. A Muslim or African-American teenager attending Huntington High would definitely feel inferior, at least unwelcome in his or her own state should this behavior go unchecked.

*See* ECF 195-6. When asked if the Plaintiff disagreed with any of the above statements by the Muslim Association of Huntington, she replied "no." *See* ECF 195-6, pg. 99. Thus, the Plaintiff agreed that her tweets were offensive, unbecoming of an educator, indicative of bigotry, hate, and ignorance, and that Muslim and/or African-American teenagers would feel inferior because of her tweets.

Yazan Khader graduated Huntington High School in 2016. *See* ECF 188-1, pg. 9. He is the son of Dr. Majed Khader. *See* ECF 189-1, pg. 19. Mr. Khader didn't have any interaction with the Plaintiff at Huntington High School other than some brief interaction through the National Honor Society. *See* ECF 188-1, pg. 29-30. Yazan's family follows the Islamic faith. *See* ECF 188-1, pg. 56. Yazan found the Plaintiff's tweets to be "super offensive" and "racist." *See* ECF 188-1, pg. 55-57. Yazan went on to testify that he felt the tweets were anti-Muslim, indicative of bigotry, and that not only would he not feel comfortable in the Plaintiff's classroom, but he would also be "quite terrified" because she doesn't like him or his people. *See* ECF 188-1, pg. 57-58.

Karima Negmouche is a former Huntington High student. *See* ECF 193-1, pg. 25. Karima and her family are Muslim. *See* ECF 193-1, pg. 22-23. Karima, as a Muslim, was offended by the Plaintiff's tweets. *See* ECF 193-1, pg. 50. Karima testified that the Plaintiff's tweets were anti-

Muslim and inappropriate.  *See* ECF 193-1, pg. 90-92. Karima also testified that she would feel

uncomfortable receiving an education from the Plaintiff. *See* ECF 193-1, pg. 92.

Of course, a person does not have to be a Muslim to be offended by the Plaintiff's tweets.

Mr. Cunningham was offended by her tweets. *See* ECF 196-1, pg. 54. Mr. Cunningham took phone

calls and emails from individuals all over the country who believed the Plaintiff should be removed

from teaching. *See* ECF 196-1, pg. 155. Trevor Ellis, a 2016 Huntington High graduate, felt the

tweets were racist and anti-Muslim. *See* ECF 192-1, pg. 6, 19. Mr. Ellis did not believe someone

with the opinions expressed in the Plaintiff's tweets should be teaching. *See* ECF 192-1, pg. 25,

45.

Ms. Cynthia Fuller, a member of the community who was active on twitter disapproving

of the Plaintiff's tweets, testified that "someone who is openly racist should not be teaching

children. *See* ECF 190-1, pg. 24-25. She alerted the media, specifically WSAZ, of the tweets

because she wanted the Plaintiff "to be exposed for her racist and culturally insensitive comments."

*See* ECF 190-1, pg. 43. Ms. Fuller had friends of the Islamic faith in the Speech and Debate

program at Marshall who were incredibly upset at the Plaintiff's tweets. *See* ECF 190-1, pg. 51.

Ms. Fuller testified that she would not feel comfortable receiving an education from the Plaintiff.

*See* ECF 190-1, pg. 51-52.

Of course, other than the Plaintiff's tweets, there are additional examples of bigotry, hate,

ignorance, and offensive conduct. Kya Robinson, a former biracial student at Huntington High

School, stated the Plaintiff made racist comments regarding her hair and skin, telling her that her

hair looked "like you just stuck your finger in a light socket" and that her skin was ashy. *See*

Affidavit of Kya Robinson, ECF 206-1. Further, Ms. Robinson confirmed that the Plaintiff has

two separate bottles of lotion in her classroom, one labeled white people lotion and the other black

people lotion. *Id*. Ms. Robinson felt unwelcome in the Plaintiff's classroom and did not feel comfortable receiving an education from her due to her tweets and treatment of minorities. *Id*. Moreover, Hannah Graham, a former Huntington High student, once observed the Plaintiff teaching a class where she put all of the white students in a group of "lords" and all the minorities into the "serfs/peasants" group while teaching a class on the feudal system. *See* Affidavit of Hannah Graham, ECF 206-2.

