IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

MARY DURSTEIN,

               Plaintiff,

v.                                 CIVIL ACTION NO.  3:19-0029

TODD ALEXANDER and
BOARD OF EDUCATION, CABELL COUNTY SCHOOLS,

               Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Plaintiff's Motion for Partial Summary Judgment (ECF No. 211), Defendant Board of Education, Cabell County Schools' ("Board" or "CCBOE") Motion for Summary Judgment (ECF No. 209), and Defendant Todd Alexander's Motion for Summary Judgment (ECF No. 206). For the reasons herein, Defendant Board's Motion is **GRANTED**, and Plaintiff's cross-Motion is **DENIED**. Defendant Alexander's Motion is **GRANTED**, in part, as to Count One, and **DENIED**, in part, as to Count Three.

**I. FACTUAL BACKGROUND**

Plaintiff Mary Durstein worked as a teacher in Cabell County from December 1999 to March 2017. During the 2016-2017 school year, Plaintiff taught World Studies to freshmen at Huntington High School, a class which is a "survey of various world cultures in which students examine the distinguishing and unique features—including religious, political, and historic features—and major contributions of significant cultures…[including] those that originated on the Arabian peninsula." *See* Suspension Letter at 1, ECF No. 211-15 (quoting West Virginia

Department of Education Policy 2520.4). Plaintiff taught a diverse group of students in her classroom. Pl.'s Dep. at 18-9, ECF No. 195-1.

On January 8, 2017, Karima Neghmouche, a female journalism student at Marshall University (and 2013 graduate of Huntington High School), retweeted some of Plaintiff's older tweets containing conservative rhetoric. Neghmouche Dep. at 25, 44; ECF No. 193-2 at 28. Those tweets included:[1]

- A July 16, 2015, retweet of conservative commentator Ann Coulter containing a photograph of two men and five women, some of whom are wearing hijabs. ECF No. 20-1. A caption above the photo reads "Deport them." ECF No. 20-1. One of the men in the photo is Mohammad Youssuf Abdulazeez, who had opened fire on two military installations in Tennessee. ECF No. 20 ¶ 25.
- A tweet, posted on May 28, 2016, Plaintiff responds "Exactly !!!!!!!!!" to a meme showing two photos; one with U.S. President Barack Obama laying a wreath in Japan with the caption "OBAMA IN JAPAN MEMORIAL WEEKEND APOLOGIZING," the other was an image of the U.S.S. Arizona memorial at Pearl Harbor with the caption "THIS IS WHERE YOU BELONG YOU MUSLIM DOUCHEBAG." ECF No. 193-3 at 9.
- A tweet from an unspecified date with the comment "Too funny not to tweet!" and a picture of a man with his arms around a woman in a full burka/niqab and the text "ISLAMIST ADVANTAGE: WHEN YOU DIVORCE YOUR WIFE AND REMARRY, YOU CAN STILL KEEP THE SAME PHOTO ON YOUR DESK." ECF No. 193-3 at 3.
- A tweet from January 5, 2017, where Plaintiff responds "This could have been Obama's children" to a tweet that contained mugshots of four Black teenagers with the caption "Can you imagine how many riots we would have around the country if the terrorists were white? #BLMKidnapping." ECF No. 188-3 at 3. She also commented on the same photo "nothing but irrelevant thugs….. thrown [sic] them jail…..save future victims….." ECF No. 187-2 at 42.[2]

---

[1] Though difficult to discern from the record, it appears, based on a retweet of Neghmouche's tweet, that these four tweets were the ones Neghmouche first retweeted, and which were initially brought to the Cabell School Board's attention by a direct tweet from @cyndimac_attack, Cyndi Mac Fuller. *See* ECF No. 193-2 at 27, ECF No. 190-2; Fuller Dep. at 18-19, ECF No. 190-1.

[2] It is not entirely clear which comment was being widely recirculated because the pictures of Neghmouche's retweets are cut off. The first comment appears to be the one that was brought to the Board's attention. *See* ECF No. 187-2 at 27.

The record is not entirely clear on which tweets were retweeted or commented on by others and in what order. What is not in dispute, however, is that others, including former students and members of the community, began to repost and comment on or reply to Neghmouche's retweets and Plaintiff's original tweets and circulate them more widely on Twitter. *See* ECF Nos. 190-4; 190-5; 190-6; 192-2; 193-2 at 29-37. The complete record, containing screenshots from several of tweets on Plaintiff's account, also includes further disparaging remarks. For example, other tweets included:

- A tweet from July 16, 2015, directed @ericbolling and including #cashinIn #WakeUpAmerica and #viewcrew. It states "Who cares if we offend Muslims at least they keep their heads on tact [sic]. They're the enemy!" ECF No. 20-2; ECF No. 187-2 at 41.
- A comment from an unspecified date saying "awesome! Do you care if I share with my alt right friends? (smiley face)" to a picture of Hitler's face in the shape of a swastika superimposed on Donald Trump's face. ECF No. 187-2.
- Comments from December 29, 2016, stating "only until January 20th" and "that is true, no more political correctness after 1/20 can't wait Finally liberated (smileys)" in a responsive discussion to a Fox News story that the New York City Police Department would soon allow Sikh members of its force to wear turbans and beards while on duty. ECF No 187-2 at 32, 33.
- A retweet of a post containing a picture of Rudy Giuliani with a quote appearing next to him "Almost by definition, when you explode a bomb in an area, it's **terrorism**." The caption above this photo from @juhhhjgghk reads "And…… it's muslims. We must name our enemy and stop being politically correct. #IslamIsTheProblem #Build the Wall." ECF No. 193-3 at 2.

Specifically, the four tweets reposted by Neghmouche were brought to the Board's attention when a Twitter user, Cynthia Fuller, tweeted at the Twitter accounts associated with Cabell Schools (@cabellschools) and Huntington High (@HuntingtonHigh). ECF No. 190-2 at 2. Director of Communications, Jedd Flowers, received notification of this tweet from Ms. Fuller (and thus Plaintiff's underlying tweets)[3] to his email account at 3:24 a.m. on January 9, 2017. *See*

---

[3] For clarity, there were other tweets and posts screenshotted by Flowers, and thus, presumably, these were also brought to Board members' attention.

*id*. at 3; Flowers Dep. at 13-14; ECF No. 187-1. Similarly, a person identified as "Joe Richardson" emailed WSAZ, a local news channel, notifying it of the Twitter account's existence and contents, and that it belonged to Plaintiff, a Huntington High teacher. *See* Richardson Email, ECF No. 211-9. The Managing Editor at WSAZ forwarded a copy of the email from Richardson to Flowers at 10:17 a.m. on the morning of January 9, 2017. *Id*. Plaintiff has produced evidence that suggests Richardson was someone at Cabell Midland High, another local school. *See* McCoy Dep. at 33-38; ECF No. 191-1; McCoy Letter; ECF No. 191-2; Google Declaration and Subscriber Info, ECF No. 211-10.

Flowers contacted Todd Alexander,[4] the Assistant Superintendent, to bring the issue to his attention. Alexander Dep. at 17; ECF No. 194-1. Alexander decided to meet with Plaintiff to address the situation. Alexander and the principal of the high school, Joedy Cunningham, called Plaintiff into the principal's office. Cunningham was also aware of the situation, given that the school was already receiving phone calls from anonymous or unidentified parents suggesting that he investigate Plaintiff's social media and he had discussed the issue with Alexander. *See* Cunningham Dep. at 37-38; Bickerton Email, ECF No. 196-6.

The exact contours of the meeting are unclear; parties agree that several tweets were discussed. *See* Alexander Dep. at 22-23; Cunningham Dep. at 45; Pl.'s Dep. at 20-22. Eventually, Plaintiff accessed her Twitter account on the principal's computer and deactivated the entire account. Cunningham Dep. at 139-40; Pl's Dep. at 22-23; Alexander Dep. at 65-65. Plaintiff testifies that she was directed to do so by Alexander; Alexander and Cunningham suggest Alexander merely advised her it was the best course of action. Pl.'s Dep. at 22-24; Cunningham

---

[4] Flowers states that he first called the Superintendent, Bill Smith, who stated he would direct Alexander to investigate. ECF No. 187-1. Either way, Flowers was the initial source of the information Alexander eventually received regarding the investigation.. Flowers Dep. at 157.