A former coworker, Julie Sheils, was deposed on September 14, 2021. Mrs. Sheils testified that Mrs. Durstein once stated "do not let black kids near my desk…ew." *See* ECF 205-1, pg. 49. Mrs. Sheils also felt that, as a teacher, the Plaintiff's tweets were inappropriate. *See* ECF 205-1, pg. 50.

Additionally, Josh Nelson, a teacher at Huntington High, noted that when the tweets were reported in the news his students wanted to spend time discussing the tweets during the time that was designated for classroom instruction. *See* Affidavit of Josh Nelson, ECF 206-3. As a result, the Plaintiff's tweets were disruptive to his teaching and her tweets failed to promote a healthy learning environment. *Id*.

On March 6, 2017, CCBOE held an evidentiary hearing and voted to terminate the employment of Mrs. Durstein. *See* ECF 195-1, pg. 41. On March 7, 2017, the Board's decision was provided to the Plaintiff in writing. *See* ECF 195-4, pg. 82. The March 7, 2017, termination letter provided that the reasons for the Board's actions were outlined the in the January 24, 2017 suspension letter. *See* ECF 195-4, pg. 82.

The Plaintiff appealed her termination, and the West Virginia Education and State Grievance Board upheld the termination on or about September 22, 2017. *See* ECF 20, ¶ 46; ECF 195-1, pg. 44; *see also* the September 22, 2017 Decision of the West Virginia Public Employees

Greivance Board, Docket No. 2017-1955-CabED, ECF 206-4. In the greivance, the Plaintiff alleged she was unlawfully terminated in violation of her First Amendment rights. *See* ECF 206-4. The West Virginia Public Employees Greivance Board held multiple hearings and made findings of fact proven by a preponderance of the evidence. *See* ECF 206-4.

Specifically, the Administrative Law Judge William B. McGinley, among other things, found that other twitter users contributed to the notoriety of the Plaintiff's tweets, and that no agent of Cabell County Schools initiated contact with any media member. *See* ECF 206-4, pg. 8. Judge McGinley found that the Plaintiff agreed to close and take down her twitter account. *See* Exhibit D, pg. 9. The story regarding the tweets made international news. *See* ECF 206-4, pg. 9. Judge McGinley found that the Plaintiff's "away from work behavior clearly violates the word and spirit of the Cabell County Employee Code of Conduct." *See* ECF 206-4, pg. 20.

In analyzing the Plaintiff's First Amendment claim, Judge McGinley found that: "Because of their negative nature toward Muslims and African-Americans, Grievant's post would more likely than not, disrupt discipline and harmony among her students and coworkers. Consequently, Grievant's Twitter posts are not protected speech for which Respondent would be prohibited from terminating her employment." *See* ECF 206-4, pg. 26. Moreover, Judge McGinley found that, even if the Plaintiff's speech was protected, that Cabell Schools' "interest in creating a safe and healthy and unbiased learning environment outweighs the Grievant' s right to make bigoted public posts." *See* ECF 206-4, pg. 27. As a result, Judge McGinley found that Cabell Schools was not prohibited by the First Amendment from terminating the Plaintiff as a result of her tweets. *See* ECF 206-4, pg. 27.

The Plaintiff filed her Amended Complaint on February 28, 2019. *See* ECF 20. Plaintiff has two Counts in her Amended Complaint against Defendant Alexander: Count I, a 42 U.S.C. §

1983 claim against Defendant Alexander for violating her First Amendment rights by directing her to terminate her Twitter account, and Count III, a 42 U.S.C. § 1983 claim against Defendant Alexander for violating her First Amendment rights by instructing her not to speak to the press. *See* ECF 20.