Dep. at 124-25; Alexander Dep. at 51-52. At no time did Alexander inform Plaintiff of the consequences of deactivating her Twitter or otherwise suggest she could or could not reactivate her account; though during her attempt to deactivate her Twitter, Plaintiff read an advisory that "after 30 days, a deactivated Twitter account cannot be revived." Pl.'s Decl. at ¶ 144, ECF No. 211-1l;  Alexander Dep. at 40. Similarly, Alexander then advised Plaintiff not to speak to the media; though, again, Plaintiff testifies that the advice was more akin to a command. Alexander Dep. at 68-69; Cunningham Dep. at 141; Pl.'s Dep. at 23-24. Alexander informed Plaintiff that she was on administrative leave and asked her to leave the school. Pl.'s Dep. at 24; Cunningham Dep. at 129; Alexander Dep. at 84.

Over the next few days, considerable media interest in Plaintiff's tweets grew. Parents and members of the community contacted the school. *See* Alexander Dep. at 27, ECF No. 194-1; Cunningham Dep. at 68, 97-98, 131, 154; Emails between Bickerton and Cunningham, ECF No. 196-5; Email from Xiomara, ECF No. 196-8. That same day, January 9, 2017, the local news ran two evening stories on the issue. Trs. of WSAZ News, ECF Nos. 187-3, 187-4. In the first, Flowers gave commentary stating that the Board first became aware of the situation that morning upon receiving student complaints and that Flowers was pursuing an investigation. Tr. at 2-3, ECF No. 187-3. The later news story, at 10 p.m., had commentary from both Flowers and a student at Huntington High. Tr. at 2-4, ECF No. 187-4. In that story, Flowers discussed the Board's expectations that teachers provide safe and secure classrooms and added that she was asked to delete her account, which she did. *Id*. Local newspapers also covered the story, citing more tweets. *See* Gazette Mail Article, ECF No. 20-6; Herald Dispatch Article, ECF No. 20-7.

On January 24, 2017, the Superintendent informed Plaintiff that she was suspended without pay. Suspension Letter, ECF No. 211-15. The letter specifically referenced her position and her

tweets.[5] The Board held a termination hearing on March 6, 2017, where it voted to fire Plaintiff. Tr. of Board Hearing, ECF No. 237. Plaintiff filed a grievance with the West Virginia Public Employee Grievance Board a few days later, alleging that she was unlawfully terminated for exercising her First Amendment rights. *See* Grievance Decision, ECF No. 206-4; Tr. of Hearing, ECF No. 211-13. On September 22, 2017, her grievance was denied. *See* Grievance Decision at 27-31. On December 11, 2017, Plaintiff received a letter from the West Virginia Board of Education indicating that it was opening an investigation concerning possible revocation or suspension of her teaching certificates. *See* Investigation Letter, ECF No. 211-19.

Plaintiff received her teaching license in Ohio and began substitute teaching in Ironton City Schools. Pl.'s Decl. ¶¶ 159-60. Eventually, she was hired on a one-year contract for the 2021-2022 school year. *Id.* ¶ 161. In October 2021, the Ironton Superintendent was informed of Plaintiff's tweets and recommended that the Board of Education vote against renewing her contract. *Id.* ¶¶ 163-64. The Ironton Board rejected this and voted unanimously to renew her contract. *Id.* ¶ 165. People voiced their opposition to this decision, and in May 2022, the Board rescinded its decision and voted against renewing her contract. *Id.* ¶ 166. The Ohio Department of Education has notified Plaintiff that her application to renew her teaching license is on hold pending investigation of her tweets. *Id.* ¶ 167.  Plaintiff filed this action, alleging a violation of her First Amendment rights by both the Board and Alexander.

## II. STANDARD OF REVIEW

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.

---

[5] At least 6 tweets or comments/retweets were referenced in the letter from 2015-2016 (the "Who cares if we offend Muslims" tweet, the Ann Coulter tweet, the Obama meme, the "too funny not to tweet" post, her comments on the Fox News story, and the "Muslims are the enemy" retweet" detailed before and at least one response she tweeted when a former student asked her if her posts were allowed. *See* Suspension Letter at 2-5; ECF No. 192-7.

Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### III. ANALYSIS

#### A. Defendant CCBOE

##### 1. Res Judicata

The Board argues that res judicata is applicable to Count Four. In proceedings before the West Virginia Public Employees Grievance Board, Administrative Law Judge ("ALJ") McGinley decided whether Plaintiff was unlawfully terminated for exercising her First Amendment rights. *See* Grievance Decision. The ALJ concluded that Plaintiff's speech was not protected by the First Amendment, and, even if it was, the Board's interests outweighed Plaintiff's free speech interests. *See* CCBOE Mem. in Supp. at 9, ECF No. 210 (citing Grievance Decision at 26-27). Thus, the Board argues, Plaintiff is barred from bringing the same claim in the instant action. *Id.*

Collateral estoppel[6] (issue preclusion) works to preclude "relitigation of issues actually litigated and necessary to the outcome of the first action." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 356 n.5 (1979). Because the Court is presented with an unreviewed state administrative decision, rather than a state court decision, the traditional elements of collateral estoppel are replaced by fairness concerns. *See Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986) (quoting *United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 422 (1966)). Thus, "[w]e give [preclusive] effect to judgments issued by an agency (1) acting in a judicial capacity, (2) resolving disputed issues of fact properly before it, (3) if the parties have had an opportunity to litigate the issues." *Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 191 (4th Cir. 1994) (breaking the *Elliott* test into three distinct elements). This preclusive effect is applicable to the "factfindings of an administrative tribunal" only, not to unreviewed legal conclusions.[7] *Elliott*, 478 U.S. at 799. "Further, federal courts must give the factfinding the same preclusive effect to which it would be entitled in the state courts." *Id*.

---

[6] Defendant refers to "res judicata" (claim preclusion) only in its initial Memorandum in Support. *See* Board's Mem. in Supp. at 9. However, upon review of the briefing, it appears that Defendant is primarily referring to collateral estoppel (issue preclusion). Of course, as the Court notes, the entire claim is not barred, given that the Fourth Circuit has held that an "unreviewed state administrative decision…has no claim preclusive effect in the subsequent § 1983 action, despite arising out of the same transaction or series of transaction." *Dionne v. Mayor & City Council of Baltimore*, 40 F.3d 677, 681, 685 (4th Cir. 1994). Of course, then, Plaintiff was not barred from bringing her claim as a whole. At most, *Elliott* makes clear that preclusive effect would extend only to the factfinding of the ALJ. 478 U.S. at 799.

[7] As an additional note, the ALJ's "finding of facts" largely discuss facts not in dispute. The facts cover matters such as Plaintiff's teaching duties, the makeup of the student body at Huntington High, her role, and the content of her tweets and the immediate aftermath. *See* Grievance Decision at 3-15. The facts detail the tweets themselves, the reactions of several students and a teacher, and discipline for employees in similar situations. *Id*. Plaintiff never seriously disputed the majority of these facts, and many are proven by evidence on the record before this Court. The factual findings do not, as the Board suggests, extend to the "findings" that Plaintiff's speech was not protected by the First Amendment, and that, even if it was, the Board's interests were greater than Plaintiff's. The ALJ's analysis of federal First Amendment jurisprudence, and subsequent determinations are legal conclusions to which this Court need not give preclusive effect; indeed, they are separated in the decision by heading from the "findings of fact."

Here, the Court need not even decide whether the *Elliot* elements are met[8] because West Virginia courts would not give the ALJ's factfindings preclusive effect in a subsequent judicial proceeding. Under West Virginia law:

> "An assessment of three factors is ordinarily made in determining whether res judicata and collateral estoppel may be applied to a hearing body: (1) whether the body acts in a judicial capacity; (2) whether the parties were afforded a full and fair opportunity to litigate the matters in dispute; and (3) whether applying the doctrines is consistent with the express or implied policy in the legislation which created the body."

*Page v. Columbia Nat. Res., Inc.*, 480 S.E.2d 817, 831 (W. Va. 1996) (quoting Syl. pt. 3, *Mellon-Stuart Co. v. Hall*, 359 S.E.2d 124 (1987)).