The Defendants retained expert Saundra K. Shuster, Esq., Partner with TNG: The NCHERM Group, LLC. *See* Defendants Expert Witness Disclosure, ECF 206-5. Ms. Schuster is a well-regarded expert in preventive and civil rights law for education, notably in the fields of free speech and First Amendment law as they apply to secondary schools. *Id*. Ms. Schuster has significant experience in providing public schools and colleges on the First Amendment in regard to the rights of their students and employees and has significant experience in college administration and teaching. *Id*. Ms. Schuster was not deposed, but did prepare a report in this matter wherein she opined that the Plaintiff's tweets "represent a significant conflict with the very nature of her role as a World Studies teacher and significantly impact her ability to discharge her teaching responsibilities." *Id*. Moreover, Ms. Schuster concluded that the Plaintiff's tweets "created a significantly negative public opinion of Ms. Durstein and an impact on Ms. Durstein's ability to effectively perform her job as a World Studies teacher or to maintain respect and confidence among the teaching staff and students at the school." *Id*. Finally, Ms. Schuster opined that:

> Even if the public posts Ms. Durstein made are determined to be protected speech, her out of the classroom actions clearly violates the Code of Conduct related to bias and intimidation and would have a substantially detrimental impact on her effectiveness as a teacher.  In this case, her comments compromised the efficient and orderly operation of the school to operate a prejudice free and unbiased learning environment.

*Id*.

On August 16, 2021, the Plaintiff started teaching a seventh-grade world history class at Ironton Local Schools. See ECF 195-1, pg. 120. However, on May 16, 2022, the Ironton School Board voted not to renew her contract, as a result of the tweets that are the subject matter of this case. *See* https://www.irontontribune.com/2022/05/18/ironton-boe-reverses-course-on-renewing-teacher-contract/. The vote of non-renewal was due to an outcry of current students, former students, and parents over the Plaintiff's prior tweets at issue in this case. *Id*.

### III.     LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that either complete or partial summary judgment may be granted when it appears that there is "no genuine issue as to any material fact." A genuine issue exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson* at 247-48 (emphasis original).

"In other words, summary judgments should be granted in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." *Miller v. Fed. Deposit Ins. Corp.*, 906 F.2d 972, 973-74 (4th Cir. 1990) (citing *Charbonnages De France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950)). "On summary judgment, any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Miller*, 906 F.2d at 974 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986)). "However, where the record taken as a whole

could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Miller*, 906 F.2d at 974 (citing *Matsushita Elec. Indus. Co., Ltd*, 475 U.S. at 587; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

## IV.   ARGUMENT

**A.  Qualified immunity shields Defendant Alexander from Count 1 of Plaintiff's 42 U.S.C. §1983 claim for allegedly instructing her to terminate her twitter account.**

The well-known purpose of qualified immunity is to shield government officials performing their duties from the burdens of trial and the threat of monetary liability. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Without such an immunity, the operations of government would be immobilized." *Torchinsky v. Siwinski*, 942 F.2d 257, 260 (4th Cir. 1991).  Government officials would be hindered from vigorously performing their discretionary duties in order to avoid the risk of being sued in federal court. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Harlow*, 457 U.S. at 814. To limit these costs, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v.* Briggs, 475 U.S. 335, 341 (1986). Thus, government officials forfeit this immunity defense only where a reasonable official would have known that an action violated clearly established constitutional rights. *Harlow*, 457 U.S. at 818; *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc).

In order for qualified immunity to apply to a government official's actions, the official bears the burden of demonstrating his conduct falls within the scope of his or her official duties or discretionary authority. *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997). Otherwise, a government official "who performs an act *clearly established* to be beyond the scope of his discretionary authority" is not entitled to a qualified immunity defense. *Id.* (emphasis added). In order to determine whether the act complained of is clearly established within the official's authority, courts are to analyze whether "a *reasonable official* in the defendant's position would have known

14

that the conduct was *clearly established* to be beyond the scope of that authority." *Id.* (emphasis added). This is an objective test that requires courts to ask, "whether the act complained of, if done for a proper purpose, would be within, *or reasonably related to, the outer perimeter* of an official's discretionary duties." *Id.* (emphasis added).

Once it is established that qualified immunity applies, a two-step inquiry follows. First, the court is to determine whether the official violated a constitutional right, and second, whether the right at issue was "clearly established" at the time of its alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 547 (4th Cir. 2010); *Little v. PrimeCare Med. of W. Virginia, Inc.*, No. CV 3:20-0684, 2021 WL 4204337, at 3 (S.D.W. Va. Sept. 15, 2021). While the order of the two-step analysis is interchangeable, qualified immunity is a complete defense to federal §1983 claims if either element is not met. *Pearson v. Callahan*, 555 U.S. 223, 238 (2009).