At oral argument, rather than in her briefing, Plaintiff argued that the factors were unmet. There is some indication that the proceeding was at least quasi-judicial, in the sense that it was a two-day hearing where Plaintiff was represented by counsel, both parties presented evidence, and witnesses testified under oath. *See e.g.*, Grievance Decision. But, as the West Virginia Supreme Court of Appeals has discussed, the Grievance Board proceedings are distinguishable from judicial proceedings in several important aspects. Indeed:

> [t]he Legislature designed the grievance process to be simple and expeditious. Consequently, the process is streamlined and lacks many of the adversarial accoutrements found in judicial and [Human Rights] Commission's proceedings. In the vast majority of grievances, for example, the grievant is not represented by a lawyer. Moreover, and more importantly, the grievance process does not provide for any of the discovery mechanisms available under the Rules of Civil Procedure and the Commission's procedural rules. Finally, in stark contrast to the Human Rights Act, the grievance statute does not provide for the right to an independent investigation of each grievance filed before the Board, does not make available at public expense representation by a lawyer for cases that proceed to a hearing before an administrative law judge, and does not give employees the option of skipping

---

[8] *McDonald v. City of W. Branch, Mich.*, 466 U.S. 284 (1984) suggests that these proceedings would not meet the *Elliott* test. In that case, the Supreme Court held that "in a § 1983 action, a federal court should not afford res judicata or collateral-estoppel to effect an award in an arbitration proceeding brought pursuant to the terms of a collective-bargaining agreement." This was, at least in part, because the arbitral factfinding was not equivalent to judicial factfinding because it lacked many of the procedural safeguards. *Id.* at 291-92. As discussed, the same is true here.

the administrative process and pursuing their claims *de novo* in circuit court where jury trials and the full array of legal and equitable remedies are obtainable.

*Vest v. Bd. of Educ. of Cnty. of Nicholas*, 455 S.E.2d 781, 786 (W. Va. 1995).

And later, in *Page*, the Supreme Court of Appeals of West Virginia refused to apply collateral estoppel to unemployment proceedings, because they lacked formality, formal rules of evidence did not apply, and there was no discovery. 480 S.E.2d at 832. In fact, "only rarely, if at all, will administrative proceedings provide the same full and fair opportunity to litigate matters as will a judicial proceeding involving the complexity, intensity, and specific inquiries common to a wrongful discharge case." *Id*. at 393.  The same is true of the Grievance Board proceedings here. For example, the ALJ notes that his decision was based, at least in part, on the exhibits and testimony offered at the level three hearing. *See* Grievance Decision at 3. But that hearing was administered by the Board itself, an interested party, and contained hearsay evidence. *See e.g*., Ex. 12, ECF No. 237.Thus, a West Virginia court would not give these proceedings preclusive effect, and neither will this Court.

### 2. § 1983 Claims Against the Board

Counts Four and Six are § 1983 claims against the Board for terminating Plaintiff's employment based on policies that violate the First Amendment and for declining to hire her because of her constitutionally protected speech. Am. Compl. ¶¶ 83-98;[9] Supp. Compl. ¶¶ 138-54. A public employer "may not retaliate against a public employee who exercises her First Amendment right to speak out on a matter of public concern." *Love–Lane v. Martin,* 355 F.3d 766, 776 (4th Cir. 2004) (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.,* 391 U.S. 563, 573 (1968)). But this right is not limitless, particularly for public employees. *See*

---

[9] The Court notes that, per her supplemental complaint, Plaintiff withdrew her facial challenge to the Board's employment policies. *See* Supp. Compl. ¶ 117, ECF No. 95.

*Smith v. Gilchrist*, 749 F.3d. 302, 308 (4th Cir. 2014) (citing *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998)). "[T]he government, as an employer, 'is entitled to maintain discipline and ensure harmony as necessary to the operation and mission of its agencies,'" and therefore has "an interest in regulating the speech of its employees." *Id*. (quoting *McVey*, 157 F.3d at 277). Thus, a public employee "by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418, (2006).

Because Plaintiff challenges an ex post disciplinary action rather than an ex ante restraint on speech, the Court applies the *Connick/Pickering* standard. *Liverman v. City of Petersburg*, 844 F.3d 400, 409 (4th Cir. 2016); *McVey*, 157 F.3d at 277-78. The Court first determines whether Plaintiff spoke as a citizen on a matter of public concern. *Liverman*, 844 F.3d at 409. The Court then evaluates whether Plaintiff's interest in First Amendment expression outweighs the Board's interest in the efficient operation of the workplace. *Id.* And because Plaintiff claims retaliatory discharge, the Court lastly decides whether her protected speech was a substantial factor in the Board's decision to terminate her. *Id.* (citing *McVey*, 157 F.3d at 277–78).

Here, the parties do not dispute the first or third elements of the test. Thus, the only remaining question is whether Plaintiff's interest in First Amendment expression outweighs the Board's interest in efficient operation of the workplace. In deciding this issue, the court should consider the following factors:

> [W]hether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

*Brickey v. Hall*, 828 F.3d 298, 304 (4th Cir. 2016) (quoting *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 317 (4th Cir. 2006)).

Defendant argues that the balancing test weighs heavily in the Board's favor, citing specifically the "vile" nature of the speech, the press investigation, the complaints and questions from the public, and  the reactions of students and teachers at the school. *See* CCBOE Mem. in Supp. at 4-8. Plaintiff, rather than engage with any of the factors in the balancing test, merely responds that the Court should not partake in ad hoc balancing and should instead focus on the material and substantial disruption to the school environment. Pl.'s Resp. at 8-10, ECF No. 223.[10] She then goes on to argue that she herself did not cause the reaction or disruption to the school through her tweets; instead, the "self-righteous republishers" of the tweets caused the problem. *Id.* at 10-12.

This Court agrees with the Board that the *Pickering* test applies. Plaintiff's arguments against using the test in this context are unpersuasive. Plaintiff's citation to dicta in *Time, Inc.* is inapposite, given that the case involved civil liability issues for private publishers, not public employees. *See Time, Inc. v. Hill*, 385 U.S. 374 (1967). Similarly, *Tinker* and *Stevens* are inapplicable, given that they dealt with student free speech rights and a criminal statute, respectively. *See Tinker v. Des Moines Sch. Dist.* 393 U.S. 503 (1969); *United States v. Stevens*, 559 U.S. 460, 470 (2010). Thus, as this Court has already noted, the *Pickering* standard is applicable; indeed, this is a classic case for *Pickering* balancing. *Ridpath*, 447 F.3d at 316 (4th Cir. 2006) ("In order to prove that a retaliatory employment action violated a public employee's free speech rights, the employee must satisfy the three prong-test we laid out in *McVey v. Stacy,* 157 F.3d 271 (4th Cir.1998) (the "*McVey* test") [including the second prong of which is commonly referred to as *Pickering* balancing])."

---

[10] Plaintiff filed two separate responses to the respective Motions for Summary Judgment, so the Court will use the corresponding ECF number each time for clarity.

The Fourth Circuit has applied this test repeatedly in analogous situations. *See e.g., Lane v. Anderson*, 660 F. App'x 185 (4th Cir. 2016) (using the test to determine whether a police officer's interest in speaking about a shooting and subsequent internal investigation outweighed the government's legitimate interest in providing efficient public services); *Smith*, 749 F.3d at 309-14 (applying the test to a district attorney's free speech claim); *Grutzmacher v. Howard Cnty.*, 851 F.3d 332 (4th Cir. 2017) (applying the test to determine whether a former paramedic's Facebook activity outweighed the Department's interest in providing efficient and effective services); *Carey v. Throwe*, 957 F.3d 468 (4th Cir. 2020) (using the test to determine whether former state employee's anonymous blog posts were protected).

Importantly, the employer need not prove actual disruption, "but only that an adverse effect was 'reasonably to be apprehended.'" *Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992), (quoting *Jurgensen v. Fairfax Cnty., Va.*, 745 F.2d 868, 879 (4th Cir. 1984)). Additionally, "this Court has  previously recognized that "[a] social media platform amplifies the distribution of the speaker's message—which favors the employee's free speech interests—but also increases the potential, in some cases exponentially, for departmental disruption, thereby favoring the employer's interest in efficiency." *Grutzmacher*, 851 F.3d at 345 (quoting *Liverman*, 844 F.3d at 407).