In the case at hand, Defendant Alexander is entitled to a qualified immunity defense against both of Plaintiff's §1983 claims because his actions were within his discretionary authority, his actions did not violate a constitutional right, and, even if he had, the constitutional right at issue was not clearly established.

### i.  Defendant Alexander's actions were within his discretionary authority.

Plaintiff incorrectly claims that Defendant Alexander violated her First Amendment rights by forcing her to terminate her personal Twitter account. Not only did no constitutional violation occur, but qualified immunity also applies to Defendant Alexander and insulates him from this claim.

It is undeniable that government employers and supervisors have the discretionary authority to investigate and discipline employees for their out-of-work speech and to limit that

speech in certain scenarios. *Sims v. Metro. Dade Cty.*, 972 F.2d 1230, 1236 (11th Cir. 1992); *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); ECF 56. This same discretionary authority necessarily includes a government employer's ability to investigate and curtail an employee's speech on social media.

The scope of authority determination is normally made by analyzing the case law, statutes, or regulations controlling the official's duties. *Id; In re Allen*, 106 F.3d at 594; *Doe v. McMillan*, 412 U.S. 306, 319–20, 93 S.Ct. 2018, 2028, 36 L.Ed.2d 912 (1973). However, courts are to make this assessment from a "layman's perspective" and should recognize that "[laypeople] cannot be expected to perform [a legal evaluation] at the level achievable by those trained in the law." *Bland v. Roberts*, 730 F.3d 368, 393–94 (4th Cir. 2013), as amended (Sept. 23, 2013). As such, law and regulations are not dispositive of the scope of authority question if a reasonable official in Defendant Alexander's position would not have known that the conduct was clearly established to be beyond the scope of that authority. *In re Allen*, 106 F.3d at 594.

To this point, a reasonable official in Defendant Alexander's position would have been surprised to learn his authority stops where social media begins for multiple reasons. First, statutes and regulations governing Defendant Alexander's position within the CCBOE suggest his authority is at its broadest when there are accusations of racial, ethnic, and/or religious discrimination or harassment. For example, the West Virginia Human Rights Act makes it clear that any superintendent, agent, or employee of any place of public accommodation cannot withhold any privileges or services provided by the place of public accommodations due to an individual's

race, religion, color, national origin, or ancestry. [1]  W. Va. Code Ann. §5-11-9(6)(A). The West Virginia Human Rights Act also prohibits an employee of any place of public accommodation from publishing, circulating or otherwise displaying any written or printed communication that suggest an individual is unwelcome because of their race, religion, color, national origin, or ancestry. W. Va. Code Ann. §5-11-9(6)(B). It should be obvious that these two statutory provisions allow an agent of an employer for a place of public accommodation, such as Defendant Alexander, to investigate any tweets that were "published" by an employee, such as Plaintiff, and to request the removal of those tweets if necessary. Otherwise, the place of public accommodation could face repercussions from the West Virginia Human Rights Commission or litigation in the circuit courts of the state. It does not follow logically if public employers that represent places of public accommodations must stand idly by while their employee's public social media posts open them up to penalties and legal consequences under the law.

Second, state regulations also confirm that racial, religious, and ethnic harassment or discrimination is cause for a thorough investigation. To this point, one regulation dealing with the procedure for investigating allegations of inappropriate behavior in schools' states as follows:

> "The county designee *shall immediately* undertake or authorize an investigation upon receipt of a report or complaint. The investigation may be conducted by school/county officials, or by a third party designated by the county school system.
>
> The investigation must, at a minimum, consist of personal interviews with the complainant, the individual(s) against whom the complaint is filed, and others who may have knowledge of the alleged incident(s) or circumstances within the complaint. The *investigation may also consist of any other methods and review of circumstances deemed pertinent by the investigator.*"

---

[1] The definition for "place of public accommodation" includes political subdivisions such as the CCBOE and its employees. W. Va. Code Ann. §5-11-3(j).