### a. Decision to Terminate

### (1) *Pickering* Balancing

Here, once the test is applied, there is uncontroverted and significant evidence that the Board's interest in the efficient operation of the workplace outweighed Plaintiff's interest in free speech. The Board reasonably apprehended that the tweets would cause both internal and external disruption, and they actually did.

First, because of Plaintiff's position as a social studies and world history teacher, her tweets at least facially[11] conflicted with her responsibilities (and the mission of the school generally). *See* Pl.'s Dep. at 16, 18. As a world history teacher, Plaintiff was responsible for teaching students about the Muslim religion and modern Middle Eastern history, society, and culture. *See* Pl.'s Dep. at 18; Textbook Excerpt, ECF No. 211-14; Suspension Letter, ECF No. 211-15. In fact, one of the goals of the "World Studies" course is to "[o]utline the origins of religion in the Middle East and the changing role of women in that region through to the modern or (contemporary) period." Suspension Letter at 3. Moreover, Plaintiff had been responsible for teaching a diverse group of children and knew the school population included African American and Muslim students. Pl.'s Dep. at 19, 87. It is important that a teacher responsible for instructing students about other religions not be seen disparaging those religions publicly. Thus, the content of her tweets and expressing prejudice is contradictory to her specific responsibilities as a teacher.

Further, the Board has many vigorous anti-harassment policies in place, including that "[a]ll Cabell County professional employees shall… maintain a safe and healthy environment, free from harassment, intimidation, bullying, substance abuse, and/or violence, free from bias and discrimination" and "demonstrate responsible citizenship by maintaining a high standard of conduct, self-control, and moral/ethical behavior." *See* Pl.'s Resp. to Board's Requests for Admission at 3-4, ECF No. 195-5. Further, the Board had a policy which stated "[i]t is the responsibility of all students and employees to promote and maintain an environment free of all types of religious/ethnic harassment." Pl.'s Dep. at 91.

---

[11] Plaintiff's briefing spends a great deal of time and effort contextualizing her tweets and arguing that they were hyperbolic, emotional reactions, rather than her actual beliefs. Even if this is true, the literal, facial content of the tweets would cause a reasonable person to conclude that Plaintiff had expressed prejudice and held discriminatory views towards people based on religion and race.

14

Similarly, the West Virginia Board of Education had a social media policy which prohibited staff from engaging on social media inside or outside of the classroom and any "behavior that constitutes a violation of district or county policy or that is detrimental to health and welfare of the students." *See* Pl.'s Resp. to Board's Requests for Admission at 5; Pl.'s Dep. at 93. The same policy prohibits "cyberbullying, hate mail, defamation, harassment of any kind, discriminatory jokes and remarks and other unauthorized uses as referenced in WVBE policies and other policies and laws." W. Va. Bd. of Educ. Policy No. 2460 at 16, ECF No. 20-17. Plaintiff's tweets plainly are not "free from bias or harassment" and violate these policies, the maintenance of which was part of her responsibilities as an educator in Cabell County.

Additionally, her tweets impaired the maintenance of discipline, impaired harmony among coworkers, and damaged personal relationships within the school itself. Multiple recent former Huntington High students, both Muslim and non-Muslim, testified that they would be uncomfortable having Plaintiff teach their class after seeing her tweets. *See* Y. Khader Dep. at 57-58, ECF No. 188-1; Ellis Dep. at 19-20, ECF No. 192-1; Neghmouche Dep. at 91-93; Robinson Affidavit at 2, ECF No. 206-1. At least one student approached Principal Cunningham to bring the issue to his attention. Cunningham Dep. at 63-65. And at least one of Plaintiff's coworkers, who was Muslim, was offended and upset by the tweets. She wrote a letter to Principal Cunningham, at his request, detailing her concern over the matter. *See* Cunningham Dep. at 81-87; Letter from Ghada Hamad, ECF No. 196-2. Another teacher reported that his students wanted to spend time discussing the tweets and their feelings about them during time that was designated for class instructions. *See* Nelson Aff. at 1-2, ECF No. 206-3. He also stated that many minority students voiced their concern over tweets to him and other teachers and explained that they did not feel comfortable being taught by Plaintiff. *Id*. at 2. In the hearing in front of the Board of Education,

Alexander detailed the disruption further, noting the number of calls, emails, and press requests Board members received. Trans. of Bd. of Educ. Meeting at 24-26, 100-01, ECF No. 237. It was reasonable for the Board, reading the tweets that seemingly disparaged Muslim, Jewish, and Black students, and knowing that the student body contained students of this very race and these very religions, to infer that the disparaging comments would cause a serious internal disruption in the school.

But not only was there an internal disruption, there was a significant external disruption that interfered with the operation of the high school and undermined its mission. Within a day of press reports on the tweets, the Board received numerous phone calls and emails with complaints, and questions from the public, including parents of students, about Plaintiff's role and the tweets. *See* Alexander Dep. at 27; Cunningham Dep. at 68, 97-98, 131, 154; Emails between Bickerton and Cunningham, ECF No. 196-5; Email from Xiomara, ECF No. 196-8. The Muslim Association of Huntington wrote a letter to a member of the Board and the Board's Director of Communications regarding the tweets on January 17, 2017, expressing their shock and dismay. *See* Letters, ECF Nos. 195-6, 196-9. School administrators, such as Cunningham, Alexander, and Flowers, were required to investigate the Plaintiff's posts and respond to inquiries from the press and others. *See* Cunningham Dep. at 66, 99, 103; Flowers Dep. at 37, 92-94, 136-37; Alexander Dep. at 27. The tweets received local and national press coverage. *See* Exs. 5, 6, 7, and 8, ECF Nos. 20-5, 20-6, 20-7, 20-8. This goes beyond the "lip service" and "vague references" to disruption that were insufficient to tip balancing in the employer's favor in *Durham*. *See Durham v. Jones*, 737 F.3d 291, 302 (4th Cir. 2013).

To the extent that Plaintiff's argument that she did not publicize the tweets herself, but rather, "self-righteous republishers did," is construed as implicating the seventh factor of the

*Pickering* test, the argument is unavailing. While Plaintiff, of course, did not contact the press regarding her own tweets, or otherwise identify her connection to Cabell County Schools, that does not mean she is not responsible for the transmission of the tweets. Indeed, she knew that her account was public and that all that was needed to bring up her profile was to search her real name on Twitter. *See* Pl.'s Dep. at 44-46. Additionally, "[a] social media platform amplifies the distribution of the speaker's message—which favors the employee's free speech interests—but also increases the potential, in some cases exponentially, for departmental disruption, thereby favoring the employer's interest in efficiency." *Liverman*, 844 F.3d at 407. Here, the tweets ended up going viral and disrupting efficiency–which was exactly the subject of the Board's concern when the tweets were brought to its attention.

"Public education is recognized as one of the most important public services offered by state government, and the maintenance of a professional and dedicated teaching staff to provide that service continuously ranks among the State's highest concerns." *Stroman v. Colleton Cnty. Sch. Dist.*, 981 F.2d 152, 158 (4th Cir. 1992). As stated before, Plaintiff does not engage with the *Pickering* balancing test in her Response. However, in her cross-motion for summary judgment against the Board, Plaintiff points out that, during the week of January 9, 2017, when coverage of the tweets was gaining in momentum, the Board hired no additional security to handle student or community reaction or counselors to help students cope with distress; nor were students so restless teachers could not control them. Pl.'s Mem. in Supp. at 44-45, ECF No. 214. Teachers did not have to call off work; students were not so traumatized that the school had to close. *Id*. at 45.[12] But the Board need not prove any of these indicators of "substantial disruption" to prevail.

---

[12] Plaintiff cites to Alexander's and Cunningham's depositions to bolster these assertions, and a review of those transcripts verifies that these facts are undisputed. *See* Alexander Dep. at 90-93; Cunningham Dep. at 150-153.