W. Va. Code R. 126-99 (emphasis added). A reasonable official in Defendant Alexander's position would believe that the "any other methods" referenced in the regulation includes the ability to investigate a social media account and request the removal of social media posts from the public eye that are related to said investigation. Similarly, a regulation that provides examples of interventions and consequences for those accused of racial, religious or ethnic harassment provides:

> Upon receipt of a complaint of racial, sexual, and/or religious/ethnic harassment or violence that has been substantiated through investigation, the appropriate school official shall take action appropriate to the status of the offender (student, staff, or public guest) …. Actions for staff *may include but not be limited to*, warning, suspension, termination, revocation of licensure, notification of law enforcement and/or human services.

W. Va. Code R.  126-99 Appendix B (emphasis added). Considering the use of the phrase "not be limited to," a reasonable official in Defendant Alexander's position would read this regulation and have no idea he is prohibited from asking the employee to remove social media posts that precipitated the complaints of racial, ethnic, and religious harassment.

This result is bolstered even more through an analysis of West Virginia Code §21-5H-1. The statute unequivocally declares, "[n]othing in this section *diminishes the authority and obligation of an employer* to investigate complaints, allegations or the occurrence of sexual, *racial, or other harassment* as provided in this code." West Virginia Code §21-5H-1(d) (emphasis added). Furthermore, the statute explains that nothing prevents an employer from "[c]onducting an investigation or requiring an employee to cooperate in an investigation." West Virginia Code §21-5H-1(b)(4). The statute also *fails to prohibit* an employer from requesting an employee to remove

a social media account or social media posts from the public eye.[2] Thus, a reasonable official in Defendant Alexander's position would have no idea that such a request would be beyond his discretionary authority.

### ii. Defendant Alexander's actions did not violate a constitutional right of the Plaintiff.

Because Defendant Alexander's actions were within his discretionary authority, the Court must next determine whether a constitutional right was violated and whether that right was clearly established at the time of the violation. *Katz*, 533 U.S. at 201. Generally speaking, the First Amendment protects citizens from being punished for their speech. However, the calculous changes when a citizen becomes an employee of the government, and, as a result, "the citizen by necessity must accept certain limitations on his or her freedom." *Waters v. Churchill*, 511 U.S. 661, 671 (1994). In cases involving an alleged First Amendment violation, courts are to apply the standard set forth in *Pickering*. 391 U.S. at 568. They are to first assess whether the employee spoke as a citizen (not pursuant to her official duties) on a matter of public concern. *Id.*; *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). If the employee did speak as a citizen on a matter of public concern, courts must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

The Defendant recognizes that the Plaintiff was likely speaking as a citizen on matters of public concern. Thus, the Court can proceed to the balancing of interests under *Pickering*. *Id.* The Fourth Circuit has previously stated:

---

[2] The only actions that are prohibited by the statute are described in the first three subsections. West Virginia Code §21-5H-1(a)(1-3). Importantly, Defendant Alexander never violated any of these three restrictions through his alleged request.

> Factors relevant to this inquiry include whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

*Brickey v. Hall*, 828 F.3d 298, 304 (4th Cir. 2016); *Ridpath v. Board of Governors Marshall Univ.*, 447 F.3d 292, 317 (4th Cir.2006); *Bland v. Roberts*, 730 F.3d 368, 374 (4th Cir. 2013), as amended (Sept. 23, 2013). Importantly, "[courts] *do not require* the public employer to prove that the employee's speech *actually disrupted efficiency*," instead they only require that an adverse effect was reasonably apprehended. *Smith v. Gilchrist*, 749 F.3d 302, 309 (4th Cir. 2014)(emphasis added); *Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir.1992); *Connick*, 461 U.S. at 152.