As discussed above, only a reasonable apprehension of disruption is required. The substantial disruption standard discussed in *Mahanoy* was an application of *Tinker's* holding that "schools have a special interest in regulating on-campus student speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'" *See Mahanoy Area Sch. Dist. v. B.L. by & through Levy*, 141 S. Ct. 2038, 2045 (2021) (quoting *Tinker*, 393 U.S. at 513). There are fundamental differences in student speech and public employee speech, and thus the burden is not the same. The Board has shown that the applicable balancing test weighs in its favor and that Plaintiff's termination was justified.

### (2) Heckler's Veto

In her briefing, Plaintiff argues that the Fourth Circuit has rejected the Board's view of what constitutes a "disruption" under the First Amendment. *See* Pl.'s Reply at 3-4, ECF No. 230. Further, she argues that *Berger* requires this Court to reject the Board's claim that it faced disruption because the evidence it presents amounted merely to a "heckler's veto," or a punishment for speech based on an anticipated hostile external reaction *See* Pl.'s Mem. in Supp. at 41-45, ECF No. Pl.'s Reply at 4-10 (citing *Berger v. Battaglia*, 779 F.2d 992 (4th Cir. 1985)). But there are many important differences between the case at hand and *Berger*. First, the "heckler's veto" applies when " the threat [the speech] assertedly posed to employer interests was not internal disruption by the speech itself, but external disruption by third persons reacting to the speech." *Id*. at 997. That is simply not the case here. While the speech here was, like the speech in *Berger*, not a criticism of the school board or its employees, it, unlike the police officer's "artistic expression," threatened internal employment and student relations and operations. This is borne out by the evidence above: students and teachers at the school were dismayed by the tweets, and it interrupted operations.

18

In *Berger*, the parties conceded that there was no internal disruption, and so the Fourth Circuit did not decide whether "internal disruption can ever suffice as a justification for public employee disciplinary action." *Id*. at 1000. Further, it did not hold, as Plaintiff seems to suggest, that external disruption to a "public employer's external operations and important external relationships" caused by employee speech can never be a basis for disciplinary action. *Id*. at 1000-01. It held simply that those circumstances were not in existence in *Berger*.

In a more recent case, similar to the one at hand here, plaintiff, a battalion chief with the county fire department, made Facebook posts that were racially insensitive, political, and violent. *Grutzmacher*, 851 F.3d 332 at 338. In concluding that his employer's interests prevailed, the Fourth Circuit noted that the plaintiff's speech "frustrated the Department's public safety mission and threatened community trust in the Department, which is vitally important to its function." *Id*. at 346 (internal quotation marks omitted). Indeed "the more the employee's job requires…public contact, the greater the state's interest in firing her for expression that offends her employer." *Id*. (quoting *McEvoy v. Spencer*, 124 F.3d 92, 103 (2d Cir. 1997)) (alteration in original). Additionally, the Court considered that the plaintiff's seemingly racist Facebook activity could "interfere with the public trust of [plaintiff] being able to make fair decisions for everybody." *Id*. at 347 (alteration in original). Thus, "[t]he potential for Plaintiff's statements to diminish the Department's standing with the public further weighs in favor of the department." *Id*.

Here, Plaintiff's job entailed direct contact with members of the public every day–her students. And while not a police or fire service member, as an educator, particularly an educator in a class that involves discussion of religion, Plaintiff's tweets, which could certainly be seen as discriminatory, diminished the Board's standing with the public, particularly given that they are antithetical to the Board's mission to provide a safe and nondiscriminatory school environment, as

laid out in its policies. Plaintiff's termination was not the result of a mere heckler's veto, but "an example of the government's accounting for the public's perception of the officers' actions when it considered the potential for disruption of the department's functions." *Dible v. City of Chandler*, 515 F.3d 918 (9th Cir. 2008). Here, the contents of the tweets, in and of themselves, caused the disruption, not just anticipated reaction to them. For these reasons, the Board's Motion as to Count Four is **GRANTED**. For the same reasons, Plaintiff's cross-Motion on Count Four is **DENIED**.

> b. Declining to Rehire

On this claim, Plaintiff must again prove that the *Pickering* factors weigh in her favor because the standard is identical. *See Ridpath*, 447 F.3d at 316. ("With regard to the retaliation claim, a public employer contravenes a public employee's First Amendment rights when it discharges or 'refuses to rehire [the] employee,' or when it makes decisions relating to 'promotion, transfer, recall, and hiring based on the exercise of' that employee's free speech rights.") (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000)). An almost identical analysis of the *Pickering* factors leads the Court to the same conclusion about the Board's decision not to rehire Plaintiff – it was constitutional because the Board's interests were greater than Plaintiff's.

The only difference here is that, by the point Plaintiff applied to other positions in 2019, approximately two years had passed since the initial controversy. As discussed above, the Board had faced a disruption, and could reasonably apprehend future disruptions that reemploying Plaintiff would portend, which is all that is require under *Pickering*. *See Maciariello*, 973 F.2d at 300. The passage of time did not change the content of the tweets or the fact that they cut against the school district's mission.

Moreover, the Board's concerns about rehiring Plaintiff were actually borne out by Ironton School Board's experience. In summer of 2021, Ironton City Schools in Ironton, Ohio, hired

Plaintiff as a full-time teacher for 7th grade history on a one-year contract. Pl.'s Decl. ¶ 161. Approximately two months into her new job, the same tweets came to the attention of the Superintendent of Ironton City Schools, who told her that the tweets were immoral, and he would recommend to that the school board vote against renewing her teaching contract. *Id*. ¶¶ 163-64. The school board voted in April 2022 to renew her contract. *Id*. ¶ 165. A month later, the Ironton board received complaints about the decision from the public and voted to rescind its decision and not to renew her contract. *Id*. ¶ 166. Also in April 2022, the Ohio Department of Education placed her application to renew her Ohio teaching license on hold, pending investigation of the tweets. *Id*. ¶ 167. Thus, the anticipated public backlash that would accompany rehiring Plaintiff actually occurred when another school board hired her.

Additionally, Plaintiff's teaching certificate was under investigation by the West Virginia Department of Education at the time of her application. Letter from WVDOE, ECF No. 211-19. While the investigation was pending, according to Plaintiff, she could not find a teaching job in West Virginia. Pl.'s Decl. ¶ 156. The Manager of Professional Personnel testified that Plaintiff was not rehired due to her previous termination and the pending investigation. Smith Dep. at 131-35, ECF No. 204-1. These facts call into question her contention that the tweets were a substantial factor in the Board's reemployment condition, and whether she meets the third prong of the *McVey* test, but that issue is not properly before the Court. Given these developments, and because none of the other *Pickering* factors have changed, summary judgment is appropriate on this count as well.  Thus, the Board's Motion for Summary Judgment as to Count Six is **GRANTED**.

### B. Defendant Alexander

Counts One and Three are claims against Defendant Alexander in his personal capacity under 42 U.S.C. § 1983. Count One is premised on Alexander's coerced termination of Plaintiff's personal Twitter account. Am. Compl. ¶¶ 53-65. Count Three is premised on his command to

Plaintiff not to speak to the press. *Id.* ¶¶ 74-82. Alexander claims that he is shielded by qualified

immunity for his behavior on both counts. *See e.g.*, Alexander Mem. in Supp., ECF No. 207.

### 1. Qualified Immunity

Although qualified immunity is expansive, a government official "who performs an act

clearly established to be beyond the scope of his discretionary authority" is not entitled to a

qualified immunity defense. *In re Allen*, 106 F.3d 582, 593 (4th Cir. 1997). The issue is not whether

an official's actions were a proper or legal exercise of his discretionary authority. *Id.* at 594 ("If

these were the relevant inquiries, any illegal action would, by definition, fall outside the scope of

an official's authority.") (internal citation omitted). Rather, the Court must ask whether a

reasonable official in the defendant's position would have known that the conduct was clearly

established to be beyond the scope of his authority. *Id*. The Court determines the scope of an

official's authority by analyzing the statutes or regulations controlling the official's duties. *Id*. at

595 (citations omitted). To gain qualified immunity, the defendant bears the burden of

demonstrating his conduct falls within the scope of his official duties. *Id.* at 594 (citations omitted).