Factors 2, 3, 4, 5, 6, and 8 all weigh in favor of Defendant Alexander. A number of Plaintiff Durstein's co-workers and/or former students of Huntington High have testified or provided affidavits that the speech at issue affected their relationship and ability to work or learn alongside Plaintiff Durstein. Additionally, Plaintiff was a World Studies teacher at Huntington High School that taught about the very religions, races, and cultures she attacked on social media. As a result, her credibility and responsibility to opine on the same issues in the classroom setting with potential Muslim and African America students was destroyed by her own statements. Testimony and affidavits show that students of these racial and religious backgrounds were offended by the Plaintiff's comments. Clearly, as supported by the record, students of all races and creeds would not want to participate in lessons taught by the Plaintiff. The statements also cut against the Code of Conduct teachers are required to abide by and undermined her employer's ability to carry out its own mission of creating an inclusive and caring educational environment. Furthermore, the

operations of the school were disrupted as a result of the firestorm Plaintiff's social media created. The record in this matter is replete with testimony that describes a sharp increase in the amount of phone calls, complaints, and concerns the school and CCBOE received from concerned citizens. Additionally, affidavits and other testimony make it clear that the students at Huntington High often wanted to discuss the social media posts during classroom instruction instead of engaging in their daily lessons.

Additionally, Defendant Alexander believed there could be additional social media posts that would cause additional outrage in the community that had not yet been discovered by the public. Based on this alone, Defendant Alexander would be justified in his actions because of the weighty interests of the government employer he represents. Given what he knew about the social media posts that had been discovered, the outrage they had caused, and the potential for more posts to come to light, Defendant Alexander reasonably anticipated that the operations and services within Huntington High and the school district at large would be disrupted. The Supreme Court of the United States has instructed federal courts to "refrain from second guessing the disciplinary decisions made by school administrators" unless those decisions were "clearly unreasonable." *Karasek v. Regents of U. of California*, 956 F.3d 1093, 1108–09 (9th Cir. 2020) (citing *Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.,* 526 U.S. at 648, 119 S.Ct. 1661).

Moreover, the Plaintiff removing her twitter account was her own idea, according to the only other people in the room, Defendant Alexander and Mr. Cunningham. Defendant Alexander simply advised the Plaintiff that removing her account was a good idea. As a result, there was no violation of the First Amendment through Defendant Alexander's actions, and qualified immunity disposes of Plaintiff's claim in Count One.

### iii.    Defendant Alexander's actions did not violate a constitutional right that was clearly established.

Even if the Court is inclined to hold there was a constitutional violation by Defendant Alexander, qualified immunity still applies because the right at issue was not clearly established when the alleged violation occurred. For this second prong of the qualified immunity analysis, a right is clearly established when the contours of the right are sufficiently clear to ensure that a reasonable official would have understood that the alleged conduct was unlawful. *Wilson v. Prince George's Cnty., Md.*, 893 F.3d 213, 221 (4th Cir. 2018). To determine whether a right is clearly established, the Court examines whether the Supreme Court, the Fourth Circuit, or the Supreme Court of Appeals of West Virginia have decided the law. *Id.* Specifically, a right must be sufficiently clear "that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In other words, "existing precedent must have placed the statutory or constitutional question *beyond debate*." *Id.* (emphasis added). This, just like the scope of authority analysis, is completed from a "layman's perspective" with their legal limitations in mind. *Bland*, 740 F.3d at 393-394.

A review of the applicable case law revealed no opinion, prior to January 9, 2017, that deals with the constitutionality of a government employer asking an employee to remove a social media post from the public eye as part of a larger investigation. Moreover, no case was found that stated such a request could not be made after the inflammatory speech had been posted to social media, and the outrage in the community had already begun to take hold. Courts should not require a layperson to parse this case law regarding prior restraints and apply it in an *ex post facto* situation that entails an entirely different legal analysis. *Id.* As such, no reasonable official in Defendant Alexander's position would realize that his alleged request to remove social media posts from the

22

public eye violated any constitutional right held by the Plaintiff. Thus, qualified immunity insulates Defendant Alexander from this claim.

**B. Qualified immunity shields Defendant Alexander from Count 3 of Plaintiff's 42 U.S.C. §1983 claim for allegedly instructing her to not speak to the press.**

Similar to Count One, in order to see if qualified immunity is applicable to Count Three, the Court must look to whether the action complained of is within the scope of Defendant Alexander's official duties. *In re Allen*, 106 F.3d at 594. However, this analysis is easily dispensed with here. It is indisputable that a public employer has the authority to limit an employee's speech. *Sims,* 972 F.2d at 1236; *Connick*, 461 U.S. 138; *Pickering*, 391 U.S. 563. Additionally, this Court has ruled on a previous occasion that qualified immunity is applicable to the §1983 claim asserted in Count Three of Plaintiff's Amended Complaint. *See* ECF 56. As a result, the Court can consider to the two-step qualified immunity analysis.