If the action complained of is within the scope of official duties, the Court proceeds to the

two-step qualified immunity inquiry laid out in *Saucier v. Katz*, 533 U.S. 194 (2001).The first

question under the qualified immunity analysis is whether "[t]aken in the light most favorable to

the party asserting the injury . . . the facts alleged show the [official's] conduct violated a

constitutional right." *Id*. at 201. If no violation occurred, the analysis ends, and the plaintiff cannot

prevail. *Id.*

If the Court finds a violation may have occurred, it must then consider whether the

constitutional right was "clearly established," meaning "it would be clear to a reasonable [official]

that his conduct was unlawful in the situation he confronted." *Id.* at 201–02 (citation omitted). The

"clearly established" standard ensures officials are only liable "for transgressing bright lines" and not for "bad guesses in gray areas." *Maciariello*, 973 F.2d at 298 (citations omitted); *see also Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 909 (4th Cir. 2016) (holding police officers' use of stun gun violated the Fourth Amendment, but qualified immunity applied because the arrestee's right not to be tased was not clearly established).

### a. Shutting Down Twitter

Here, there is a dispute of material fact, as demonstrated by competing depositions by both parties, as to what occurred in Mr. Cunningham's office when Plaintiff shut down her Twitter account. Alexander contends that he merely suggested Plaintiff close her account. *See e.g*., Alexander Mem. in Supp; Alexander Dep. at 51-54, 60-62. Plaintiff, on the other hand, states that she was ordered to shut down her account. *See e.g.*, Pl.'s Resp., ECF No. 224; Pl.'s Dep. at 21-23; Pl.'s Decl. ¶¶ 130-40. Because Plaintiff is the nonmoving party, the Court must take the record evidence in the light most favorable to her. Thus, it will assume that Plaintiff was directed to shut down her account, or at least pressured to do so because of the coercive atmosphere inherent at the meeting between her and her supervisors.

### (1) Discretionary Authority

Alexander claims that his acts were within the scope of his discretionary authority, because of the wide discretion he possesses to investigate and curtail employees' speech. *See* Alexander Mem. in Supp. at 15-19. Plaintiff, on the other hand, argues that Alexander's actions were decidedly outside his scope of authority. While Alexander had authority to investigate the tweet, he did not have authority to pressure teachers to deactivate social media accounts, particularly in light of Section 21-5H-1(a),[13] which bars an employer from requesting, requiring, or coercing an

---

[13]Section 21-5H-1(a) provides in full:
    (a) An employer shall not do any of the following:

employee to access their personal account in the presence of the employer. Pl's Resp. at 8-9, ECF No. 224 (citing W. Va. Code Ann. § 21-5H-1(a)).[14] But the two are not truly discrete events, and, even if they were, the Court is convinced that Alexander acted within the scope of his discretionary authority in requesting that Plaintiff take down the account.

Again, the issue is not whether an official's actions were a proper or legal exercise of his discretionary authority. *In re Allen*, 106 F.3d at 594. Rather, the Court must ask whether a reasonable official in the defendant's position would have known that the conduct was clearly established to be beyond the scope of his authority. *Id*. The Court determines the scope of an official's authority by analyzing the statutes or regulations controlling the official's duties. *Id*. at 595 (citations omitted). However, "in considering whether constitutional rights were clearly established for qualified-immunity purposes, we view the issue from 'the layman's perspective.'" *Bland v. Roberts*, 730 F.3d 368, 393-94 (4th Cir. 2013), *as amended* (Sept. 23, 2013) (quoting *Ross v. Reed,* 719 F.2d 689, 696 n.8 (4th Cir.1983)).

Despite the existence of Section 21-5H-1(a), Section 21-5H-1(b) goes on to state "[n]othing in this section prevents an employer from: [r]equesting an employee to share specific content regarding a personal account for the purposes of ensuring compliance with applicable laws, regulatory requirements or prohibitions against work-related employee misconduct." Further,

---

(1) Request, require or coerce an employee or a potential employee to disclose a username and password, password or any other authentication information that allows access to the employee or potential employee's personal account;

(2) Request, require or coerce an employee or a potential employee to access the employee or the potential employee's personal account in the presence of the employer; or

(3) Compel an employee or potential employee to add the employer or an employment agency to their list of contacts that enable the contacts to access a personal account.

[14] While Plaintiff ultimately accessed her account in the employer's presence, the evidence is not clear on whether Alexander directed her to access her account in his presence to shut it down, or whether it would have been acceptable for her to access her account on a private device or later, at home. The testimony indicates that Plaintiff told administrators that she did not know how to shut down her Twitter account, and it was done on the principal's device at least in part because of this. *See* Pl.'s Dep. at 22-24. Thus, it is unclear whether these circumstances constituted a violation of the statute.

"[n]othing in this section diminishes the authority and obligation of an employer to investigate complaints, allegations or the occurrence of sexual, racial, or other harassment as provided in this code." *Id*. at 21-5H-1(d).

Additionally, other statutes governing the scope of Alexander's duties make it clear that a reasonable official would have assumed he was complying with his duties when directing Plaintiff to shut down her Twitter. Superintendents (and thus assistant superintendents) are to:

- frame[] problems and make[] decisions that promote the long-term best interest of students;
- anticipate[] and address[] conflict in ways that promote the improvement of the system;
- ensure[] implementation of programs and processes to create safe, orderly and well-maintained schools conducive to student learning;
- work[] with the county board and staff create policies and practices that value and protect diversity and promote social justice;
- ensure[] that the district has processes to maintain safe, clean and inviting school facilities that serve student and community needs;
- develop[] system processes for communicating with and responding to print, digital and other media in ways that promote the best interests of the students in the system

W. Va. Code R. §§ 126-165-4.2.a.7, 4.2.a.8, 4.2.d.6, 4.2.f.3, 4.2.g.9, 4.2.h.5.

Other statutory provisions and regulations suggest that Alexander's actions fell under the scope of his duties. Under the West Virginia Human Rights Act ("WVHRA"), it is unlawful for any employee of a place of public accommodation[15] to withhold any privileges or services provided by the place of public accommodation due to the individual's race, religion, color, national origin, or ancestry. *See* W. Va. Code Ann. § 5-11-9(6)(A). Similarly, an employee of a place of public accommodation may not "publish, circulate, issue, display, post or mail, either directly or indirectly, any written or printed communication, notice or advertisement to the effect

---

[15] "Place of public accommodation" includes political subdivisions of the state such as the CCBOE. *See* W. Va. Code Ann. § 5-11-3(j).

that any of the accommodations, advantages, facilities, privileges or services of any such place shall be refused, withheld from or denied to" any person because of a protected characteristic. *Id.* at (6)(B). A reasonable official, employed at a place of public accommodation, would believe that he had the authority to investigate the discriminatory tweets posted by Plaintiff. Otherwise, the place of public accommodation may be in violation of the WVHRA.

Under applicable state regulations, if an employer is investigating allegations of inappropriate behavior in schools (which would include racial, religious, and ethnic harassment), the county designee "shall immediately undertake or authorize an investigation upon receipt of a report or complaint…[the investigation] may also consist of any other methods…deemed pertinent by the investigator." W. Va. Code R. § 126-99. Similarly, upon receipt of a complaint of racial or religious/ethnic harassment "actions for staff may include but not be limited to, warning, suspension, termination, revocation of licensure, notification of law enforcement and/or human services." *Id.* at Appendix B. This suggests that Alexander's methods, which here included removal of the entire Twitter account, were reasonably perceived to be justifiable and acceptable. Indeed, given that the regulations suggest that his authority is at its broadest when there are accusations of racial, ethnic, and/or religious discrimination or harassment, a reasonable employer would have believed his actions were within the scope of his duties – and perhaps even required. Thus, the Court finds that his actions in shutting down the Twitter account were within the scope of his authority.

<u>(2) Constitutional Violation</u>

Largely for the same reasons discussed in concluding that the Board's interests in the *Pickering* balancing test outweighed Plaintiff's, the Court concludes that no constitutional violation has taken place. Again, to determine whether Alexander violated Plaintiff's constitutional

right to free speech, the Court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. As discussed before, the Board faced–and has provided evidence of–internal and external disruption.