Again, the first step is to determine whether Defendant Alexander's conduct violated a constitutional right. *Katz*, 533 U.S. at 201. In the First Amendment context, this requires a court to establish whether Plaintiff was prohibited from speaking as a citizen on a matter of public concern. *Garcetti*, 547 U.S. at 418. This is an issue that has already been dispensed with by the Court previously. *See* ECF 56.

 Because this particular claim involves an allegation of a prior restraint issued to a *single employee* as part of a disciplinary action and investigation, the Court should apply the previously discussed *Pickering* analysis next. *Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016) (stating the basic *Pickering* balancing tests applies *unless* there is "a generally applicable statute or regulation (*as opposed to a post-hoc disciplinary action*) operates as a prior restraint on speech.") (emphasis added). Critically, there is no generally applicable statute or regulation limiting prospective speech at issue with regard to Count Three, so the stricter standard set forth

in *United States v. Nat'l Treasury Emps. Union* (NTEU), 513 U.S. 454, (1995) is not applicable. *Baar v. Jefferson Cnty. Bd. of Educ.*, 311 F. App'x 817, 821 (6th Cir. 2009); *Belcher v. City of McAlester, Oklahoma*, 324 F.3d 1203, fn. 3 (10th Cir. 2003); *Latino Officers Ass'n, New York, Inc. v. City of New York*, 196 F.3d 458, 464 (2d Cir. 1999); *Swartzwelder v. McNeilly*, 297 F.3d 228, 237 (3d Cir. 2002); *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1439 (D.C. Cir. 1996); *Harman v. City of New York*, 140 F.3d 111, 118 (2d Cir. 1998).

Here, Defendant Alexander's interest in the efficient operation of Huntington High and the school district at large outweighs Plaintiff's interest in speaking as a citizen on matters of public concern. Defendant Alexander knew that the public had already taken a considerable interest in Plaintiff's tweets on the day he allegedly instructed Plaintiff not to speak to the press. The news coverage quickly resulted in the CCBOE receiving multiple complaints about Plaintiff's tweets. Defendant Alexander was worried that exposing Plaintiff to the press would generate more news reports and public outcry. The idea being Plaintiff's hypothetical interviews with the press would add fuel to the fire that was already growing in intensity.

To this point, Defendant Alexander did not have to wait for an actual disruption to the Huntington High or the school district, he simply had to reasonably apprehend such a disruption. *Gilchrist*, 749 F.3d at 309; *Maciariello*, 973 F.2d at 300; *Connick v. Myers*, 461 U.S. at 152. Moreover, Courts should "refrain from second guessing the disciplinary decisions made by school administrators" unless those decisions were "clearly unreasonable." *Karasek v. Regents of U. of California*, 956 F.3d 1093, 1108–09 (9th Cir. 2020) (citing *Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.,* 526 U.S. at 648, 119 S.Ct. 1661). Logically, a reasonable official in Defendant Alexander's position would believe that allowing Plaintiff to be interviewed or questioned by the press would further divide the public, CCBOE staff, and students that were

24

offended by the tweets. Moreover, one could argue that the request not to speak to the press benefitted the Plaintiff. Additionally, the testimony shows that Defendant Alexander advised the Plaintiff not to speak to the press and did not prohibit her from doing so. As such, the *Pickering* analysis weighs in favor of Defendant Alexander yet again, and no constitutional violation occurred.