Of course, the difference is that at the time that Alexander asked Plaintiff to shut down her Twitter, a great deal of the anticipated disruption had not yet occurred. But the requirement is only, as discussed before, that an adverse effect was 'reasonably to be apprehended.'" *Maciariello*, 973 F.2d at 300 (quoting *Jurgensen*, 745 F.2d at 879.) Certainly, by the morning of January 9, 2017, Alexander had reasonable apprehension of disruption. Flowers had contacted Alexander concerning the tweets, as had his son, who was a student at Marshall and had already heard about the tweets. Alexander Dep. at 18-19. He had read the contents of the tweets and had determined that they were inappropriate in light of her duties. *Id*. at 20-21. Moreover, community members and the newspaper were contacting the school, and staff at the school indicated that students there had begun to discuss the tweets. *Id*. at 26-27. These events indicated to Alexander that more disruption was to follow, and it did. Removing the offending tweets immediately was within his authority.

### (3) Clearly Established Constitutional Right

Plaintiff again fails to engage with the balancing test and instead argues that Alexander is not entitled to qualified immunity because seizing Plaintiff's tweets is a presumptively unconstitutional prior restraint which was clearly established. *See* Pl.'s Resp. at 9-18, ECF No. 224. Specifically, she argues that the Supreme Court and Fourth Circuit had already clearly

established that the Constitution "bars executive-branch officials from imposing prior restraints of speech by seizing the means by which a citizen engages in discourse with others." *Id*. at 10.

First, the Court is not convinced that the directive to shut down her account was a prior restraint. The term "prior restraint" is used to describe "administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quoting Melville Nimmer, *Nimmer on Freedom of Speech*, § 4.03, p. 4–14 (1984)). Of course, as recognized by the Fourth Circuit, a social networking policy can constitute a prior restraint where it is a generally applicable statute or regulation which regulates employees' rights to speak on matters of public concern. *See Liverman*, 844 F.3d at 407. Similarly, "informal procedures undertaken by officials and designed to chill expression can constitute a prior restraint." *Multimedia Holdings Corp. v. Cir. Ct. of Fla., St. John's Cnty.*, 544 U.S. 1301, 1306 (2005) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)).

But that is simply not implicated here. Here, there was no blanket ban on all Plaintiff's Twitter speech, but an instruction for her to remove preexisting tweets and the account they were posted on. There was no regulation, statute, policy, or order prohibiting Plaintiff's future speech on any topic. There is simply no record evidence from Plaintiff that Alexander or Cunningham instructed her not to tweet at all or not to reopen her previous Twitter account or a new one. Further, despite Plaintiff's argument that she interpreted the advice as prohibiting her from getting back on Twitter, there is no evidence of the same beyond her subjective belief. While it may have been wise for Plaintiff to refrain from tweeting while the disciplinary investigation was unfolding, there is simply no evidence that Alexander or Cunningham did or said anything to imply this. This implicit, subjective understanding that Plaintiff should not reopen her previous Twitter or

28

otherwise tweet is simply not the kind of prior restraint contemplated in other cases. *See Near v. State of Minnesota ex rel. Olson,* 283 U.S. 697 (1931) (an injunction enjoining future speech); *Liverman* 844 F.3d at 407 (written policy that was a "virtual blanket prohibition on all speech critical of the government employer"); *see also* Ariel L. Bendor and Michal Tamir, *Prior Restraint in the Digital Age*, 27 Wm. & Mary Bill Rts. J. 1155 (2019) (arguing that a reshaping of the doctrine of prior restraint is necessary in light of social media speech's unique characteristics).

Moreover, the cases Plaintiff cites regarding physical seizure of entire inventories of publications, before they can reach their intended audience, are inapposite. Plaintiff's argument that shutting down the account at school is tantamount to an actual seizure is incorrect. Unlike physical seizures of inventory, there is no evidence that Plaintiff could not simply regain access to her deactivated account.[16]

And, perhaps most importantly, even if Alexander should have merely requested that Plaintiff delete the tweets at issue, rather than the whole account, this mistake is exactly the kind that qualified immunity is designed to protect. Qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, (2011)). Alexander was forced to make a fast decision in reaction to an unfolding disruption. There is no indication that he believed that deleting the account would mean Plaintiff could never reopen it. In fact, Alexander testified that, as a Twitter user, he was aware that Twitter policy allowed users to reopen a closed account, and he did not believe that shutting down her account would destroy the

---

[16] The Court does not have the benefit of an exhibit which details Twitter's deactivation protocol. However, in her Declaration, Plaintiff references the fact that Twitter uses an advisory message when shutting down an account that notifies a user that "after 30 days, a deactivated Twitter account cannot be revived" and specifies that users can request Twitter data before deactivation. Pl.'s Decl. ¶¶ 144-45. Though Plaintiff notes that she did not know how to reactivate her Twitter account, it appears she was warned of the consequences upon deactivation and was advised of her ability to access her account in the future.

information on it. Alexander Dep. at 40-42. The "mistake" Alexander made about social media, in directing Plaintiff to shut down the account rather than just delete the tweets at issue, is protected by qualified immunity, particularly given the relatively new nature of social media and the indication of the lack of bad faith[17] on Alexander's part regarding permanent deletion. Given these specific circumstances, the Court finds that qualified immunity is applicable to Alexander's actions regarding the Twitter account.

### b. Commanding Plaintiff Not to Speak to the Press

Alexander argues that he is also protected from Plaintiff's claims in Count Three because of qualified immunity. *See* Alexander's Mem. in Supp. at 23-25. Parties again dispute the exact contours of the meeting on January 9, 2017, and whether Plaintiff was commanded not to speak to the press or merely advised against it. *See* Alexander. Dep. at 69-70; Pl.'s Dep. at 24, 30-31. Because there are facts that plausibly suggest either version of events could be true, the Court will take the facts in the light most favorable to the Plaintiff and again assume Alexander either commanded Plaintiff not to speak to the press or coerced her from doing so. Unlike Count One, parties do not dispute whether the action complained of falls within the scope of Alexander's duties because public employers have the authority to limit employees' speech. *See Pickering*, 391 U.S. 563. Thus, the Court continues to the two-prong qualified immunity analysis.

### (1) Constitutional Violation

Alexander's command that Plaintiff not speak to the press constituted a prior restraint. When a public employee challenges the constitutionality of a prior restraint, a modified *Pickering* standard that raises the government's burden applies. *U.S. v. Nat'l Treasury Emps. Union (NTEU)*,

---

[17] Of course, the Court recognizes that "*Harlow v. Fitzgerald* [], rejected the inquiry into state of mind in favor of a wholly objective standard." *Davis v. Scherer*, 468 U.S. 183, 191 (1984) (citing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). Thus, Alexander's subjective belief about the constitutionality of his actions is immaterial. However, the Court merely raises it insofar as it related to his belief about whether a Twitter deactivation permanently deleted tweets, which is a matter of some importance in this instance.

513 U.S. 454, 465–68 (1995). The Court first assesses whether the prior restraint restricted the employee from speaking as a citizen (not pursuant to her official duties) on matters of public concern. *Id.* at 466 (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)). If so, the government must demonstrate that "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Id.* at 468 (quoting *Pickering*, 391 U.S. at 571).

As an initial matter, Alexander contends that *NTEU* is not applicable to this case, and that the correct balancing test is the traditional *Pickering* standard. *See* Alexander Mem. in Supp. at 23-24. As this Court has already recognized in its previous Memorandum Opinion and Order, "[s]ome courts restrict application of *NTEU* to broad statutory bans covering large groups of employees." Mem. Op. and Order at 8-9, n.1, ECF No. 56 (citing *Baar v. Jefferson Cnty. Bd. of Educ.*, 311 F. App'x 817, 821 (6th Cir. 2009) (holding *NTEU* was inapplicable because the restraint at issue was narrow, imposed on an individual employee, and imposed via a disciplinary action); *Belcher v. City of McAlester, Okla.*, 324 F.3d 1203, 1206 n.3 (10th Cir. 2003) (holding *NTEU* was inapplicable because the prior restraint was narrow and affected a small group of employees)).

The Court previously noted its decision to apply *NTEU's* standard was based on Fourth Circuit precedent. *See e.g., Mansoor v. Trank,* 319 F.3d 133 (4th Cir. 2003). The Fourth Circuit did not explicitly decide the applicability of *NTEU* to prior restraints on single employees because parties did not raise the issue. However, the Fourth Circuit did affirm the lower court's decision applying *NTEU* to a restraint imposed on a single employee. *Mansoor v. Cnty. of Albemarle*, 189 F. Supp. 2d 426, 433–38 (W.D. Va. 2002). Further, other courts have determined that *NTEU* is

applicable merely because it governs speech "before it occurs, rather than penalizing employee speech after the fact." *Swartzwelder v. McNeilly*, 297 F.3d 228, 235 (3d Cir. 2002).