Even if there was a constitutional violation, the second prong in the qualified immunity analysis also favors Defendant Alexander. In that regard, the Court must find that the right allegedly violated was clearly established at the time of the violation. *Katz*, 533 U.S. at 201-202. A right is clearly established when a reasonable official would have understood their alleged conduct was unlawful. *Wilson*, 893 F.3d at 221. Here, the only two cases that may establish the constitutional right at issue fail to create a "bright line" and leave the Defendant to make a guess in one of the many "gray areas" in the law. *Gilchrist*, 749 F.3d at 307; *Maciariello*, 973 F.2d at 298. Specifically, in *Mansoor v. Trank*, the court applied the incorrect balancing test to a prior restraint placed on a single employee. 319 F.3d 133 (4th Cir. 2003) (applying the *NTEU* standard *only because* the lower court had employed that test, and no party challenged the issue). Similarly, in *Liverman v. City of Petersburg,* the prior restraint at issue was related to a generally applicable policy that imposed a prior restraint—not a disciplinary and investigatory action imposed on a single employee's speech. 844 F.3d at 407. Additionally, rights that rely on a balancing of interests are rarely upheld because the analysis is "subtle, difficult to apply, and not yet well-defined." *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995) Thus, a reasonable official in Defendant Alexander's position may have believed his actions were entirely lawful. As a result, qualified immunity shields Defendant Alexander from the claim asserted in Count Three of Plaintiff's Amended Complaint.

**C. Even if qualified or statutory immunity does not apply, Plaintiff has failed to demonstrate a violation of the First Amendment alleged with respect to Count One or Count Three of Plaintiff's Amended Complaint.**

Regardless of whether this Court finds that qualified immunity applies to either of Plaintiff's claims against Defendant Alexander, no First Amendment violation occurred. As such, Plaintiff's §1983 claims fail as a matter of law. *Connick*, 461 U.S. at 150-152; *Pickering*, 391 U.S. at 568. With that being said, the need to repeat the constitutional violation analysis is unnecessary considering it is an element of qualified immunity that the Court has already considered in the sections above. For the sake of brevity, Defendant Alexander incorporates his arguments that no First Amended violation occurred with regard to Counts One or Three, as if stated entirely herein. Thus, Defendant Alexander is entitled to summary judgment against the Plaintiff as to each claim asserted against him regardless of the application of qualified immunity, and he should be dismissed from this action, with prejudice.

## V.    CONCLUSION

**WHEREFORE,** Defendant Alexander respectfully requests that this Court **GRANT** his Motion for Summary Judgment and **ENTER** an **ORDER** dismissing all claims asserted against him by the Plaintiff with prejudice, and for any such other and further relief to which he may be entitled.

**TODD ALEXANDER,**

**BY COUNSEL,**

s/Eric D. Salyers
Perry W. Oxley, Esq. (W. Va. Bar # 7211)
David E. Rich, Esq. (W. Va. Bar # 9141)
Eric D. Salyers, Esq. (W. Va. Bar # 13042)
Oxley Rich Sammons, PLLC
517 9th Street, P.O. Box 1704
Huntington, WV 25718-1704
Phone: (304) 522-1138

26

Fax: (304) 522-9528
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com

**THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

**MARY DURSTEIN,**

      **Plaintiff,**

**v.**                                    **CASE NO.: 3:19-cv-00029**

**TODD ALEXANDER,
BOARD OF EDUCATION, CABELL COUNTY SCHOOLS, and
STATE SUPERINTENDENT OF SCHOOLS, WEST VIRGINIA DEPT. OF
EDUCATION,**

      **Defendants.**

## CERTIFICATE OF SERVICE

      The undersigned counsel for Defendant, Todd Alexander, served the foregoing "***DEFENDANT TODD ALEXANDER'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT***" via email and electronically filing the certificate of service with the Clerk of the Court using the CM/ECF system on this **22nd day** of **June, 2022**.

Michael S. Bailey
BAILEY LEGAL SERVICES PLLC
P.O. Box 347
Barboursville, WV 25504
*Counsel for Mary Durstein*

Kelli D. Talbott
Senior Deputy Attorney General
Office of the West Virginia Attorney General
812 Quarrier Street, Second Floor
Charleston, WV 25301
*Counsel for Defendant, State Superintendent of Schools*

David Marburger
MARBURGER LAW LLC
14700 Detroit Avenue, Suite One
Cleveland, OH 44107
*Of Counsel for Mary Durstein*

s/Eric D. Salyers
Perry W. Oxley (WVSB #7211)
David E. Rich, Esq. (WV Bar #9141)
Eric D. Salyers (WVSB #13042)