Thus, it appears that *NTEU* is applicable here because the case involves a prior restraint, regardless of its size or breadth. *See Latino Officers Ass'n v. City of New York*, 196 F.3d 458, 463 (2d Cir. 1999) ("But nothing in *NTEU* implies that the stricter standard applies only when a 'vast group' of employees is involved or when a regulation restricts a 'broad range' of expression.") (quoting *NTEU*, 513 U.S. at 464). Exactly like the honoraria ban in *NTEU*, the ban on Plaintiff's speech about all matters to the press impeded "a broad category of expression" and "chill[ed] potential speech before it happens." *NTEU,* 513 U.S. at 467-68; *see also Superior Films v. Dept. of Educ. of Ohio, Div. of Film Censorship*, 346 U.S. 587, 589 (1954) (Douglas J., joined by Black, J. concurring) (noting that "the First Amendment draws no distinction between the various methods of communicating ideas.").

Alexander's prohibition undoubtedly covered Plaintiff's speech as a citizen on matters of public concern. *See Garcetti*, 547 U.S. at 418. Plaintiff's conduct ignited a controversy in the community, as extensively discussed before; Plaintiff may have desired, outside of her duties as a teacher, to defend her personal reputation against these criticisms and to explain her conduct. Her response to the controversy was of "legitimate news interest" because journalists contacted her for a statement. *Snyder v. Phelps*, 562 U.S. 443, 453 (2011); ECF Nos. 20-6, 20-7, 20-8. However, the prior restraint kept Plaintiff from speaking to the press about her out-of-work conduct at the center of this controversy.

Thus, the employer must meet the higher standard of *NTEU* and demonstrate that "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on

the actual operation' of the Government." 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at 571). Here, the employer has not met that burden.

The breadth of Alexander's command was absolute – Plaintiff was not to speak to the media about any issue regarding the controversy. And, while in the context of the Twitter account Alexander brought forth enough evidence to show that he was aware of imminent disruption to pass constitutional muster, the same is not true here, where he must show a necessary impact on actual operation. Indeed, the past speech had already taken place and generated the media interest discussed before. Alexander apparently did not have any idea what Plaintiff was going to say or whether she would apologize or contextualize the tweets.[18] It might be reasonable to assume that allowing Plaintiff to reaffirm her belief in offensive tweets would fuel the public outcry that had recently begun, but here, there is no evidence that Alexander knew Plaintiff would go to the press to reaffirm the content of the tweets. Plaintiff has since indicated that her intent was to do the exact opposite–merely to defend and explain herself. Pl.'s Dep. at 154. Moreover, Board officials continued to speak to the press, while Plaintiff could not, and suggested that Plaintiff's tweets violated the Board's code of conduct. *See* Tr. of WSAZ News at 4-5, ECF No. 187-4; Herald-Dispatch Article at 2. As the Court previously noted:

> It is also not apparent how Durstein's comments to the press may have interfered with the school's ability to investigate and discipline her conduct. Prohibiting Durstein from speaking allowed the school to control the narrative in the media and usher Durstein quietly toward her termination, but these are scanty justifications for imposing a prior restraint on Durstein's speech.

---

[18] Plaintiff asserts this intention in her briefing; it is not clearly stated in either her deposition or declaration. *See* Pl.'s Resp. at 19-20. However, given that Plaintiff appears to have attempted to explain the tweets at the time, though Superintendent did not find her explanation credible, this is at least plausible. *See* Suspension Letter at 3-5. Plaintiff has since indicated that she did not believe the contents of the tweets at the time and instead they were hyperbolic, emotional reactions. Pl.'s Decl. ¶ 62, 170. Thus, it seems plausible, based on this evidence, that if she had spoken with the media, she might have sought to explain her position in a way that would have defused the situation at hand.

Mem. Op. and Order at 10. These facts remain true. There has been no proof that Plaintiff's comments to the press would have implicated the Board's authority to maintain order in the same manner as would the tweets remaining available. Thus, Alexander cannot show that the predicted speech had a necessary impact on the operation of the government, unlike the previous discriminatory tweets. The burden is not met. Plaintiff has shown her constitutional rights were violated, precluding qualified immunity.

<u>(2) Clearly Established Constitutional Right</u>

The Court must consider whether Plaintiff's constitutional right was clearly established at the time Alexander allegedly violated it. *Saucier*, 533 U.S. at 201. A right is clearly established when the contours of the right are sufficiently clear to ensure that a reasonable official would have understood that the alleged conduct was unlawful. *Wilson v. Prince George's Cnty., Md.*, 893 F.3d 213, 221 (4th Cir. 2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

To determine whether a right is clearly established, the Court examines whether the Supreme Court, the Fourth Circuit, or the Supreme Court of Appeals of West Virginia have decided the law. *Id.* (citation omitted). The inquiry is not whether these courts have decided the law based on identical facts. *Id*. Instead, the Court considers whether officials within its jurisdiction have been provided fair warning, with sufficient specificity, that the alleged conduct is unlawful. *Id.*

Plaintiff argues that her right to speak to the press was clearly established because of the longstanding disfavor of prior restraints and discrimination against speech because of its viewpoint. Pl.'s Resp. at 18-19, ECF No. 224 (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994); *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 391 (1994)). Defendant argues that the right was not clearly established because the order not to speak to the press was "simply a

request that was made in direct response to actual speech that had already occurred," or a "disciplinary and investigatory action imposed on a single employee's speech," as opposed to a generally applicable prior restraint.  Def.'s Reply at 5-6, ECF No. 228 (citing *Liverman*, 844 F.3d at 407).

Here, the right at issue is simply Plaintiff's right to speak to the press after a controversy regarding her past statements. Of course, it occurred because the past tweets were becoming a subject of press attention, but that does not change its innate characteristic as a prior restraint. And the First Amendment's intolerance of prior restraints is well-established, for "a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

Any prior restraint bears "a heavy presumption against its constitutional validity." *Se. Promotions, Ltd*, 420 U.S. at 558 (citations omitted). Although the government has greater freedom to censor public employees, *NTEU* set a high bar for prior restraints nearly twenty-five years ago. *NTEU*, 513 U.S. at 465. At least two Fourth Circuit cases have entrenched these principles in this jurisdiction. In *Mansoor*, the court affirmed that a police department's prohibition on a single officer from making negative comments about police officials violated the First Amendment. 319 F.3d at 138–39. This policy was a prior restraint even where it was put in place only because the plaintiff had begun to raise matters of concern over "various department policies." *Id*. at 135. And in *Liverman*, the court affirmed that a police department's social networking policy prohibiting employees from criticizing the department also violated the First Amendment. 844 F.3d at 407–09. A similar policy here forbidding Plaintiff to speak about anything, including criticizing the Board's reaction to her tweets, is thus unlawful. A reasonable official would have been on notice that this kind of classic prior restraint forbidding Plaintiff from responding to the

media who were, in some instances, camped outside her home for comment, would be untenable in light of existing law. Pl.'s Dep. at 31. Thus, qualified immunity cannot protect Alexander here.

As a final matter, Defendant asserts that, even if qualified immunity is not applicable, Plaintiff has failed to demonstrate a violation of the First Amendment. Alexander's Mem. in Supp. at 26.  Given that the Court has analyzed whether a constitutional violation has taken place as part of its discussion of the application of qualified immunity, the Court will not further address this argument.

### IV. CONCLUSION

For the foregoing reasons, Defendant Board's Motion (ECF No. 209) is **GRANTED**. As there are no remaining claims against Defendant Board, the Court **DIRECTS** the Clerk to terminate the Defendant Board as a party. Additionally, Plaintiff's cross-Motion (ECF No. 211) is **DENIED**, and Defendant Alexander's Motion (ECF No. 206) is **GRANTED**, in part, as to Count One, and **DENIED**, in part, as to Count Three.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        August 30, 2022

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE